### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| GEORGE G. FLOWERS | : |
| Plaintiff, | : CIVIL ACTION |
| | : |
| vs. | : NO.  2:12-cv-04787-RBS |
| | : |
| CONNECT AMERICA.COM, LLC | : |
| Defendant. | : |
| | : |

### MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DEFENDANT'S LIABILITY ON THE FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT

Plaintiff George G. Flowers, by his undersigned counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure and the November 2, 2012, February 26, 2013 and March 4, 2013 Orders of this Court, hereby moves this Court for an Order granting Plaintiff partial summary judgment as to liability on the first cause of action for breach of contract pleaded in Plaintiff's Complaint, for the reasons set forth in the accompanying Memorandum of Law in support thereof, which is incorporated as if set forth in full herein.

*/s/ Henry I. Pass*
Henry Ian Pass, Esquire
LAW OFFICES OF HENRY IAN PASS
PA Atty. I.D. No. 21437
3 Bala Plaza East, Suite 700A
Bala Cynwyd, PA 19004
Telephone No.:  (610) 660-8001
Fax No.: (610) 660-8004
Email:  hip@hipesq.com

*Attorney for Plaintiff George G. Flowers*

March 5, 2013

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

GEORGE G. FLOWERS

                Plaintiff,

    vs.

CONNECT AMERICA.COM, LLC

                Defendant.

:
:
:   CIVIL ACTION
:
:   NO.  2:12-cv-04787-RBS
:
:
:

---

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**

**PARTIAL SUMMARY JUDGMENT AS TO DEFENDANT'S LIABILITY**

**ON THE FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT**

---

Henry I. Pass (I.D. No. 21437)
Law Offices of Henry Ian Pass
3 Bala Plaza East, Suite 700A
Bala Cynwyd, PA 19004
(610) 660-8001 (phone)
(610) 660-8004 (facsimile)
E-mail: hip@hipesq.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (ii)

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF UNDISPUTED FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A.   Background -- George Flowers & Personal Emergency Response System
     Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B.   The Finder's Fee Agreement Between Connect America and Flowers and the
     Contracts Between Connect America and Electric Mobility and firstStreet . . . . . . . 4

C.   The Referrals by Flowers to Connect America . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

D.   Connect America Pays Flowers Approximately $50,000 Over Thirteen Months . . 13

E.   Connect America Unilaterally Terminates the Finder's Fee Agreement . . . . . . . . . 14

F.   Connect America Sells An Eighty Percent Interest to Rockbridge and
     Terminates Recurring Revenue Deals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . 16

G.   Sales by firstStreet of Connect America Medical Alarms . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

POINT I - CONNECT AMERICA BREACHED THE FINDER'S FEE AGREEMENT
BY REFUSING TO PAY FLOWERS HIS EARNED COMMISSIONS . . . . . . . . . . . . . . . . . . 17

A.   The Finder's Fee Agreement is Enforceable, Has Been Partially Performed,
     and its Silence as to Duration Does Not Prohibit Enforcement . . . . . . . . . . . . . . . 18

B.   Connect America Cannot Force Flowers to Forfeit His Earned Commissions
     by Terminating the Finder's Fee Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.   The Scope of the Finder's Fee Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

D.   Flowers Introduced Four Referrals to Connect America and Connect America
     Cannot Terminate its Payment Obligation By Arguing that Flowers did Little
     to Earn His Commissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

E.   The Duration of the Contract is a Red Herring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

F.   The Reasons Why Connect America Terminated the Agreement Do Not
     Excuse its Breach and Are Irrelevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES

## Cases

*Adickes v. S.H. Kress & Co.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
    398 U.S. 144 (U.S.N.Y. 1970)

*American Eagle Outfitters v. Lyle & Scott Ltd.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
    584 F.3d 575 (C.A.3(Pa.) 2009)

*Amerofina, Inc. v. U. S. Industries, Inc.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24, 26, 27
    335 A.2d 448 (Pa.Super.1975)

*Anderson v. Liberty Lobby, Inc.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
    477 U.S. 242 (U.S.Distr.Col. 1986)

*Bethlehem Steel Corp. v. U.S.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
    270 F.3d 135 (C.A.3(Pa.) 2001)

*Darlington v. General Elec.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
    504 A.2d 306 (Pa.Super. 1986)

*Eastland v. Du Pont* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
    1996 WL 421940 (E.D.Pa., Jul. 23, 1996)

*Feldman v. Phila. Trust Co.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20, 21
    2008 WL 4281966 (Phila.Com.Pl., Aug. 22, 2008)
    *aff'd without op.*, 990 A.2d 58 (Pa.Super. 2009)

*Felix v. Giuseppe Kitchens & Baths, Inc.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32
    848 A.2d 943 (Pa.Super. 2004)

*Fraser Sweatman, Inc. v. Schreiber* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30
    291 F.Supp. 276 (E.D.Pa. 1968)

*Gorwara v. AEL Industries, Inc.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
    1990 WL 44702 (E.D.Pa., Apr. 12, 1990)

*Helpin v. Trustees of University of Pennsylvania* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
    969 A.2d 601 (Pa.Super. 2009)
    *aff'd*, 10 A.3d 267 (Pa. 2010)

*Hiriam Hicks, Inc. v. Synagro WWT, LLC* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31
    867 F.Supp.2d 676 (E.D.Pa. 2012)

*Kinnel v. Mid-Atlantic Mausoleums, Inc.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
    850 F.2d 958 (3d Cir. 1988)

*Linn v. Employers Reinsurance Corp.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    153 A.2d 483 (Pa. 1959)

*Little v. USSC Group, Inc.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    404 F.Supp.2d 849 (E.D. Pa. 1995)

*Marcin v. Darling Valve & Mfg. Co.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    259 F.Supp. 720 (W.D.Pa. 1966)

*Miller v. Ginsberg* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    874 A.2d 93 (Pa.Super. 2005)

*Nova Chemicals, Inc. v. Sekisui Plastics Co., Ltd.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    579 F.3d 319 (C.A.3(Pa.) 2009)

*Prusky v. Reliastar Life Ins. Co.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    445 F.3d 695 (C.A.3(Pa.) 2006)

*Sachs v. Continental Oil Co.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    454 F.Supp. 614 (E.D.Pa. 1978)

*Sanford Inv. Co., Inc. v. Ahlstrom Machinery Holdings, Inc.* . . . . . . . . . . . . . . . . . . . . . . . . . 19
    198 F.3d 415 (C.A.3(Pa.)1999)

*Spyridakis v. Riesling Group, Inc.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    2009 WL 3209478 (E.D.Pa., Oct. 6, 2009)

*Step Plan Services, Inc. v. Koresko* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    12 A.3d 401 (Pa.Super. 2010)

*Thomas v. Thomas Flexible Coupling Co.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    46 A.2d 212 (Pa. 1946)

*Turner v. Baker* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    74 A. 172 (Pa. 1909)

*Ware v. Rodale Press, Inc.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    322 F.3d 218 (C.A.3(Pa.) 2003)

*Westinghouse Elec. Co. v. Murphy, Inc.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    228 A.2d 656 (Pa. 1967)

*Wissahickon Realty Corp. v. Boyle* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    122 A.2d 720 (Pa. 1956)

## <u>Court Rules</u>

Fed.R.Civ.P. 56(c) and (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| GEORGE G. FLOWERS | : |
| Plaintiff, | : CIVIL ACTION |
| | : |
| vs. | : NO.  2:12-cv-04787-RBS |
| | : |
| CONNECT AMERICA.COM, LLC | : |
| Defendant. | : |
| | : |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT AS TO DEFENDANT'S LIABILITY
<u>ON THE FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT</u>**

Plaintiff George G. Flowers ("Flowers" or "Plaintiff"), by his undersigned counsel,

respectfully submits this Memorandum of Law in support of his Motion for Partial Summary

Judgment as to the liability of Defendant Connect America.com, LLC ("Connect America" or

"Defendant") on the first cause of action for breach of contract ("Motion"), pursuant to Rule 56

of the Federal Rules of Civil Procedure and the Court's November, 2, 2012, February 26, 2013,

and March 4, 2013 Orders imposing a March 5, 2013 deadline to file motions for summary

judgment as to liability.

**<u>PRELIMINARY STATEMENT</u>**

Plaintiff George Flowers entered into a Finder's Fee Agreement (the "Finder's Fee

Agreement" or the "Agreement") with Connect America, which called for Flowers to introduce

Connect America to companies that would market and sell Connect America's personal medical

alarm and monitoring system in exchange for commissions, calculated in various ways.  Flowers

**<u>completed</u>** his contractual performance by introducing Connect America to several referrals, **<u>and</u>**

**<u>earned</u>** his commissions.  Connect America admitted its obligations in writing and by partial

performance.  Connect America paid Flowers approximately $50,000 for units sold over the

course of thirteen months.  In November 2009, Connect America unilaterally terminated the

Agreement and stopped paying Flowers, even though Connect America continued doing business

with companies introduced by Flowers generating millions of dollars in sales thereafter.

This Motion presents a narrow issue of law:  whether Connect America's unilateral

termination of an Agreement of unstated duration retroactively eliminates its obligation to pay

Flowers for his completed performance, whose substantial benefits Connect America continued

to enjoy.  This Motion does not raise the issues of the Agreement's term, as opposed to the

duration of Connect America's obligation to pay Flowers commissions, or whether it was

properly terminated.  Regardless of the reason(s) why Connect America terminated the

Agreement (which Flowers contends was done in bad faith), the law does not permit Connect

America to evade its obligation to pay **commissions already earned** by Flowers for referrals

made long before Connect America unilaterally decided to stop paying Flowers.  Significantly,

Flowers is not seeking to continue the agreement by introducing new referrals to Connect

America.  Flowers wishes only to be compensated for his completed performance under the

Agreement, as Connect America had agreed and actually done for thirteen months.  The

documents produced by just one referral show that Connect America has cheated Flowers out of

hundreds of thousands of dollars of earned commissions.[1]

## STATEMENT OF UNDISPUTED FACTS

**A.**     **Background – George Flowers & Personal Emergency Response System Products**

Plaintiff George Flowers graduated from Rutgers University in 1975 with a major in

accounting, then spent twenty-five (25) years working for Electric Mobility Co. d/b/a The Rascal

---

[1]  Defendant's payments to Plaintiff represent partial performance, but Plaintiff does not concede that
payments were properly calculated under the parties' Agreement, an issue that awaits discovery under the
bifurcation ordered by the Court.

Co. ("EM"), a company founded by his brother, and of which Flowers was a part owner.  EM, which employed hundreds of people, manufactured, marketed and sold the Rascal scooter to the elderly, disabled and infirm.  Flowers was responsible for EM's 100,000 square foot manufacturing facility, and was also involved in sourcing products, marketing and sales.  In 2005-07, Flowers was in charge of EM's development of a catalog of products for the geriatric market.  EM had an active inquiry database of 4,000,000 names.  Declaration of George G. Flowers, dated March 4, 2013 ("Flowers Dec."), at ¶¶ 3-4.

As part of that effort, Flowers became familiar with the market for products for senior citizens and companies offering related products, including firstStreet for Boomers and Beyond Inc., d/b/a TechnoBrands, Inc. and firstStreet ("firstStreet"), AmeriMark Holdings d/b/a/ Dr. Leonard's Healthcare Corp. ("Dr. Leonard's") and Internet Alliance, Inc. ("Internet Alliance").  Flowers was impressed with the range and quality of the products they offered.  Flowers was also acquainted with Dr. Leonard's because it offered EM scooters for sale in its catalog, and was acquainted with Internet Alliance (and its President Jeff Sheffer) because it did business with EM in both the United States and in the United Kingdom.  *Id.*

Flowers retired in January 2007 and, bored with retirement, began in October 2007 to develop various business ideas directed towards senior citizens.  Flowers created a company called Platinum Independence to bring together the best products in various categories and market them to seniors.  He continued to study product catalogs and sought to identify category leaders.  One of these categories, known as the "Personal Emergency Response System" or "PERS," is a wearable transmitter, base unit and call center monitoring system, by which a person can summon medical help to his or her home with a push of a button.  The fees paid by a PERS consumer may include a lump sum payment for equipment, but that fee is sometimes

waived to encourage the consumer to pay the more valuable monthly recurring revenue ("MRR") payments for monitoring services, often $29.95 per month. The strategy is identical to "giving away the razor to sell the blades." Flowers Dec. ¶¶ 5; Exh. 1 at 74; Exh. 5.

Flowers developed a relationship with a distributor of a PERS product manufactured by a company called Linear. Flowers also attended trade shows and met with people in the field. Among the people Flowers met was Ken Gross ("Gross"), then the President of Connect America. Connect America used a network of dealers to sell its PERS, which was also manufactured by Linear, and was marketed as the Designed for Seniors® Medical Alarm. Gross knew that Flowers was familiar with PERS products. Flowers discussed various proposals with Gross, including becoming a Connect America dealer and/or marketing Connect America's product as part of Platinum Independence's line of products. However, a finder's fee agreement was reached instead. Flowers Dec. ¶ 6; Exh. 1 at 74; Exh. 4A at 125-26.

### B.    The Finder's Fee Agreement Between Connect America and Flowers and the Contracts Between Connect America and Electric Mobility and firstStreet

As of Fall 2008, Connect America had signed up ten to twenty dealers, but only three or four were producing sales. In or around October 2008, Connect America, through Gross, and Flowers, entered into an oral agreement, which was later memorialized in writing. Connect America agreed to pay Flowers commissions for introducing Connect America to companies which would sell Connect America products. The formula for commissions that was agreed on was that Flowers would receive $15 of the monthly recurring revenue for each unit sold by a company he introduced, less the portion given to the referral by Connect America. If Connect America gave the full $15 MRR per unit to the referral, Flowers would receive $10 per unit sold (the "Commission Calculation Method"), to be paid monthly, with the duration of the agreement to run for the life of the relationship between Connect America and the referral.

-4-

The Finder's Fee Agreement was later memorialized by email.  Flowers Dec. ¶ 7, Exh. 1 at 22, 24 and Exh. 4A at 135.

Shortly thereafter, Flowers introduced Connect America to EM and firstStreet.  Connect America agreed to pay EM $15 MRR per unit.  Flowers Dec. ¶8; Exh. 6 at 95.  Connect America's negotiation with firstStreet, which used its own form of contract, took longer.  Flowers Dec. ¶ 8; Exh. 6 at 105-120.

On November 11, 2008, Gross, using his email address of WeAlarmYou@aol.com, wrote to Flowers at ggf@comcast.net, stating in relevant part, as follows:

> George … **I will honor my commitment to you** on EM and First Street should they come to fruition since you did introduce us to both companies, but will not enter into any new agreements past them.
>
> You will earn $10 per unit sold by EM, paid monthly, and the difference between $15 per month and what we finally settle on with FS [firstStreet].  If there is no spread on the monthly with FS then you will earn the same $10 per unit sold.  NO new partnerships will be entertained at this time.
>
> Ken

[emphasis added]  Flowers Dec. Exhs. 1 at 22 and 4A at 148-50.  Thus, Gross specifically confirmed that Connect America had a commitment to Flowers regarding the Electric Mobility and firstStreet introductions and set forth the financial terms of that commitment, under which Flowers would be paid (a) as to firstStreet, a fee equal to the greater of (i) $15 MRR per unit sold by firstStreet less the amount of MRR per unit paid to firstStreet or (ii) $10 per unit sold by firstStreet; and (b) as to Electric Mobility, $10 per unit sold by Electric Mobility, since the $15 MRR per unit was given entirely to Electric Mobility.  Significantly, despite the specificity of the payment terms, Connect America does not state an end date for such payments and Flowers reasonably expected to receive such payments until the conclusion of Connect America's relationship with each of the referred companies.  Flowers Dec. Exhs. 4A at 149-50 and 6 at 95.

It is also important to note that Connect America confirmed its obligation to pay Flowers for his introductions and provided the specific payment terms described above despite specifically stating to Flowers that it "will not enter into any new agreements" and "NO new partnerships will be entertained at this time," which is clear and irrefutable evidence that Connect America was fully aware that it was obligated to make payments to Flowers regardless of whether Flowers provided any future introductions or other services to Connect America.[2]

On November 21, 2008, Connect America executed a contract with firstStreet, effective December 1, 2008. Flowers Dec. Exh. 6 at 105-120. Pursuant to that agreement, Connect America agreed to pay firstStreet several types of fees, including a flat fee per product sold and a share of MRR, payable only after a certain period of time elapsed. firstStreet's share of MRR changed over time. In the December 1, 2008 agreement, firstStreet was entitled to "$10 per month for each product sold by [firstStreet] for so long as the customer continues to use and pay for the service after the first twelve months following the sale." *Id.* at 106 ¶ 4.A.ii. Effective January 9, 2009, the agreement was amended so that firstStreet's share of MRR did not begin until after "the first thirty-six months following the sale," *Id.* at 110 ¶ 4.A.ii, a term carried into the next contract iteration dated August 2009. *Id.* at 113 ¶ 4.A.ii. In the March 2010 contract between Connect America and firstStreet, firstStreet's share of MRR was eliminated, and a flat fee substituted. *Id.* at 118 ¶ 4.A.ii.

Flowers' introduction of firstStreet proved to be very valuable to Connect America, and Electric Mobility also looked promising at the time of Flowers' introduction. *Id.* at 103 and Exh. 1 at 26, 45 and 47. Connect America wanted Flowers to introduce more companies. Connect

---

[2] Despite this language, as discussed below, Connect America decided that it wished Flowers to continue to introduce referrals under the Commission Calculation Method, and confirmed this in a March 5, 2009 email, until March 23, 2009, when the financial terms of the Agreement regarding future referrals were revised, as discussed in greater detail below.

America sent Flowers its standard dealer agreement.  Flowers marked it up and returned it to

Gross on February 24, 2009, alerting Gross that he was pursuing deals with Dr. Leonard's,

Hoveround and Scooter Store on behalf of Connect America.  However, Flowers and Connect

America did not execute a dealer agreement, and decided instead to continue the Finder's Fee

Agreement.  Flowers Dec. ¶¶ 9-10.

      On March 5, 2009, Gross forwarded to Flowers an email concerning the remarkable

success of Flowers' introduction of firstStreet and the early sales figures regarding Connect

America units sold by firstStreet.  The email was entitled "Fwd: Shipments," and forwarded

internal Connect America data showing that firstStreet had sold more than 550 units in just over

four months.  Gross' covering email to Flowers stated in large font:

> George … If you brought in 5 more like this one …. You would never have to work again!!
>
> Ken

Flowers Dec. Exh. 1 at 45.  As Gross testified, the purpose of this email was "to motivate

[Flowers] to … bring in other deals."  Flowers Dec. Exh. 4B at 90-91.  Connect America thereby

confirmed Flowers' understanding that the commissions were continuing, and applied to all

referrals, not only EM and firstStreet.  Within the week, Gross forwarded to Flowers an email

showing that firstStreet sales were "taking off," Connect America issued its first commission

check to Flowers for "Dec Sales" and "Jan Sales" of the Medical Alarm, and Flowers went to

work finding other referrals.  On March 18, 2009, Flowers reminded Gross that "Dr.

[L]eonard[']s is in my sights also!!"  On March 20, 2009, Flowers spoke with and wrote to the

Dr. Leonard's employee in charge of purchasing medical alarms about doing business with

Connect America.  Flowers Dec. ¶¶ 11-12 and Exhs. 7; 4B at 88, and 1 at 27, 29, 58.

Connect America was happy with Flowers' business referrals, but sought to curtail Flowers' right to share in MRR.  On March 23, 2009, Gross sent Flowers an email stating as follows:

> George … I thought about our last conversation over the weekend and have come to the conclusion if you are not happy with the $10 per medical alert unit sold by partners introduced by you, we should go in different directions.
>
> I believe my offer was extremely fair based upon the same compensation package as two other industry professionals who work for us, so I am not going to deviate from my policy.
>
> I wish you good luck as you pursue a recurring revenue deal.  **We will continue to pay you** on this scale (as mentioned above) **for sales generated by Electric Mobility and First Street**.
>
> There is no reason to meet further or discuss a dealer program at this time.
>
> Ken

[emphasis added]  Flowers Dec. Exh. 1 at 24.  This email revised the calculation of commissions on a going forward basis by eliminating Flowers' share of MRR for new referrals in favor of a straight $10 per unit commission (the "Amended Commission Calculation Method").  However, Gross' incredibly erroneous suggestion that the Amended Commission Calculation Method be applied retroactively to firstStreet was rejected by Flowers.  In fact, Flowers' referrals of firstStreet and Electric Mobility to Connect America were made in 2008, and Flowers' performance in referring firstStreet and Electric Mobility to Connect America was complete months before Flowers and Gross agreed upon the Amended Commission Calculation Method on a going forward basis.  Flowers Dec. ¶ 13; Exh. 6 at 105; Exh. 4A at 72; Exh. 1 at 24.

As with the prior agreement, Connect America confirmed in this email its obligation to pay Flowers for his prior introductions despite specifically acknowledging that the parties might "go in different directions."  Again, this is clear and irrefutable evidence that Connect America was fully aware that it was obligated to make payments to Flowers regardless of whether Flowers provided any future introductions or other services to Connect America.

Flowers accepted the revised terms of the agreement on a going forward basis, *id.*, and sought to introduce other companies to Connect America, by meeting, calling and emailing them and helping to consummate deals between those companies and Connect America.  Flowers Dec. ¶¶ 12-13 and Exh. 1 at 28-43.

**C.    The Referrals by Flowers to Connect America**

Flowers introduced four customers to Connect America:  firstStreet, Electric Mobility, Internet Alliance and Dr. Leonard's.

Connect America admitted in Gross' November 11, 2008 email and in response to Flowers' Requests for Admissions ("RFA") that Flowers introduced firstStreet and Electric Mobility.  Gross also testified at deposition that "the first time I heard of firstStreet was from George," and that "George Flowers introduced Connect America to Electric Mobility."  Flowers Dec. Exhs. 1 at 22; 3 at 14 & 17; 4A at 139, and 4B at 19.  Connect America conceded that EM sold Connect America medical alarms, Flowers Dec. ¶ 36; Exh. 6 at 98-99, but it never paid commissions to Flowers.[3]

Flowers had an existing relationship with an officer of Internet Alliance, Jeff Sheffer, since Internet Alliance had done business with EM when Flowers was employed there.  Flowers assisted Connect America in negotiating its contract with Internet Alliance.  On April 8, 2009, Alan Grady of Internet Alliance wrote to Ninon Prozonic of Connect America, regarding a draft agreement: "I'm sorry to say that the Non Compete section is going to be a show stopper.  It doesn't matter how we reword it.  We just can't do business with that section in the contract." Within a few minutes, Flowers emailed Internet Alliance asking for "a copy of the latest contract

---

[3]  Connect America attempts to minimize Flowers' role in introducing Connect America but, as explained below, that is irrelevant, since Flowers did all he was required to do by contract and dispositive legal authority.

and I will see what I can do!"  The next day, Prozonic wrote to Flowers, with a copy to Gross, that "I would also like to thank you for providing the new wording below which I've provided to Alan [Grady] to take forward to Jeff Sheffer [of Internet Alliance]."  The next week, Gross executed the "Internet Alliance Agreement."  Flowers Dec. ¶ 28 and Exh. 1 at 38-40.  Connect America does not dispute that Flowers introduced Internet Alliance, and Gross testified, "I'm assuming he did."  Flowers Dec. Exh. 4B at 13-14.  Unable to dispute the fact of Flowers' referral, Connect America claims that the issue is "irrelevant," since it says Internet Alliance never sold any product.  Flowers Dec. Exh. 3 at 16.  That remains an issue for discovery on damages.

Flowers also introduced Dr. Leonard's to Connect America.  For several months, from at least February through May 2009, Flowers called and emailed employees of Dr. Leonard's explaining the benefits of partnering with Connect America, the financial terms, the fact that Dr. Leonard's competitor was working with Connect America, and even presented a mock-up ad.  Flowers Dec. ¶¶ 14-26; Exh. 12.  These solicitations bore fruit, and employees of Dr. Leonard's were discussing Flowers' proposals internally in April and May 2009.  *Id.*

While this was ongoing, on May 7, 2009, a brand new Connect America employee named Mark Leighton ("Leighton") started making calls to Dr. Leonard's.  *Id.*; Exh. 14 at 274.  Leighton had just been hired at that time by Gross.  Flowers Dec. ¶ 20; Exh. 13 at 7, 23-25.  On May 15, 2009, Leighton spoke for the first time to an employee of Dr. Leonard's.  Flowers Dec. ¶ 20; Exh. 13 at 81-83; Exh. 15 at 253.  Leighton had never spoken to Dr. Leonard's before May 15, 2009, at which point employees of Dr. Leonard's were actively discussing the proposals Flowers had been making for several months. Flowers Dec. ¶ 22.

Leighton is now CEO and an equity owner of Connect America, and Gross discussed this lawsuit with Leighton before each of them was deposed. Flowers Dec. ¶ 23;  Exh. 4A at 30, 38-40.  Though Flowers notified Gross several times in February and March 2009 that he was pursuing Dr. Leonard's, and employees of Dr. Leonard's were actively discussing Flowers' proposals in May 2009, Ken and Leighton claim that they never discussed this potentially highly lucrative partner with a database of 16 million names before Leighton began calling Dr. Leonard's.  Connect America makes this claim even though Leighton was hired in May 2009 to find partners for Connect America, since Connect America then had only three to four partners actually selling medical alarms.  Flowers Dec. ¶ 23; Exhs. 4A at 76-77, 106, 135; 4B at 70-71; 13 at 31-41.  Leighton claims he identified Dr. Leonard's after he began working at Connect America but did not remember when this happened.  Flowers Dec. ¶ 23; Exh. 13 at 31-36. Leighton claims he learned about Dr. Leonard's through internet research but the computer he used to do this "blew up."  Id. at 35.  Gross claimed that Connect America has documentation to prove that Leighton introduced Dr. Leonard's to Connect America. Exh. 4B at 74-75.  However, Connect America's counsel stated on the record at Gross' January 7, 2013 deposition that "If such documents exist -- I have not seen them."  Exh. 4B at 75.

After January 7, 2013, Connect America produced documents that prove Flowers introduced Dr. Leonard's to Connect America and that Leighton did not.  On February 12, 2013, after Leighton was deposed, Connect America produced Leighton's handwritten notes showing that he started calling Dr. Leonard's on May 7, 2009, immediately after Leighton was hired by Dr. Leonard's, making three unanswered calls that day, and eight unanswered calls in eight days, before finally speaking to a Dr. Leonard's employee on May 15, 2009, after my proposals were being considered by employees of Dr. Leonard's.  Flowers Dec. ¶ 24; Exh. 13 at 81-83; Exh. 14.

Clearly, Flowers had been in contact with Dr. Leonard's for months preceding Leighton, who simply used Flowers' approach.

Leighton's emails to Dr. Leonard's, produced on January 29, 2013, after Gross was deposed, show that Leighton proposed the same ideas Flowers had proposed to Dr. Leonard's over the prior several months.  On April 14, 2009, Flowers had proposed to Dr. Leonard's that it could receive monthly "recurring revenue" based on $10 per unit.  Flowers Dec. ¶ 25; Exh. 12.  On May 16, 2009, Leighton emailed Dr. Leonard's with a discussion of "monthly recurring revenue" from sales of 1,000 units per month at $10 per unit.  Exh. 15 at 253-55, 263.  On April 14, 2009, Flowers explained to Dr. Leonard's that "we do the work," "you have no inventory" to maintain and the medical alarm would bring "peace of mind" to its customers.  Exh. 12.  On May 16, 2009, Leighton wrote Dr. Leonard's that it would have "no overhead or inventory costs" and would provide "peace of mind" to its customers. Exh. 15 at 260.  On April 14, 2009, Flowers offered Dr. Leonard's a "custom designed, DEDICATED Dr. Leonard's website," Exh. 12, while on June 10, 2009, Leighton offered to "[d]esign [a] [w]eb [s]ite" for Dr. Leonard's.  Exh. 15 at 248.  On March 20, 2009, Flowers offered Dr. Leonard's a "free website and a dedicated phone number to track your sales," Exh. 12, while on June 10, 2009, Leighton offered Dr. Leonard's a website and "an exclusive 800# … so that we can accurately track your incoming calls …." Exh. 15 at 248.  On April 22, 2009, Flowers informed Dr. Leonard's that its competitor, firstStreet, was running ads for Connect America medical alarms and that Connect America's product was working for them.  Exh. 12.  On May 16, 2009, Leighton informed Dr. Leonard's that firstStreet was carrying Connect America medical alarms in its catalogue and that Gross wanted to "discuss with you how the First Street program is working."  Exh. 15 at 247, 257.  On April 22, 2009, Flowers forwarded to Dr. Leonard's a mock ad they could use to sell Connect America medical

alarms, including the major benefits to customers, such as "no contract," "lifetime warranty," "24/7 monitoring," "waterproof pendant," "no activation fee," and "no long term contract."  On July 16, 2009, Leighton sent mock-up ads to Dr. Leonard's containing the identical terms.  Exh. 15 at 232-35.

Connect America's claim that Leighton serendipitously introduced Dr. Leonard's to Connect America right after Flowers identified Dr. Leonard's as a partner is proven to be bogus by the documents and the undisputed facts.  As Flowers had informed Gross, Flowers spent months calling and emailing Dr. Leonard's employees.  These employees of Dr. Leonard's referred internally exclusively to Flowers' emails and communications, and not any contact with Leighton.  They were motivated to partner with Connect America because Flowers alerted Dr. Leonard's to the lucrative possibility of working with Connect America and notified Dr. Leonard's that their competitor firstStreet was engaged in an advertising campaign and was apparently highly successful.  The claim that the new VP of Sales did not learn of Flowers' ongoing pursuit of Dr. Leonard's, even though that was his job, that he found Dr. Leonard's independently while Flowers was in touch with Dr. Leonard's, but his computer "blew up" so that his searches cannot be recovered, is too incredible to create a genuine issue of material fact, particularly when the paperwork produced by Connect America after key depositions were completed shows that Leighton copied Flowers' work.  Moreover, even if that incredible story were granted credence, Flowers was still responsible for introducing Dr. Leonard's to Connect America, since Connect America concededly had no contact with Dr. Leonard's beforehand.

**D.**     **Connect America Pays Flowers Approximately $50,000 Over Thirteen Months**

Connect America paid Flowers approximately $50,000 for Medical Alarm sales by firstStreet from December 2008 through December 2009, with the last check dated January 15,

2010.  Connect America described the purpose of these checks in its ledger description as "Dec Sales," "Jan Sales," "Feb Sales" and "Commission Sales" by George Flowers.  Flowers Dec. ¶ 29 and Exh.1 at 53-58.  Connect America's partial performance under the Finder's Fee Agreement demonstrates that Flowers' commissions were not a one-time fee, as Connect America now contends.[4]

**E.**        **Connect America Unilaterally Terminates the Finder's Fee Agreement**

Connect America unilaterally terminated the Finder's Fee Agreement and the payment of commissions thereunder by letter dated November 10, 2009.  In that letter, Gross wrote to Flowers as follows:

> Dear George,
>
> It will be a year in December 2009 that we have compensated you for the First Street introduction.
>
> Based on the fact that you have not introduced us to any other strategic partners and are now working for a competitor (VRI), I have decided to terminate our arrangement after one full year.  We will continue to pay you at the $10/unit for First Street sales through December 31, 2009.  Since your sales trail by 60 days, your last commission check from Connect America will be in February 2010.
>
> This proved to be a good introduction for you as you are on track to make $50,000 due to this relationship.
>
> Very truly yours,
>
> Kenneth S. Gross
>
> President
>
> cc: Dave Modena

---

[4]  Connect America now refuses to call these payments "commissions," to minimize Flowers' role and claims that Connect America had no obligation to pay anything beyond an "introduction fee."  Flowers Dec. Exh. 3 at 18-19; Exh. 8; Exh. 9.  This is a red herring.  As explained below, the nomenclature is subordinate to the terms of the contract, and Connect America's payments over thirteen months evidence that it was obligated to continue making payments based on units sold.

Flowers Dec. Exh. 1 at 64.  Of course, the Finder's Fee Agreement does not obligate Flowers to work exclusively for Connect America or produce a minimum number of introductions.[5] Flowers Dec. ¶ 30; Exh. 1 at 22, 24.  At his deposition, Gross admitted that, prior to sending this November 10, 2009 termination letter to Flowers, Connect America **never** imposed upon Flowers any type of restrictive covenant or non-compete; **never** told Flowers, "We won't pay you if you go to work for a competitor;" **never** told Flowers that "We would stop paying you if you don't bring us more business;" **never** told Flowers that the commitment to pay Flowers would be only for one year; and **never** told Flowers that Connect America would stop paying him after December 31st, 2009.  Flowers Dec. ¶ 31, Exh. 4A at 152, 160.  Gross admitted that the real reason he decided to stop paying Flowers was because he decided "[t]hat was a lot of money for an introduction."  *Id*. at 160.

Flowers responded with several letters requesting payment under the Finder's Fee Agreement, and disputing the way Gross retroactively calculated the commissions.  Flowers Dec. ¶ 32; Exh. 1 at 66, 67.  Connect America never responded.

Gross' admission that he terminated the Finder's Fee Agreement because he was tired of paying Flowers was confirmed in an email produced by a third party, firstStreet.  On March 21, 2010, Gross sent an email to Dave Modena of firstStreet, stating in relevant part:

> Dave … I am receiving threatening certified letters from George Flowers telling me I need to continue paying him $10 per unit on all firstStreet sales.  As you and I previously discussed, he only introduced us and has had no further involvement or contact ever since.  He received $50K in 12 months for doing nothing.  There is no written agreement in place only my good word.  **As we both agreed, we choose to give you the extra money in our new deal, and we are not paying him anymore**.

---

[5]  By contrast, Gross testified that Connect America's dealer agreements contained a clause requiring dealers to make a certain number of minimum sales to continue to receive recurring payments on units sold.  However, Gross testified, "we didn't have a dealer agreement with George."  Flowers Dec. Exh. 4A at 85-86, 118.

If you are doing any business with him, please ask him to back off and concentrate on all his other things. …

Thanks, Ken

[emphasis added]  Flowers Dec. ¶ 33 Exh. 10.

**F.    Connect America Sells An Eighty Percent Interest to
Rockbridge and Terminates Recurring Revenue Deals**

On December 23, 2010, Rockbridge Growth Equity ("Rockbridge") acquired at least an 80% equity interest in Connect America for an undisclosed sum of money.  Flowers Dec. Exhs. 4A at 30 and 4B at 30.  According to a report in Security System News, which quoted Ken Gross, "Rockbridge Growth Equity on Jan. 12 [2011]  announced it had acquired direct-to-consumer PERS company Connect America for an undisclosed sum in a deal that brings 75,000 accounts worth around $2.2 million in RMR [recurring monthly revenue] to investor Rockbridge, according to Gross."  Flowers Dec. Exh. 1 at 49.  The calculation of MRR is based upon a standard $29.95 monthly monitoring fee paid by the consumer.

In connection with Rockbridge's investment, in December 2010 Connect America terminated many dealer contracts which required it to share MRR, and executed agreements requiring Connect America to pay a lump sum for each unit sold.  Flowers Dec. Exh. 4A at 88-89.  Gross testified that the agreement with firstStreet was terminated as of April 30, 2012.  *Id.* at 68.  Thus, at least some of the referrals made by Flowers continued to do business with Connect America for at least one year following Connect America's termination of the Finder's Fee Agreement.

**G.    Sales by firstStreet of Connect America Medical Alarms**

In response to Flowers' subpoena, firstStreet produced internal sales data showing that it sold 46,569 Medical Alarm units for Connect America.  Flowers Dec. Exh. 11.  Thus, firstStreet,

which Flowers introduced to Connect America, provided Connect America with approximately $1.4 million in MRR, or $16.7 million per year, assuming each account continued, an issue for discovery on damages.  Connect America expected these accounts to last for several years, because Gross claimed that Connect America did not realize a profit until the thirtieth month of service, and two of its agreements with firstStreet require the sharing of MRR after thirty-six months of service.  Flowers Dec. Exh. 4B at 81; Exh. 6 at 110, 113 ¶4.A.ii.  Assuming they continued, firstStreet's 46,569 accounts represent approximately 62% of the 75,000 accounts that Gross reported as the basis for the sale of an 80% interest to Rockbridge. Flowers Dec. Exh. 11; Exh. 1 at 49.

Connect America paid firstStreet not less than $7.95 million.  Flowers Dec. Exh. 6 at 123. Connect America projected that it would pay Dr. Leonard's $6.6 million.  Flowers Dec. Exh. 15 at 254.  While the parties have not engaged in discovery on damages due to the Court's Order of November 5, 2012, it appears that on the firstStreet referral alone, Connect America owes Flowers substantial damages exceeding $400,000.00. [6]  Flowers Dec. Exh. 11; Exh. 1 at 11 ¶ 21 & 53-58.

## ARGUMENT

### POINT I

### CONNECT AMERICA BREACHED THE FINDER'S FEE AGREEMENT BY REFUSING TO PAY FLOWERS HIS EARNED COMMISSIONS

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

---

[6]  Plaintiff cannot calculate damages because the Court bifurcated this case and discovery on damages has not begun.  Damages based on MRR would likely add up to millions of dollars.  At the bare minimum, Connect America cheated Flowers out of $416,400.00, (calculated based on $10 per unit times 46,569 units sold by firstStreet, less the $49,290 that Connect America paid Flowers).  Flowers Dec. ¶ 35.

matter of law. Fed.R.Civ.P. 56(c).  Flowers bears the burden of proving that no genuine issue of material fact is in dispute. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (U.S.N.Y. 1970). Once Flowers has carried his initial burden, to prevent summary judgment Connect America may not rest upon the mere allegations or denials of his pleading, but its response must set forth specific facts showing that there is a genuine issue for trial.  Fed.R.Civ.P. 56(e).

Here there is no genuine issue of material fact because the contract is definite and unambiguous.  Connect America's payments of $49,290 to Flowers over thirteen months demonstrate that Flowers is entitled to his earned commissions, not an arbitrary "introduction fee," calculated solely by Connect America and paid as long as Connect America desired.  In addition, the email messages from Connect America that memorialize the Finder's Fee Agreement specifically contemplate Connect America making payments to Flowers without the need for him to provide any additional introductions or other services to Connect America.

A.    **The Finder's Fee Agreement is Enforceable, Has Been Partially**
      **Performed, and its Silence as to Duration Does Not Prohibit Enforcement**

"Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages."  *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (C.A.3(Pa.) 2003) (citation and quotation marks omitted).  Under Pennsylvania law, whether contract terms are sufficiently definite is a question of law for the court.  *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 585 (C.A.3(Pa.) 2009).

An agreement is enforceable under Pennsylvania law:

> when the parties to it 1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity.  An agreement is expressed with sufficient clarity if the parties intended to make a contract and there is a reasonably certain basis upon which a court can provide an appropriate

-18-

> remedy. Accordingly, not every term of a contract must always be stated in complete detail. ... In the event that an essential term is not clearly expressed in their writing but the parties' intent concerning that term is otherwise apparent, the court may infer the parties' intent from other evidence and impose a term consistent with it. Indeed, <u>terms of an agreement that appear otherwise vague may be rendered definite by subsequent performance: One or both parties may perform in such a way as to make definite that which was previously unclear.</u>

*Helpin v. Trustees of University of Pennsylvania*, 969 A.2d 601, 610-11 (Pa.Super. 2009), *aff'd*, 10 A.3d 267 (Pa. 2010)(citations and quotation marks omitted; emphasis added).

Where, as here, one party has begun to perform under contract with the acquiescence of the counterparty, there can be no question that the parties intended to make a contract. *Gorwara v. AEL Industries, Inc.*, 1990 WL 44702, at *2, n.3 (E.D.Pa., Apr. 12, 1990) (citing *Darlington v. General Elec.*, 350 Pa.Super. 183, 504 A.2d 306, 312- 13 (Pa.Super. 1986)).

When a party moves for summary judgment and the issue is contract interpretation, summary judgment will be granted if the contractual language is subject to only one reasonable interpretation. *Sanford Inv. Co. v. Ahlstrom Machinery Holdings, Inc.*, 198 F.3d 415, 420–21 (C.A.3(Pa.) 1999). The Court may grant summary judgment, and determine that a contract is not ambiguous, by looking to "the conduct of the parties that reflects their understanding of the contract's meaning." *Bethlehem Steel Corp. v. U.S.*, 270 F.3d 135, 139 (C.A.3(Pa.) 2001) (affirming grant of summary judgment after interpreting contract).

In this case, the only issues raised are (1) the effect of Connect America's termination on Flowers' right to earned commissions – which Pennsylvania law dispositively resolves in favor of Flowers; (2) whether the Finder's Fee Agreement encompasses firstStreet, EM, Internet Alliance and Dr. Leonard's; and (3) whether Flowers introduced these referrals to Connect America. These questions are clearly answered in Flowers' favor under the terms of the Finder's Fee Agreement and as shown by the behavior of Connect America.

**B.**     **Connect America Cannot Force Flowers to Forfeit His Earned**
           <u>**Commissions by Terminating the Finder's Fee Agreement**</u>

"Where a contract is silent or ambiguous, Pennsylvania law generally will not divest an employee's right to an earned commission." *Little v. USSC Group, Inc*., 404 F.Supp.2d 849, 854 (E.D.Pa. 2005) (denying employer's summary judgment motion even though employment agreement expressly provided for forfeiture of commissions earned prior to termination).

The leading case is In *Linn v. Employers Reinsurance Corp.*, 153 A.2d 483 (Pa. 1959), where the Pennsylvania Supreme Court affirmed a plaintiff's judgment after trial.  Plaintiff was entitled under an oral agreement to 5% commissions on all reinsurance premiums from a particular insurer.  The Court found that plaintiff's work was complete upon aiding in securing the business, with no continuing obligations.  The Court rejected defendant's contention that since the agreement was terminable at will it was permitted to cease paying commissions already earned.  The Court stated:

> Defendant has also alleged that this contract had no limit as to the time it was to run and was therefore terminable at will after a reasonable time.  The cases cited by defendant to support this position involve situations where the contract contemplated that performance continue on both sides, as for instance an employment contract. We agree that in such a case the employment may be terminated at will by either party. This, however, is not such a case. Here the plaintiffs did all they had contracted to do, i. e., they secured the reinsurance business for defendant under an agreement that they receive 5% of the premiums so long as the business continues. There was no requirement that the plaintiffs were to perform any other service. Defendant has thus received full performance from plaintiffs and cannot now be permitted to accept the benefits of its agreement while at the same time repudiate the obligations it assumed and has recognized for twenty-seven years. So long as the fruits of this agreement are enjoyed, the consideration agreed upon must be paid in accordance with the contract under which it was given.

*Linn v. Employers Reinsurance Corp.*, *supra*, 153 A.2d at 485-86 (citation omitted).  *Linn* was cited recently by the Court in *Feldman v. Phila. Trust Co.*, 2008 WL 4281966 (Phila.Com.Pl., Aug. 22, 2008), *aff'd without op.*, 990 A.2d 58 (Pa.Super. 2009).  In that case, the Court found

that, after termination of an oral agreement, plaintiff was entitled to commissions on

management fees charged by the bank on accounts introduced by the plaintiff.  The opinion was

issued in response to defendant's motion for post-trial relief after a judgment was rendered for

plaintiff in the amount of $2.6 million plus stock options following a bench trial.  That judgment

was upheld (and later affirmed by the Superior Court).  The Court held:

> In the absence of express contract terms governing the payment of commissions after termination, an employee's right to an earned commission is not automatically forfeited.  An employee may continue to receive a commission as long as the employer continues to receive a benefit from the business procured by the employee. This principle is exemplified in <u>Linn v. Employers Reinsurance Corp.</u> ….
>
> In this case, the record evidence amply demonstrates that plaintiff has a vested interest in the commissions claimed and that the subsequent written agreement did not invalidate that interest. He procured the business and has been paid some of the commission owed. Plaintiff did all he contracted to do. Defendant has thus received full performance and cannot now be permitted to accept the benefits of its agreement while at the same time repudiating the payment obligations it assumed. Plaintiff's right to an annual commission continues so long as the funds remain under defendant's management. A calculation of the amounts owed is attached hereto as Appendix "A" and made part of this opinion. Since the right to commission continues, plaintiff's demand for an Accounting is granted. The plaintiff is entitled to the fruits of his labor pursuant to the original oral employment agreement as found by the Court.

*Feldman v. Phila. Trust Co.*, 2008 WL 4281966 (Phila.Com.Pl., Aug. 22, 2008), *aff'd without*

*op.*, 990 A.2d 58 (Pa.Super. 2009)(footnotes omitted).[7]

    Similarly, in *Eastland v. Du Pont*, 1996 WL 421940 (E.D.Pa., Jul. 23, 1996), the Court

found that Plaintiff stated a claim for breach of contract for failure to pay wages and severance

pay already earned, even though the employment was terminable at will.  The Court stated that

"Du Pont's power to discharge Eastland does not logically encompass a decision not to pay him,

as agreed upon, for work already completed.  Under the allegations of the complaint, 'Defendant

---

[7]  The Court stated in its opinion that "No exclusivity of Mr. Feldman's work was ever required or even mentioned in conversation with Mr. Crofton [the defendant's President]," suggesting that this could not be implied as a basis for forfeiture of earned commissions.

has ... received full performance from plaintiff[ ] and cannot now be permitted to accept the benefits of its agreement while at the same time repudiate the obligations it assumed and has recognized for [seven] years.'"

Because Flowers' right to compensation for earned commissions is a legal issue, it can be upheld on summary judgment.  This is what happened in *Marcin v. Darling Valve & Mfg. Co.*, 259 F.Supp. 720, 724 (W.D.Pa. 1966).  The Court, applying Pennsylvania law, granted summary judgment on liability to plaintiff, a commission salesman, who was seeking commissions for services rendered prior to his termination.  The contract clearly provided for non-payment of commissions if the employee left his position in three different types of circumstances: resignation, discharge or death.  In this case the parties were negotiating a new contract when then defendant elected to terminate the contract on thirty days' notice, which the defendant likened to a discharge.  The Court held that this was a situation that was not addressed by the contract.  The Court rejected "defendant's interpretation of the contract provisions [which] would, in effect, deprive the plaintiff of compensation for services rendered prior to the termination of the contract," because "[a]s a general rule, forfeitures are not favored in the law." *Marcin v. Darling Valve & Mfg. Co.*, 259 F.Supp. 720, 724 (W.D.Pa. 1966).

Not only does the law require Connect America to pay Flowers' earned commissions, Connect America understood this, as shown by Connect America's behavior and statements. Connect America paid Flowers nearly $50,000 over the course of thirteen months, not out of generosity, but because it owed Flowers commissions for the valuable bargained-for introduction, in accordance with the Finder's Fee Agreement.

In fact Gross' emails of November 11, 2008 and March 23, 2009, which incorporate the terms of the Finder's Fee Agreement, specifically address this issue.  The November 11, 2008

email states in relevant part "I will honor my commitment to you on EM and First Street" and sets forth payment terms for doing so.  No termination date for such payments is stated or even alluded to even though Gross specifically states that Connect America "will not enter into any new agreements" and "NO new partnerships will be entertained at this time," clear evidence that Connect America was aware of its obligation to continue making payments to Flowers whether or not he provided any additional introductions or other services.  Gross' email of March 23, 2009 contains similar language, specifically stating, "[w]e will continue to pay you . . . for sales generated by Electric Mobility and First Street," again without indicating any termination date for such payments and contemplating that such payments would continue even if the parties were to "go in different directions."

In addition, Gross' March 5, 2009 email to Flowers, written when Connect America was excited about the volume of sales by firstStreet, a company introduced by Flowers, states in large font, "George … If you brought in 5 more like this one …. You would never have to work again!! Ken." Flowers Dec. Exh. 1 at 45.

The import of Gross's March 5, 2009 email is that commissions under the Finder's Fee Agreement will be paid for the life of the business relationship between Connect America and the referrals made by Flowers, regardless of when the Finder's Fee Agreement terminated.  Gross' email would make no sense under Connect America's disingenuous interpretation.  Connect America's incredibly groundless theory is that commissions are only owed if the Finder's Fee Agreement has not terminated, and that the Agreement was properly terminated because Flowers ceased making introductions to Connect America.  Flowers Dec. Exh. 1 at 64; Exh. 2 at ¶ 87.  Under Connect America's untenable position, Flowers had to keep working to continue receiving commission payments; there was no way for Flowers to retire on the

commissions then accrued from the introductions he made.  Yet that is exactly what Gross suggested could happen.

Gross' language "never have to work again" means that Flowers would continue to earn commissions without further work.  This is powerful evidence that Connect America believed that commissions would continue to be paid regardless of the termination of the Finder's Fee Agreement.  "[T]he subsequent conduct of the parties is a persuasive indicator of their original intent." *Amerofina, Inc. v. U. S. Industries, Inc.*, 335 A.2d 448, 452 (Pa.Super. 1975) (citing *Westinghouse Elec. Co. v. Murphy, Inc.*, 228 A.2d 656 (Pa. 1967)).

## C.   The Scope of the Finder's Fee Agreement

Gross' March 5, 2009 email also suggests that Connect America intended the Finder's Fee Agreement to apply to **all** **referrals** by Flowers (and that Gross understood that Flowers was entitled to an accounting).  At a time when the firstStreet business was picking up, selling more than 550 units in just over three months, with large newspaper advertisements planned, Gross was "motivating" Flowers to "br[ing] in 5 more like this."  Flowers Dec. Exhs. 1 at 45 and 4 at 90-91.  Flowers went ahead and did so.  Less than two weeks later, on March 18, 2009, Flowers emailed Gross with the title "Had a great show," confirming that "u said I could say that I represented connect America. I believe I did a very good job of it here.  I Really found some opportunities … Dr. [L]eonard[']s is also in my sights!"  Flowers Dec. Exh. 1 at 27.  On March 23, 2009, after Connect America imposed the Amended Commission Calculation Method for new referrals at $10 per unit, Flowers emailed Gross, "When I am at Medtrade this week, I am meeting with three of my killer accounts, including HDIS, I would still like to pursue these deals and look for any other opportunities for you at the show under the $10 agreement." *Id.*, at 28.

Rather than rebuff Flowers' efforts to find more referrals, Connect America was happy with Flower's involvement.  Flowers continued to call, email and meet with people and help

Connect America negotiate a contract. The email record shows that Flowers went to trade shows, met, called and emailed people, helped to negotiate contracts, and connected with Internet Alliance and Dr. Leonard's. *Id.*, at 28-43. Thus, Flowers discussed contract terms with Internet Alliance, including the MRR they could receive, *id.*, at 31-34, and assisted in contract negotiation. *Id.*, at 35-40.

Throughout this period both Gross, as President of Connect America, and Ninon Prozonic, Connect America's Vice President for Strategic Alliances, communicated with Flowers by email. They never wrote to Flowers asking him to cease his efforts or warning him that he would not be paid if his efforts bore fruit.

To the contrary, on June 6, 2009, Gross emailed Flowers to report on some of Flowers' referrals. The email was entitled, "Fwd: Great Paycheck!" and Gross wrote, "firstStreet relationship GREAT! EMC and Internet Alliances … ZERO!" *Id.* at 41. Clearly, Gross believed that Flowers was being compensated for Internet Alliance in the same manner as firstStreet and Electric Mobility Co. (EMC), or there would be no reason to mention them together, or to discuss Internet Alliance with Flowers at all. Flowers replied to Gross with thoughts about improving sales at Electric Mobility and Internet Alliance, and Gross forwarded these comments to his colleague, Prozonic. *Id.* at 41-42. Prozonic replied, expressing disappointment with the way Connect America's product was featured on Internet Alliance's website. *Id.* at 42. Flowers responded, offering to continue helping in whatever way he could. *Id.* at 43.

The record is clear: Connect America repeatedly sought to motivate Flowers to introduce large referrals to Connect America, then repeatedly sought to revise the terms of the Finder's Fee Agreement. However, it was not until November 2009 that Connect America sought to

-25-

terminate its relationship with Flowers.  Until that time, Connect America was happy to take

advantage of every introduction Flowers made.

**D.     Flowers Introduced Four Referrals to Connect America and
        Connect America Cannot Terminate its Payment Obligation
        By Arguing that Flowers did Little to Earn His Commissions**

Plaintiff also expects Connect America to argue that Flowers did little to earn his

commissions.  But, this is irrelevant, since Flowers' performance was complete once he

introduced a party who later sold Connect America's product.  It was on this basis that Connect

America paid Flowers $49,290, and this is in accord with Pennsylvania law:

> In general, a finder is an independent actor whose role is that of a middleman
> who introduces the parties, supplies information to one or both about the other
> and is required to do little else, whereas a broker "negotiates on behalf of one of
> the parties or performs or is required to perform some other act identified with the
> interests of one party and against the interests of the other."

*Sachs v. Continental Oil Co.*, 454 F.Supp. 614, 618 (E.D.Pa. 1978)(quoting *Amerofina, Inc. v.*

*U.S. Industries, Inc.*, 335 A.2d 448, 451 (Pa.Super. 1975)).  The *Amerofina* court explained:

> [O]ne who merely introduces the parties and supplies information is a finder. This
> can, of course, be accomplished with minimal active performance. It is possible
> for a finder to accomplish his service by making only two phone calls and, if the
> parties later conclude a deal, he is entitled to his commission. … it is clear that a
> finder's fee is not dependent upon the finder's participation in negotiations, and
> that it may become payable even though a third person brings the parties to
> agreement.  It may be noted that the usual brokerage commission cases are not
> necessarily on point.  In the brokerage case the broker must be the procuring
> cause of a ready, willing and able buyer who purchases on the terms and at the
> price designated by the principal. The finder, however, is engaged to do
> something less. …

*Amerofina, supra*, 335 A.2d at 452-54 (citations and quotation marks omitted). While Connect

America claims that Flowers "received $50K in 12 months for doing nothing,"  Flowers Dec.

Exh. 10, nothing more was required of Flowers.  Connect America never asked Flowers to get

involved in negotiating a contract with firstStreet or marketing the Medical Alarms.  Gross even

discouraged Flowers by telling Flowers he "does not need help with these more sophisticated

companies." Flowers Dec. Exh. 4B at 108. Flowers' introductions proved valuable to Connect America, and Connect America cannot avoid its obligations merely because it regrets the deal it made after receiving its benefits.

As discussed, *supra*, pp. 9-14, Connect America admitted in emails, in its responses to Plaintiff's Requests for Admissions, at deposition, and through its behavior that Flowers introduced firstStreet, EM and Internet Alliance. The record also conclusively demonstrates that Flowers introduced Dr. Leonard's to Connect America, *and told Gross about it*, long before Leighton began calling Dr. Leonard's and offering proposals like those Flowers had offered months previously. Even if Leighton and Gross negotiated the final deal with Dr. Leonard's, which is all that Connect America can argue, that is insufficient to deny Flowers his commissions. Pennsylvania law requires only that Flowers "merely introduce[] the parties and suppl[y] information … which can, of course, be accomplished with minimal active performance. … is not dependent upon the finder's participation in negotiations, and … may become payable even though a third person brings the parties to agreement." *Amerofina, supra*, 335 A.2d at 452-54. *See also*, *Kinnel v. Mid-Atlantic Mausoleums, Inc.*, 850 F.2d 958, 962-63 (3d Cir. 1988) (quoting approvingly from *Amerofina* and affirming liability verdict for finder on breach of contract, because finder proved that he found two customers and was the first person associated with the defendant to speak to the two customers)."

Since Flowers did all that was required of him under the Agreement and Pennsylvania law, Connect America cannot defeat Flowers' right as a matter of law to commissions for sales by Dr. Leonard's by claiming to have closed that deal. In other words, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material

fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (U.S.Dist.Col. 1986).  The supposed "fact" that Leighton closed a deal with a referral introduced by Flowers is not "material," because it cannot affect the outcome of the case under the governing substantive law, *id.*, at 255, and it is not "genuine," because it is created by evidence that is "not significantly probative." *Id.* at 250.

Finally, Connect America's claim that it hired Leighton as a new VP of Sales at or about May 2009, at a time when it had very few partners producing sales, and Gross did not tell Leighton that Flowers had been pursuing this large account for several months, but that Leighton serendipitously and independently identified Dr. Leonard's immediately when he began working at Connect America (though he could not remember when this happened), through internet research using a computer that then "blew up," simply defies credulity.  It is not only incredible, it is irrelevant, since Flowers told Gross about Dr. Leonard's and pursued it long before Leighton entered the picture.  "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc., supra*, at 255.  Under these circumstances, Connect America has failed to raise a genuine issue of material fact, and Flowers is entitled to commissions for introducing Dr. Leonard's, as well as firstStreet, EM and Internet Alliance.

**E.**      **The Duration of the Contract is a Red Herring**

Plaintiff expects Connect America to argue that Flowers' entitlement to commissions under the Finder's Fee Agreement is terminable at will.  That is not the law in Pennsylvania. *Nova Chemicals, Inc. v. Sekisui Plastics Co., Ltd.*, 579 F.3d 319, 326 (C.A.3(Pa.) 2009)(applying Pennsylvania law) ("absent an explicit term, the duration of a contract is to be determined based on its subject matter"); *Thomas v. Thomas Flexible Coupling Co.*, 46 A.2d 212 (Pa. 1946) ("[w]here there is no express provision in a contract as to its duration, the intention of the parties in that regard is to be determined from the surrounding circumstances and by the application of a reasonable construction to the agreement as a whole").

However, the Court need not determine the duration of the agreement, because although Flowers contends the agreement was terminated in bad faith, Flowers is not seeking to continue introducing referrals to Connect America.  Flowers seeks merely to be paid the commissions that he had already earned; those earned fees are not retroactively forfeited by the termination of the agreement, as explained above.   Thus, the real issue is the effect of termination on completed performance, not the duration of the Agreement.  The Court should not deny Flowers relief based on a false issue. [8]

**F.  The Reasons Why Connect America Terminated the Agreement Do Not Excuse its Breach and Are Irrelevant**

Connect America may attempt to raise a factual issue as to whether it acted in good faith in terminating the Finder's Fee Agreement.  Clearly the parties disagree on that issue but, for purposes of this Motion, the Court need not decide why Connect America terminated the Agreement.  While greed and bad faith are the operative terms here regarding Connect America's misconduct, it is sufficient that overwhelmingly supportive Pennsylvania law does not permit Connect America to escape payment of earned commissions.

Thus, even if Connect America had cause to terminate the Finder's Fee Agreement – and it did not – that would not eliminate Flowers' right to receive earned commissions.  *See* point B, *supra*.  Moreover, Connect America posits three reasons why it terminated the Finder's Fee Agreement, but none of these justify Connect America's breach.  It claims that Flowers worked for a competitor, VRI; that Flowers failed to bring in more business; and that it amended its

---

[8]  If the Court decides that the duration of the Finder's Fee Agreement is at issue, Flowers reserves the right to argue that the Agreement was not terminable at will, and was in fact terminated in bad faith to deny commissions owed to Flowers.  *See Spyridakis v. Riesling Group, Inc.*, 2009 WL 3209478, at *11, n.12 (E.D.Pa., Oct. 6, 2009) ("even an at-will employee may bring a cause of action for breach of the covenant of good faith and fair dealing where the employer acted in bad faith with respect to terms of the employment contract other than those concerning termination") (citations omitted).

agreement with firstStreet so Connect America had less margin to pay Flowers.  Flowers Dec. Exhs. 1 at 64 and 2 at ¶ 88.

The Finder's Fee Agreement does not include a non-competition clause, and none is even remotely implied.  As Gross admitted, Connect America never asked for a restrictive or non-competition covenant from Flowers.   Flowers Dec. Exh. 4A at 159-160.  By contrast, Connect America's model dealer agreement included a non-competition clause.   Flowers Dec. Exh. 1 at 38-39.  The fact that Connect America normally required a non-competition clause, but did not require one from Flowers is strong evidence that it was deliberately excluded.  Nor can an omitted clause be implied in the Finder's Fee Agreement.  Under Pennsylvania law, "[i]mplied covenants are not favored in the law. … Where there is no restrictive provision at all, we will not imply one."  *Fraser Sweatman, Inc. v. Schreiber*, 291 F. Supp. 276, 281 (E.D.Pa. 1968) (citations omitted).[9]

Similarly, the Finder's Fee Agreement does not require Flowers to make a minimum number of introductions to continue receiving earned commissions.  By contrast, Gross testified that Connect America's dealer agreements required dealers to make a certain number of minimum sales to continue receiving a share of MRR on units previously sold, but that "we didn't have a dealer agreement with George."  Flowers Dec. Exh. 4A at 85-86, 118.  In fact, as discussed in greater detail in section B above, Gross' emails of November 11, 2008 and March 23, 2009, which incorporate the terms of the Finder's Fee Agreement, both provide for payments to Flowers while specifically contemplating the possibility that Flowers would not be providing

---

[9]  Connect America's non-competition argument is made in bad faith.  Connect America knew as of June 6, 2009 that Flowers worked with VRI, when Gross wrote Flowers, "First Street relationship GREAT!  … How are things working out for you at VRI?"  <u>After</u> June 6, 2009, Connect America paid Flowers approximately $15,000, demonstrating that Connect America did not believe that Flowers owed a non-competition duty.  Flowers Dec. Exh. 1 at 41, 53-56.

any additional introductions or other services going forward.  This is clear and unequivocal evidence that Connect America was aware at the time it entered into the Finder's Fee Agreement that Flowers was not required to provide any additional introductions or services to Connect America in order to receive the payments due him under the Agreement.

Connect America fares no better with its bogus argument that it need not pay Flowers' earned commissions because Connect America renegotiated its contract with firstStreet, making it less profitable for Connect America.  That decision was within Connect America's control, and did not involve Flowers.  Connect America continued doing business with firstStreet because it was in Connect America's financial interest to do so.  But, even if that were not the case, Connect America "cannot be relieved from a bad bargain because [its] agreement may have been foolish or improvident."  *Turner v. Baker*, 74 A. 172 (Pa. 1909).  "Mere inconvenience, or difficulty of performance, or the fact that the obligation may have become burdensome making compliance a hardship, does not excuse a party from performance."  *Wissahickon Realty Corp. v. Boyle*, 122 A.2d 720, 722 (Pa. 1956) (citing numerous cases).  Other cases are to similar effect. *Prusky v. Reliastar Life Ins. Co.*, 445 F.3d 695, 701 (C.A.3(Pa.) 2006)("increased burden on a party does not render performance impracticable"); *Hiriam Hicks, Inc. v. Synagro WWT, LLC*, 867 F.Supp.2d 676, 699 (E.D.Pa. 2012)(under Pennsylvania law, the fact that defendant's payout on contract with the City was reduced, leaving it unable to pass on the costs of plaintiff's services, "does not frustrate the purpose of the Agreement"); *Step Plan Services, Inc. v. Koresko*, 12 A.3d 401, 412-13 (Pa.Super. 2010)("An individual's financial position, for example, cannot generally be an implied 'basic assumption' of a contract, nor will it excuse a party's performance") (citations omitted); *Miller v. Ginsberg*, 874 A.2d 93, 99 (Pa.Super. 2005)("[W]e may not ignore otherwise clear language merely because one of the parties did not anticipate

related complications prior to performance.") (citation and quotation marks omitted); *Felix v. Giuseppe Kitchens & Baths, Inc.*, 848 A.2d 943, 948 (Pa.Super. 2004) ("It is well settled that a party assumes the risk of his or her own inability to perform contractual duties.").

In truth, Connect America terminated the Finder's Fee Agreement because it made a deal with firstStreet to split the commissions owed to Flowers. As Gross put it to firstStreet after terminating Flowers, "As we both agreed, we choose to give you the extra money in our new deal, and we are not paying him anymore." Flowers Dec. Exh. 10.

## <u>CONCLUSION</u>

For the reasons stated, Plaintiff George G. Flowers respectfully requests that the Court grant his Motion for Partial Summary Judgment on Liability as to the First Cause of Action for Breach of Contract, in accordance with the proposed Order.

      */s/ Henry I. Pass*
      Henry Ian Pass, Esquire
      LAW OFFICES OF HENRY IAN PASS
      PA Atty. I.D. No. 21437
      3 Bala Plaza East, Suite 700A
      Bala Cynwyd, PA 19004
      Tel (610) 660-8001
      Fax (610) 660-8004
      Email:  hip@hipesq.com

      *Counsel for Plaintiff, George G. Flowers*

Dated: March 5, 2013