**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GEORGE G. FLOWERS | : |
| | : |
| Plaintiff, | :   CIVIL ACTION |
| vs. | : |
| | :   NO.  2:12-cv-04787-RBS |
| CONNECT AMERICA.COM, LLC | : |
| | : |
| | : |
| Defendant | : |
| | : |

**DEFENDANT CONNECT AMERICA.COM, LLC'S
MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT ON COUNTS I THROUGH V
OF PLAINTIFF GEORGE G. FLOWERS' COMPLAINT**

Defendant Connect America.com, LLC ("Connect America") respectfully submits this

Memorandum of Law in support of its Motion for Summary Judgment on Counts I through V of

the Complaint filed by plaintiff George G. Flowers.

## I.  Introduction and History of the Case

Flowers commenced the instant diversity action by filing his Complaint on August 20,

2013.  In the Complaint, Flowers alleged causes of action for Breach of Contract (Count I),

Quantum Meruit (Count II), Promissory Estoppel (Count III), Unjust Enrichment (Count IV),

and Declaratory Judgment (Count V).

Connect America's Answer with Affirmative Defenses was filed and served on

September 25, 2013.

In a November 2, 2012 Scheduling Order entered following the Court's Initial Pre-Trial

Conference with counsel, the Court directed that "all discovery, expert and otherwise, on issues

related to liability shall be completed no later than January 31, 2013." At the Conference the Court directed that discovery related to damages would be deferred.

The Scheduling Order also directed plaintiff and defendant to serve expert reports related to liability on each other by December 31, 2012 (plaintiff's reports) and January 31, 2013 (defendant's reports), respectively. All Dispositive Motions relating to liability were to be filed no later than February 28, 2013, later extended to March 8, and responses thereto were to be filed no later than March 29, later extended to April 8, 2013.

Initial disclosures were timely made, and no expert reports were served by either party. Discovery related to liability was timely completed by the parties.

For the reasons discussed below, the record created through discovery clearly demonstrates Connect America's entitlement to summary judgment on each of the claims asserted by Flowers.

## II. Summary Judgment Standard

As this Court observed in *PNC Mortgage v. Superior Mortgage Corporation*, 2012 WL 628000 (E.D.Pa.)

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505,91 L.Ed.2d 202 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is

no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 325, 106 S.Ct. 2548,91 L.Ed.2d 265 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.,* 391 F.3d 497, 502 (3d Cir.2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c)(1) ("A party asserting that a fact is genuinely ... disputed must support the assertion by ... citing to particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co. v.Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (citations omitted).  When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255.  Courts must not resolve factual disputes or make credibility determinations.  *Siegel v. Transfer, Inc.v. Carrier Express, Inc.,* 54 F.3d 1125, 1127 (3d Cir.1995).

### III. Undisputed Facts Supporting Summary Judgment Motion

### A.  The Parties

Connect America is a Pennsylvania LLC based in Broomall, Pennsylvania which for many years has been involved in the business of selling and servicing Medical Alert™ personal emergency response systems ("PERS") and related monitoring services.  Subscribers to Connect America's services, typically senior citizens, can summon assistance at the press of a button in the event of a medical or other emergency.  *See generally*, Exh. 3.  Gross Dep. Exh. 1, pp. 1-9.

Connect America markets its products through direct mail solicitations, internet advertising, local dealers and through "strategic alliance partners.[1]"

George G. Flowers is a resident of Woodbury Heights, New Jersey.  From 1982 through 2007 Flowers was employed with Electric Mobility (maker of "The Rascal" electric mobility scooter), a company owned by his nephew, Michael [Exh. 6, (hereinafter "Flowers I"), pp. 13-14]  During virtually his entire career at Electric Mobility Flowers  was responsible for operations, manufacturing and distribution of Rascal's products, while his nephew, Michael, served as President and handled all sales and marketing responsibilities. [Exh. 6, Flowers I, pp. 15-22.] .  For one year preceding his 2007 "retirement" from Electric Mobility, when he "was not working full weeks … [and] was on my way to retirement" Flowers was placed in charge of developing "new business initiatives" for Rascal, *i.e.*, identifying other products that Electric Mobility could market in addition to its "Rascal" product  line.  At that time Flowers was also placed in charge of developing a catalog for Electric Mobility. [Exh. 6, Flowers I, pp. 23-24], a project for which he had no relevant experience.  [Exh. 6,  Flowers I pg. 27].

Neither Flowers' "new business initiative" programs for Electric Mobility, nor the Electic Mobility catalog he was tasked to create, ever came to fruition.  Instead, in early 2007 Electric Mobility "downsized" and Flowers was "retired."  [Exh. 6, Flowers I, pp. 36-37].

---

[1]   Connect America's "strategic alliance partners" are typically large, established, national companies (*e.g.,* CVS, FirstStreet, etc.) that offer for sale, through catalogs, direct mail and internet marketing, a wide variety of health-related products to the same geriatric customer base targeted by Connect America. Strategic alliance partners promote Connect America's Medical Alert™ products and services in their catalogs, mailings and web sites to their own customers. Customer purchases of Medical Alert™ products and services generated through solicitations by strategic alliance partners are fulfilled and serviced by Connect America, and Connect America pays fees to the strategic alliance partner for each sale so obtained.  [Exh.1, Gross I pp. 68-70, 74]

While at Electric Mobility Flowers was part of the Strategic Planning Committee, which reviewed and approved direct mail marketing materials prepared by others in the company and advertisements the company placed in national magazines.  Flowers' only other sales and marketing experience consisted of helping his son to design promotional materials for an automobile detailing business.  [Exh. 6, Flowers I pp. 57-59].

In October of 2007 Flowers attempted to start a business called Platinum Independence [Exh. 6, Flowers I pp. 60-61], for which he recruited a former coworker from Electric Mobility named Walter Jacob as a co-partner.  At its inception Flowers' "business model" for Platinum Independence involved small-scale direct mail marketing, internet marketing, and in-home sales to seniors of walk-in tubs, stair lifts, scooters, large button telephones, and PERS medical alarm systems (through a competitor of Connect America called Amcest Monitoring) to senior citizens [Exh. 6, Flowers I, pg. 70].  As envisioned by Flowers, Platinum Independence would source its product line from third party manufacturers, and would identify prospective sales leads from direct mail advertising.  As between Jacob and Flowers, "he [Jacob] was finding customers through a marketing effort, and then I [Flowers] was going into the home and trying to prove a business model, that we could sell products in the home using our sales and marketing material, and my closing."  [Exh. 6, Flowers I, pg. 69].

Platinum Independence was formally dissolved in April of 2009, following Mr. Jacob's departure from the business to pursue other interests and the company's dismal business performance.  Flowers' "business model" for Platinum Independence resulted in gross sales of

less than $30,000, no profits, and no payment of salary to Flowers or Jacob, from its inception in

October 2007 to its formal dissolution in April 2009.  [Exh. 6, Flowers I, pg.86].[2]

It was while Flowers was acting in his capacity as a principal of Platinum Independence

that Flowers first became acquainted with Connect America's President, Kenneth S. Gross.

[Exh. 6, Flowers I, pg. 90].

### B.  History of the Business Relationship Between Flowers and Connect America

In September of 2008 Flowers contacted Gross by phone to inquire about Platinum

Independence selling Connect America PERS units.  [Exh. 6, Flowers I, pg. 147].  Prior to that

time Flowers had had no relationship with either Gross or Connect America. [Exh. 6, Flowers I,

pg. 148].  Gross agreed to meet with Flowers, assuming that Flowers wished to discuss becoming

a Connect America "dealer.[3]" [Exh. 6, Flowers I, pp. 149-51; Exh. 1, Gross I, pg. 130

("hereinafter Gross I")].  Flowers was given a tour of Connect America's offices and received

information about Connect America's "dealer" program but no agreement was signed or

relationship created at the September 2008 meeting.  [Exh. 6, Flowers I, pp.149-150].

In early October of 2008 Flowers scheduled another meeting with Gross "to give the

presentation for Platinum Independence." [Exh. 6, Flowers I, pp. 150-155; Exh. 1, Gross I,

pp.130-137].  In addition to the relatively modest (and unsuccessful) direct home sales "business

---

[2]   Although not worth belaboring here, in his deposition Flowers testified to several other
geriatric product "business ventures" and "alliances" he attempted with various parties *other
than* Connect America between approximately 2008 and 2011.  Each of those ventures was a
dismal failure.

[3]   Connect America's "dealer" program was entirely separate and distinct from its "strategic
alliance partner" program.  Dealers signed standardized "dealer agreements," generally worked
in small, defined territories and were compensated for sales of  MedicalAlert ™ PERS to end
users resulting from the Dealer's own localized direct marketing and sales efforts.  [Exh. 1,
Gross I, pp. 77-79, 85-87].

model" for Platinum Independence described above, in the fall of 2008 Flowers had grand
visions for making Platinum Independence "the consolidators of a very fragmented industry, and
that being the [elder health] care giving industry, and keeping people in their homes." [Exh. 6,
Flowers I, pg. 150].  Flowers "pitched" Gross on having Connect America become a "Platinum
Independence Member" at the early October 2008 meeting.[4]  [Exh. 6, Gross I, pp. 154-5].

Gross was not interested in having Connect America become a Platinum Independence
"member," but he agreed, on a *gratis* basis, to include Platinum Independence brochures as

---

[4]  Although not directly relevant to the issues addressed in the instant motion, Flowers'
description of his "grand plan" for Platinum Independence sheds light on his unrealistic and self-
delusional approach to business.  At his December 18, 2012 deposition, Flowers testified:

> *Walt and I had this theory that companies spent a lot of money in advertising and
> marketing, and, specifically, companies that only had one product. They may have
> generated 100,000 leads, but only sold to 20,000 customers. Okay. Our premise was, we
> can help you figure out what to do with those 80,000 leads.* [Exh. 6, Flowers I, pp.92-93]
> ...
> *A company like, and I'd hate to use Connect America but I am, Connect America only
> sells one product. Okay. And they might sell 2000 widgets, okay, but they may do
> marketing and advertising and get 100,000 leads. So, they have a whole bunch of leads
> that are sitting there, all right, that they didn't sell anything to nor will they. They might
> sell a little more to that base, but not a lot, so our concept -- we called Connect America
> a category killer. They sold one product, they did it well and they did it great process
> [sic]. So, Walt and I delineated a whole bunch of these category killers, and we
> were going to go to all of them. The presentation basically outlined how, by combining the
> leads, and those companies deciding their level of involvement with Platinum
> Independence based on a membership fee, all right -- they could be Platinum members.
> Depending on how much they wanted to get involved, they could join Platinum
> Independence, and we would be the marketing company for all these category killers. We
> would combine the data basis. We would do the marketing on television under the brand
> Platinum Independence. We would develop the in-homes sales force for these
> organizations, because that's what we were good at, and we would take a profit from
> that. The presentation was basically getting them interested in becoming a Platinum
> Independence member.* [Exh. 6, Flowers I, pp. 93-95].

Flowers pitched the "Platinum Independence Member" program to only three companies:
Connect America, First Street and Scooter Store.  Not surprisingly, neither those
companies nor any other "category killer" companies agreed to be "Platinum
Independence Members."  [Exh. 6, Flowers I, pp. 95-96].

inserts in Connect America's marketing mailings.  [Exh. 1, Gross  I, pp. 133-134; Exh. 6, Flowers I, pp. 165-167].   Gross and Flowers met briefly on other occasions in early October 2008 to discuss the mailings program.  At the second such meeting, Flowers advised Gross that he would be "pitching" the Platinum Independence program and other business opportunities to First Street the following week.  [Exh. 6, Flowers I, pp.177-180]

Coincidentally, approximately one week before Flowers' third meeting with Gross in October 2008 Flowers had met Dave Medina, FirstStreet's Vice President of Marketing, at a trade show in Philadelphia. [Exh. 6, Flowers I, pp.102-103]  Prior to that meeting, Flowers had had no dealings or relationship with Medina or FirstStreet. [Exh. 6, Flowers I, pg. 53].   Flowers was scheduled to meet with Medina on October 22 at FirstStreet's corporate headquarters near Richmond, Virginia to pitch Platinum Independence membership and other "business opportunities" relating to products sourced through Flowers. [Exh. 6, Flowers I, pp. 91-92]

When Gross learned that Flowers planned to meet with Medina, Gross expressed interest in being introduced to Medina.  Flowers agreed to do so.  Gross agreed to compensate Flowers for introducing him to Medina, if the introduction led to a business relationship between Connect America and FirstStreet.  Various compensation formats were discussed, but no specific agreement was reached between Flowers and Gross regarding the amount or form of compensation since at that time neither party knew whether a relationship between Connect America and FirstStreet would in fact come to fruition as the result of Flowers' introduction, and if so, what the profitability of that relationship would be.  [Exh. 6, Flowers I, pp. 177-180]

During Flowers' meeting with First Street's Medina the following week, an opportunity arose for Flowers to suggest that FirstStreet could benefit from adding Connect America's MedicalAlert™ PERS to FirstStreet's product offerings.  Medina agreed to speak with Gross,

whereupon Flowers immediately placed a phone call to Gross and handed the phone to Medina. Gross and Medina spoke for less than one minute, agreeing to speak again at greater length at a later date.  [Exh. 6, Flowers I, pp.125-129; Exh. 1, Gross I, pp. 140-142]

Over the ensuing weeks and months Gross and Medina engaged in further discussions and negotiations regarding FirstStreet becoming a "strategic alliance partner" of Connect America.  Flowers played no part in those negotiations. [Exh. 1, Gross I, pp. 143-146; Exh. 2, (hereinafter "Gross II", pp. 33-35].

At one or more meetings held between Flowers and Connect America personnel in October and November, Flowers offered to "introduce" Connect America to his former employer, Electric Mobility, as a prospective strategic alliance partner.  Kenneth Gross and Ninon Prozonic, Connect America's Vice President of Strategic Alliances, met with representatives of Electric Mobility in that time period. [5] [Exh. 1, Gross I, pp. 71-72]

During October and November of 2008, Flowers repeatedly attempted to enlarge and enhance his "business relationship" with Connect America.  In November Flowers expressed renewed interest in becoming a Connect America "Dealer" and he was provided with a blank copy of Connect America's "Dealer Agreement."  [Exh. 1, Gross I , pp.136; Exh. 13, CA 000281-285].

Connect America was not interested in forming a wide-ranging relationship with Flowers or with his company, Platinum Independence.  Following one of the Electic Mobility meetings on November 11, 2008, Gross emailed Flowers as follows:

*We had a good meeting this afternoon at Electric Mobility with Mike and Linda. They seem interested in doing something with us starting after JAN 1.*

---

[5]     In truth, Ms. Prozonic had previously solicited Electric Mobility to be a strategic alliance partner in 2006, while Flowers was still employed there.  No business relationship resulted from those earlier solicitations. [Exh. 10, (hereinafter "Prozinic" , pp. 23-25, 48-53].

*I had a long conversation with Ninon on the way to EM and back and have decided that at this time that we are closing the door to any new alliances. We have enough on our plate with the addition of CVS, Caremark and A&P supermarkets brands that we do not wish to be diluted.*

*I will honor my commitment to you on EM and First Street should they come to fruition since you did introduce us to both companies, but will not enter into any new agreements past them.*

*You will earn $10 per unit sold by EM, paid monthly, and the difference between $15 per month and what we finally settle on with FS. If there is no spread on the monthly with FS then you will earn the same $10 per unit sold. NO new partnerships will be entertained at this time.*

*Ken*

On November 21, 2008 Gross emailed Flowers as follows (in pertinent part):

*George ... I drove to First Street earlier this week and am currently reviewing an agreement from them. We had a great meeting. Their deal is a little unusual as they want to be bulletproof on the returns. They claim they can produce a minimum of 5,000 units and as many as 10,000 during 2009 if we can come to an agreement immediately. I am willing to enter into an agreement with you at $10 per unit. This would be an introduction fee only. I do not need help maintaining these relationships once the introduction is made. The larger more sophisticated partners want the full $15 per month. There is no more room to share in the recurring [revenue].*

*Let me know if you want to proceed. If nothing else and First Street and Electric Mobility produce as they indicated you should earn in excess of $100,000 during 2009 for 2 introductions.*

*Ken*

By November 21, 2008 Kenneth Gross (for Connect America) and Dave Modena (for FirstStreet) had negotiated and concluded an agreement for FirstStreet to promote and sell MedicalAlert ™ PERS to its customers as a Connect America strategic alliance partner [Exh. 2, Gross II, pp. 33-37].   In consideration for FirstStreet's strategic partner marketing, Connect

America agreed to pay to FirstStreet a substantial fee for each sale made to a FirstStreet customer and a substantial share of each customer's monthly monitoring fee ("recurring revenue").  [Exh. 2 Gross II, pp.33-37]

Also in or about January of 2009, Electric Mobility agreed to become a Connect America strategic alliance partner on terms similar to those negotiated with FirstStreet.  [Exh. 7, (hereinafter "Flowers II", pp. 139-141].

As previously promised by Gross, in early 2009 Connect America commenced paying to Flowers an "introduction fee" of $10 for each MedicalAlert ™ PERS sale made to a FirstStreet or Electric Mobility customer.

Flowers was dissatisfied with receiving only a $10 per sale "introduction fee" on FirstStreet and Electric Mobility sales and campaigned to receive a share of "recurring revenues" on those sales.  He also wanted Connect America to grant him essentially unlimited freedom to solicit other "strategic alliance partners" for which he would receive substantial compensation.

On February 5, 2009 Flowers wrote a letter to Gross (Exh. 12, (hereinafter "Complaint Exh C"; Exh. 3, (hereinafter "Gross Dep exh" 3), p.26] "after placing several unsuccessful phone calls and emails to you in the past few weeks."  In the letter Flowers expressed happiness "to hear that First Street and Electric Mobility have started their marketing campaigns to promote and sell Connect America's Medical Alarms," and stated he was "interested in promoting Connect America to my other contacts with some other type of agreement with you or becoming a special dealer for you as we previously discussed."

On February 24, 2009 Flowers emailed to Gross a version of the standard Connect America "Dealer Agreement" to which he had made substantial unilateral modifications.  [Exh. 8, (hereinafter "Flowers I Dep exh") 1, Exh.11, (hereinafter "Flowers Disclosures" 457-9 and

Supp 1]  Each of Flowers' modifications to the standard Agreement increased "the Dealer's" rights and revenues, including entitlement to "recurring revenue," and/or imposed additional obligations on Connect America.  Flowers also modified the standard Agreement to provide that "Company will support Dealer to promote large Accounts as found on Addendum A." "Addendum A," drafted unilaterally by Flowers, contained language which, *inter alia*, purported to protect Flowers' "interests" in certain "potential customers" (identified in the Addendum as being Scooter Store, Hoveround, and Dr. Leonard's); guaranteed to Flowers various support services from Connect America such as toll-free numbers and web sites; and, for good measure, obliged Connect America to employ telemarketers to support Flowers' "Dealer" efforts.

In his deposition Flowers acknowledged that when Gross saw the "modified" Dealer Agreement he advised Flowers "there's no reason to discuss a dealer agreement. There's no reason to discuss this."  Flowers also readily acknowledged that Gross never signed his proposed "Dealer Agreement."  [Exh. 6, Flowers I, pg.207]. [6]

By March of 2009 sales of MedicalAlert ™ PERS resulting from the FirstStreet strategic partner alliance were increasing, and Flowers was receiving substantial "introduction fees."  In

_____

[6] Regarding the modified "Dealer Agreement," Mr. Gross testified at his deposition as follows: [Exh. 1, Gross I, pp. 111-112]:

> *Q. Do you recall receiving from Mr. Flowers the template dealer agreement with his proposed changes depicted here?*
> *A. I don't really recall.*
> *Q. You don't recall ever receiving it; is that your testimony?*
> *A. I may have; I may not have. This is an unsigned agreement that obviously never got executed.*
> *Q. I'm referring to the agreement in its unexecuted form.*
> *A. But even the alterations weren't made by us, so I'm not sure what the question is.*
> *Q. The question is: Do you recall ever receiving the altered form?*
> *A. I don't recall exactly. I'm not saying I did or I didn't, nor did we have any discussion about it, but I wouldn't have accepted these changes anyway, so I'm not sure where we're going  with this.*

an email to Flowers dated March 5, 2009 Gross exclaimed "George, if you brought in five more like this one you would never have to work again!!"  [Exh. 5, (hereinafter "Gross Dep II, Exh.7"].

In March of 2009 Flowers again attempted to expand his relationship with Connect America by, *inter alia*, unilaterally attending a major West Coast trade show ("Medtrade") as a self-appointed "representative" of Connect America.   In an email sent to Gross on March 18, [Exh. 4, (hereinafter "Gross Dep exh 3" p. 27] Flowers wrote:

> *Ken,*
> *When we talked last week u said I could say I represented Connect America.  I believe I did a very good job of it here!  I would really like to talk tomorrow and come and see you on Friday.  I Really found some opportunities and need to know how to proceed!*
> *Dr. Leonard's is in my sights also!  Flying home on the red eye!!!  Yikes! Talk to u tomorrow.*
> *Thanks,*
> *George*

By March of 2009 Flowers' ceaseless efforts to redefine and expand his relationship with Connect America annoyed Gross and caused him to believe that Connect America's relationship with Flowers was "going south."  As Gross testified at his deposition: [Exh. 2, Gross II pg. 99]:

> *In that two-week period between March 5th and March 23rd, obviously, there were some things that came up, things that were said that I did not have a good feeling about and therefore did not want to do more business with George….  that it was not what I – it just wasn't the kind of amicable relationship I wanted to have with someone. … Greed comes to mind, actually.*

In an email sent to Flowers on March 23, 2009 [Exh. 4, Gross Dep exh 3, pg. 24], Gross stated:

*George ... I thought about our last conversation over the weekend and have come to the conclusion if you are not happy with the $10 per medical alert unit sold by partners introduced by you, we should go in different directions.*

*I believe my offer was extremely fair based on the same compensation package as two other industry professionals who work for us, so I am not going to deviate from my policy.*

*I wish you good luck as you pursue a recurring revenue deal.  We will continue to pay you on this scale (as mentioned above) for sales generated by Electric Mobility and First Street.*

*There is no reason to meet further or discuss a dealer program at this time.*

Flowers understood Gross's March 23 email to mean that his business relationship with Connect America was terminated, except insofar as his continued entitlement to receive $10 per unit on sales of Connect America PERS made by FirstStreet and Electric Mobility, and that Connect America would not honor any other "partner" relationships he may introduce.  [Exh. 7, Flowers II pp. 26-30].   In early April of 2009 Flowers signed an "independent sales representative" agreement with a competing medical alarm company, VRI [Exh. 7, Flowers II pg. 53], but did not disclose that to Gross. [Exh. 7, Flowers II pg. 42]

Despite Gross' March 23 clarification and reiteration of the limited nature and scope of Connect America's obligations to Flowers, in March and April of 2009 Flowers persisted with efforts to accomplish an "introduction" of  Dr. Leonard's, another large senior citizen retail marketer, to Connect America.  Since Flowers had no contacts at Dr. Leonard's [Exh. 6, Flowers I,  pp. 51-52], his efforts in that regard consisted of:  a) unsuccessful efforts to meet with a representative of Dr. Leonard's at the MedTrade trade show in March of 2009; b) emails sent and calls made to a Dr. Leonard's buyer-in-training named Vilma Hampton who had no decision making authority; and c) unsuccessful efforts in or about March and April of 2009, made in collaboration with a sales representative of Linear, the manufacturer of  alarm units utilized by

Connect America and many other alarm companies, to identify who the decision makers of Dr. Leonard's might be.  [Exh. 7, Flowers II, pp. 191-200].   In his deposition Flowers acknowledged that none of the aforesaid efforts had *in fact* resulted in an "introduction" between Connect America and Dr. Leonard's:

> Q.      *Who at Dr. Leonard's did you introduce to whom at Connect America?*
> A.      *No one.*

[Exh. 7, Flowers II, pg. 191].

In *September* of 2009, Amerimark, the parent company of Dr. Leonard's, *did* become a "strategic alliance partner" of Connect America.  That relationship resulted solely and exclusively from communications initiated by Connect America's Vice President of Sales, Mark Leighton, commencing in May and June of 2009, and negotiations conducted between Leighton and Gross (for Connect America) and Mark Lennox and Dave Oby (for Amerimark) throughout the summer of 2009.  [Exh. 1, Gross I pp. 74-77; Exh. 14, (hereinafter "Leighton", pp. 31-34, 41-42, 45-52; Exh. 13, CA 000220-265].  As expressly acknowledged by Amerimark/Dr. Leonard's in its response to a document subpoena served by Flowers' counsel, Flowers played no role in introducing Connect America to Lennox and Oby and did not participate even peripherally in the negotiations leading to an agreement. [*See*, Response of Amerimark/Dr. Leonards to Document Subpoena of Flowers and correspondence produced in response to subpoena]. Exh. 15(a-c).

In April of 2009 Flowers was allowed to introduce Internet Alliance, another senior citizen health products retail marketer, to Connect America's Vice President of Strategic Alliances, Ninon Prozonic. [Exh. 10, Prozonic Dep, pg. 27; Exh. 2, Gross II, pp.13-14]  On April 9, Ms. Prozonic and Internet Alliance negotiated an agreement for Internet Alliance to be a "strategic alliance partner" for Connect America.  [Exh. 10, Prozonic Dep 35; Exh. 13, CA 000076-87.]  For purposes of this case, Connect America does not dispute that Flowers

would have been entitled to be paid $10 per MedicalAlert™ PERS sold to Internet Alliance's customers – if in fact such sales had occurred.  No sales did occur. [Exh. 2, Gross II, pp. 15-16].

## C.  Termination of the Business Relationship Between Flowers and Connect America

Connect America paid an "introduction fee" of $10 to Flowers for each MedicalAlert™ PERS unit sold by "strategic alliance partner" FirstStreet during calendar 2009.  Payments to Flowers for FirstStreet sales totaled in excess of $50,000.00.

Electric Mobility sold fewer than twenty MedicalAlert™ PERS units as a "strategic alliance partner" with Connect America. [Exh. 7, Flowers II, pg. 152; Exh. 1, Gross I pp.170-71]. Flowers was entitled to be paid $10 for each such sale. [Exh. 2, Gross II, pp. 27-28].

As previously noted, "strategic alliance partner" Internet Alliance sold no MedicalAlert™ PERS units.

In a letter dated November 10, 2009 addressed to Flowers [Exh. 13, CA 000074] Kenneth Gross said:

> *Dear George,*
>
> *It will be a year in December that we have compensated you for the First Street introduction.*
>
> *Based on the fact that you have not introduced us to any other strategic partners and are now working for a competitor (VRI), I have decided to terminate our arrangement after one full year.  We will continue to pay you at $10/unit for First Street sales through December 31, 2009.  Since your sales trail by 60 days, your last commission check from Connect America will be in February 2010.*
>
> *This proved to be a good introduction for you as you are on track to make $50,000 due to this relationship.*
>
> *Very truly yours,*
>
> *Kenneth S. Gross*
>
> *President*

By letter dated January 13, 2010 Flowers advised Gross:

*I received your letter and I do not agree that you can terminate my commission payments after one year.  This clearly was never your intent.  There was never any discussion of a time limit in any of our conversations or correspondence.  I expect you will continue to make the monthly payments on all my referral accounts.  My referral accounts are First Street, Electric Mobility, and Internet Alliance…[sic]*

Regarding the parties' "agreement" relating to the duration of Flowers' entitlement to receive "introduction fees," Flowers testified in his deposition [Exh. 6, Flowers I, pp. 189-190 ] as follows:

*Q. All right. What, if any, understanding do you have as to how long that [introduction fee] per sale Connect America was committed to pay?*

*A. I have no preconceived notions about that. I assume it was forever.*

*Q. Did Mr. Gross say it was forever?*

*A. No.*

*Q. You assumed it was forever. What was the basis for your assumption?*

*A. I don't have any basis for that assumption.*

*Q. Okay. Well, if Mr. Gross didn't say that, why do you contend that it was forever?*

*A. Because it came up in subsequent concepts that were presented well beyond the initial date of the offer.*

*Q. All right. When you say, "it came up in subsequent concepts," I'm not sure I understand your use of the term "concepts." Do you mean communications?*

*A. Yes.*

*Q. What kind of communications?*

*A. Well, future agreements. I'll let you ask the questions.*

*Q. Future agreements, okay. Agreements between who?*

*A. Connect America and myself.*

*Q. Relating to what, firstSTREET?*

*A. No. All strategic alliance clients that I introduced to Connect America.*

> *Q. Are we in agreement that when you use the term "concepts," you mean communications?*
>
> *A. Yes.*

Under further questioning,  Flowers explained what he was referring to as "future agreements" and "communications" in the quoted testimony:

 [Exh. 6, Flowers I pp. 190-191]:

> *Q. Okay. What communications are you referring to?*
>
> *A. In February of '09, I was asked by Ken develop a dealer agreement.*
>
> *Q. February '09?*
>
> *A. Mm-hmm.*

The "future agreement" and "communications" referenced in Flowers' testimony as confirming his understanding of "forever" entitlement to payment– subsequently marked as Flowers Deposition Exhibit 1 [Exh. 6, Flowers I, pp. 94-96] – was the unilaterally-altered and bastardized Connect America "Dealer Agreement" which Flowers had emailed to Gross on February 24, 2009. [Exh. 8, Flowers Dep exh. 1; Exh. 11, (hereinafter "Flowers Disclosures" 457-459 and Supp 1] *See, discussion, supra*.  The same "agreement" which, by Flowers' own admission, Gross refused to even discuss with him, and certainly never signed.

## IV.  Argument

### A.  Connect America Has Not Breached the Parties' Agreement to Pay Flowers "Introduction Fees" on Sales of MedicalAlert™ PERS Units Made to Customers of Strategic Alliance Partners Introduced by Flowers

With respect to interpretation and enforceability of a contract, the United States Court of Appeals for the Third Circuit has stated:

Under Pennsylvania law, the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are

sufficiently definite to be specifically enforced. Additionally, of course, there must be consideration on both sides. Consideration confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise. *Channel Home Centers, Div. of Grace Retail Corp.v. Grossman,* 795 F.2d 291, 298–99 (3d Cir.1986) (citations omitted) (internal quotations omitted). In addition, "a contract must represent a meeting of minds on the essential elements of the agreement." *CourierTimes, Inc., v. U nited Feature Syndicate, Inc.,* 445 A.2d 1288, 1295 (Pa.Super.Ct.1982).

In the instant case, the existence and enforceability of an agreement between the parties is undisputed.  The foregoing review of the record makes clear that the terms of the agreement were as follows:  in consideration for Flowers making an "introduction" to a prospective strategic alliance partner, and upon that introduction directly leading to the consummation of a strategic alliance partnership between the partner and Connect America, Flowers was entitled to be paid $10 for each sale of a MedicalAlert™ PERS units made to a customer of the partner.

With respect to First Street and Electric Mobility Connect America honored its obligations to pay Flowers "introduction fees" for 2009.  It stood ready to pay "introduction fees" to Flowers for Internet Alliance sales, but no sales occurred.

The sole point of disagreement between the parties regarding the agreement's terms relates to the duration of Connect America's obligation to pay "introduction fees."  Although Flowers contends that that obligation lasted "forever," he acknowledged in his deposition testimony that that was simply an "assumption" on his part and that Kenneth Gross had never made such a commitment.

Connect America believed it was obliged to pay "introduction fees" for only a reasonable time and in a reasonable amount. That point was made clear to Flowers in Gross' November 21 email, wherein Gross advised Flowers that he intended to pay "*an introduction fee only. I do not need help maintaining these relationships once the introduction is made.*"

In Gross' November 9, 2009 letter to Flowers he specifically outlined the reasons why limiting payment of fees to sales made in calendar 2009 was reasonable and consistent with his previously-communicated "introduction fee only" intention:

> *Based on the fact that you have not introduced us to any other strategic partners and are now working for a competitor (VRI), I have decided to terminate our arrangement after one full year. … This proved to be a good introduction for you as you are on track to make $50,000 due to this relationship.*

Based on the undisputed facts of record, this Court may reasonably conclude that Connect America's understanding of the agreement's duration term was reasonable and warranted. "Where terms of a contract are otherwise sufficiently definite, the court may supply an omitted term which is reasonably based on the contract as a whole. *J.V. Distributing, Inc. v. Waber, Inc.,* 1995 WL 505951(E.D. Pa.); *Greene v. Oliver Realty, Inc.,* 526 A.2d 1192, 1194 (Pa.Super.Ct.), *appeal denied,* 536 A.2d 1331 (1987).

*J.V. Distributing, Inc.* involved a dispute between parties over the amount and duration of a "finder's fee" payable to an individual who had "introduced" the parties to a transaction and played no further role therein. There, as here, no specific agreement had been reached regarding the duration of the payment obligation. Reasoning that "where, as here, a contract lacks a specific length, the court may imply a term of a reasonable length," the Court concluded that payment of fees for one year "is fair and just recompense for the work Valentino did in

20

facilitating the deal with Clover when all he did was bring Classic and Waber together through a telephone call and they did all the rest of the work."

With respect to Dr. Leonard's the record clearly demonstrates that Flowers *did not make the requisite introduction.* Common sense suggests that unilateral and ineffectual communications with low-level employees of a prospective strategic alliance partner are not sufficient to constitute a compensable "introduction," especially where, as here, direct solicitations and negotiations conducted by Mark Leighton and Kenneth Gross *in fact* led, independently of Flowers' efforts, to the formation of Connect America's strategic alliance with Dr. Leonard's. As Flowers expressly acknowledged in his deposition:

> Q.    *Who at Dr. Leonard's did you introduce to whom at Connect America?*
> A.    *No one.*

For the foregoing reasons, Connect America is entitled to summary judgment on Flowers' Count I, Breach of Contract.

### B.  Connect America is Entitled to Summary Judgment on Flowers' Claims for Quantum Meruit (Count II), Promissory Estoppel (Count III), <u>Unjust Enrichment (Count IV), and Declaratory Judgment (Count V)</u>

Given that the record clearly shows the existence of an express agreement between the parties, and that Connect America has fully complied with its obligations thereunder, Flowers cannot credibly contend that he is entitled to additional compensation on theories of quantum meruit, promissory estoppel, or unjust enrichment. *See Mitchell v. Moore,* 729 A.2d 1200, 1203 (Pa.Super.1999) (holding that unjust enrichment and the remedy of quantum meruit cannot be

found where there is a written or express contract between the parties); *Roman Mosaic & Tile Co. v. Vollrath,* 226 Pa.Super. 215, 313 A.2d 305, 307 (1973) ("The doctrine of unjust enrichment is clearly 'inapplicable when the relationship between the parties is founded on a written agreement or express contract.' " (internal citations omitted).

Moreover, it is difficult to understand how Flowers can seek refuge in the doctrine of promissory estoppel (presumably to support his claim for "forever" payments) when he has conceded in his deposition that NO promises to that effect were made by Gross or any other representative of Connect America:

> *Q. All right. What, if any, understanding do you have as to how long that [introduction fee] per sale Connect America was committed to pay?*
> *A. I have no preconceived notions about that. I assume it was forever.*
> *Q. Did Mr. Gross say it was forever?*
> *A. No.*
> *Q. You assumed it was forever. What was the basis for your assumption?*
> *A. I don't have any basis for that assumption.*

Regarding Flowers' claim for declaratory judgment, this Court cannot declare the existence of rights and duties which are not supported by the record.  As previously stated, the terms of the parties' agreement are straightforward and well-established by the evidence. Flowers' requested declaratory judgment seeks judicial amendment and enlargement of that agreement, relief that simply cannot be justified.

## C.  Conclusion

For the foregoing reasons, Connect America respectfully requests this Honorable Court to enter summary judgment in favor of Connect America and against Flowers on Counts I through V of Flowers' Complaint.

Respectfully submitted,


_s/ Bruce E. Rodger_____
Bruce E. Rodger, Esquire, PA Atty. ID 29011
GALLAGHER, SCHOENFELD, SURKIN,
CHUPEIN & DEMIS
25 West Second Street
Media, PA 19063
Tel:  610-565-4600
Fax: 610-566-8257
Email: brodger@gsscd.com
Attorneys for Defendant, Connect America.com
LLC

Dated:  March 8, 2013