**Exhibit 6**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| GEORGE G. FLOWERS, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| V. | : | NO. 12-4748 |
| | : | |
| CONNECT AMERICA.COM, | : | |
| Defendant | : | |

- - -

Tuesday, December 18, 2012
Media, Pennsylvania

- - -

Oral deposition of GEORGE G. FLOWERS,

taken in the Law Offices of GALLAGHER,

SCHOENFELD, SURKIN, CHUPEIN & DEMIS, 25 West

Second Street, on the above date, beginning at

approximately 1:15 p.m., before Maria Rousakis,

Court Reporter and Notary Public.

- - -

DELCASALE, CASEY, MARTIN & MANCHELLO
Registered Professional Reporters
230 South Broad Street - Suite 605
Philadelphia, Pennsylvania  19102

George Flowers

**12**

1  **A.**  Yes.
2  **Q.**  All right. Was that company based in
3  Florida, or based here but the manufacturing
4  was done in Florida?
5  **A.**  I'm not sure how the corporate structure
6  was set up, to be honest with you. It was
7  located in Florida.
8  **Q.**  Okay. Was the corporate office, if you
9  will, in Florida, or was there a corporate
10  office?
11  **A.**  Yeah, there was a corporate office. It
12  was in Thorofare, New Jersey. That's where
13  most of our nonmanufacturing people were.
14  **Q.**  Okay. So was your brother also involved
15  in that company?
16  **A.**  Yeah. He actually bought out another
17  company, which I can't recall the name of.
18  **Q.**  Okay. And he was also involved, I
19  assume, in Pedal Power?
20  **A.**  Yes and no. He gave that business to
21  his son, Michael Flowers, and he was the
22  president of that company.
23  **Q.**  Okay. Is that during the time when you
24  were employed there?

**13**

1  **A.**  Yes. I was always in charge of that
2  operation. His father was his mentor and
3  financier.
4  **Q.**  Okay. And you were the accountant
5  customer service production supervisor person?
6  **A.**  We were small. Lots of hats.
7  **Q.**  Okay. You were with the Commuter
8  Vehicles Company from '82 until when?
9  **A.**  '84.
10  **Q.**  Okay. As prices came back down, then --
11  **A.**  Found more dead dinosaurs under the
12  Middle East. We liquidated the business. Paid
13  everybody off.
14  **Q.**  Okay. And the company shut down?
15  **A.**  Yes.
16  **Q.**  All right. In or after 1984, where did
17  you go professionally?
18  **A.**  I went back to Electric Mobility, and
19  that's where I spent the next 25 or so years.
20  **Q.**  Okay. Was Electric Mobility a company
21  that your brother had founded as well?
22  **A.**  Yes.
23  **Q.**  Okay. What's the nature of the business
24  of Electric Mobility?

**14**

1  **A.**  We make the world famous Rascal
2  scooters. You might have heard of it on
3  Letterman. It's truly world famous. We're
4  pioneers in the industry. We were inventors of
5  the three wheel scooters for the elderly and
6  handicap, along with a couple other smaller
7  guys, but we were able to grow that business
8  tremendously over the next quarter of a
9  century.
10  **Q.**  Okay. Now, was '84 your first
11  involvement with that company? I think earlier
12  when I asked you, you said '82 to '07. Was
13  there some overlap?
14  **A.**  There's some overlap. One of the
15  reasons there was overlap was, I was
16  manufacturing the frames for the units in
17  Florida to be shipped to New Jersey and
18  manufactured in New Jersey.
19  **Q.**  You're manufacturing the frames for
20  the --
21  **A.**  Scooters.
22  **Q.**  -- Rascal scooter product simultaneously
23  with manufacturing the commuter vehicles?
24  **A.**  Yes. We had equipment.

**15**

1  **Q.**  Okay. All right. So, do I understand
2  correctly that as of '84, you returned to the
3  Rascal scooter business in earnest, and that
4  became your full-time employment?
5  **A.**  Yes.
6  **Q.**  Okay. Between '84 and '07, were you
7  involved in any other businesses or business
8  ventures, your brother's or otherwise?
9  **A.**  I don't believe so.
10  **Q.**  Okay. When you started with Electric
11  Mobility -- that's the name of the company
12  right, Electric Mobility?
13  **A.**  Yes.
14  **Q.**  Okay (continuing) in '84 in earnest,
15  what was your position there?
16  **A.**  From '84 to -- I don't know. I wore a
17  lot of hats with that company, too, and it
18  doesn't seem like it makes much sense to go
19  through each individually.
20  **Q.**  Give me generic descriptions if you
21  want.
22  **A.**  This is the way it basically worked,
23  Bruce. My nephew was in charge of selling and
24  marketing the product. I was in charge of

DelCasale, Casey, Martin & Manchello
(215) 568-2211

George Flowers

| 16 |
|---|
| 1    operations, manufacturing and distribution, and |
| 2    that's basically the way it worked for about 23 |
| 3    years. |
| 4    **Q.**    Okay.  So you were in charge of, if I |
| 5    recall correctly, operations, manufacturing and |
| 6    distribution of the Electric Mobility Rascal |
| 7    scooter product or product line? |
| 8    **A.**    Yes. |
| 9    **Q.**    And your nephew was Michael? |
| 10    **A.**    Michael Flowers. |
| 11    **Q.**    Did sales, marketing?  I'm sorry.  What |
| 12    did you say? |
| 13    **A.**    Sales and marketing.  And as President, |
| 14    he, of course, oversaw everything. |
| 15    **Q.**    So you were President of the company |
| 16    during that time period? |
| 17    **A.**    Michael was. |
| 18    **Q.**    Michael was the President.  Okay.  So he |
| 19    functioned as the CEO as well as sales and |
| 20    marketing? |
| 21    **A.**    Yes. |
| 22    **Q.**    Okay.  Aside from manufacturing |
| 23    employees, production employees, how many |
| 24    employees did Electric Mobility have during |

| 17 |
|---|
| 1    that time period? |
| 2    **A.**    We probably had 250 on site, and we had |
| 3    probably 400 in the field. |
| 4    **Q.**    Okay.  Those are exclusive of production |
| 5    people, so they would be, for example, sales, |
| 6    management, marketing people? |
| 7    **A.**    Of the 250, that was total on-site in |
| 8    our production facility in Sewell. |
| 9    **Q.**    Okay.  Were they production workers; did |
| 10    they make the scooters or -- |
| 11    **A.**    A portion of the 250.  About 100 were |
| 12    charged with manufacturing. |
| 13    **Q.**    Okay.  And then the others were? |
| 14    **A.**    Telemarketers, accounting people, that |
| 15    sort of thing. |
| 16    **Q.**    Okay. |
| 17    **A.**    Administration. |
| 18    **Q.**    From your description, it sounds like |
| 19    you were in charge of the production people and |
| 20    the marketing, accounting, sales people. |
| 21    Telemarketers were under your nephew's |
| 22    leadership, right? |
| 23    **A.**    That's correct. |
| 24    **Q.**    Okay.  Did you have responsibility for |

| 18 |
|---|
| 1    finance or accounting functions in the company? |
| 2    **A.**    No.  We all had control. |
| 3    **Q.**    All right.  So you were basically in |
| 4    charge of production, manufacturing, operations |
| 5    and distribution? |
| 6    **A.**    And at the time -- at one time, I was in |
| 7    charge of the design of the scooters, |
| 8    engineering.  And at a time, I was also |
| 9    responsible -- we had -- it was very rounded, |
| 10    well-rounded with all phases of the operation, |
| 11    and at one time, I was even asked to run the |
| 12    telemarketing floor. |
| 13    I was an efficiency expert in |
| 14    manufacturing, lean manufacturing.  We were a |
| 15    Class II MRP manufacturer and we took all the |
| 16    lean courses.  We were going for the Malcolm |
| 17    Baldrige award.  We were a sophisticated |
| 18    manufacturer.  And they asked me to go over to |
| 19    the telemarketing floor and apply some of those |
| 20    efficiency concepts to the telemarketers. |
| 21    **Q.**    Okay.  In terms of systems, things of |
| 22    that nature? |
| 23    **A.**    Right.  Processes, metrics. |
| 24    **Q.**    Okay.  I think when I initially was |

| 19 |
|---|
| 1    asking you about Electric Mobility, I said tell |
| 2    me what you did in '84.  Is what you have told |
| 3    me since then basically what you did between |
| 4    '84 and '07? |
| 5    **A.**    Yes.  Absolutely. |
| 6    In 2005, since I had already -- |
| 7    we had our production line; it was running very |
| 8    smoothly.  But competition made us take our |
| 9    product offshore, so I was in charge of the |
| 10    supply chain.  I developed, of course with my |
| 11    staff, tremendous relationships with vendors, |
| 12    people, companies, and I knew the import, |
| 13    export model very well. |
| 14    **Q.**    So the manufacturing operations were |
| 15    moved offshore? |
| 16    **A.**    Yes. |
| 17    **Q.**    Where were they moved to? |
| 18    **A.**    Various locations in China. |
| 19    **Q.**    Okay. |
| 20    **A.**    And then in 2005 -- |
| 21    **Q.**    Your responsibility in connection with |
| 22    that was to sort of make that transition |
| 23    happen, and maintain the necessary supply |
| 24    lines, distribution, importing, exporting |

7  (Pages 16 to 19)

DelCasale, Casey, Martin & Manchello
(215) 568-2211

20

1    stuff?
2    **A.**    Yes.  My title was Executive Vice
3    President of Manufacturing.
4    **Q.**    Okay.  Has that been your title for the
5    whole time you were there?
6    **A.**    It varied but it usually had
7    manufacturing in it.
8    **Q.**    All right.  So you oversaw that
9    transition to offshore manufacturing operations
10   and then the flipside, bringing the finished
11   product back in to the states, I assume?
12   **A.**    Yeah.  We had 200 sales reps, 200 to 400
13   sales reps, during different times that were
14   selling our product in the home, so they each
15   had an individual warehouse.  So I was also
16   responsible for getting that product from our
17   facility out to those gentlemen.
18   **Q.**    Okay.  So, logistics, is that a term
19   that applied to what you did?
20   **A.**    Logistics.  I would also say I was an
21   expert at logistics.
22   **Q.**    The logistics of?
23   **A.**    Transportation.
24   **Q.**    How many warehouses did you say?

21

1    **A.**    200.  It could have been a guy's garage,
2    but as far as our computer was concerned, they
3    were a warehouse.
4    **Q.**    Okay.  And they were across the country?
5    **A.**    Yes.
6    **Q.**    All right.  So if Sales Guy A needs an
7    inventory in his garage in LaHoya,
8    hypothetically, it was your job to make sure
9    that the product came in from the Chinese
10   manufacturing plant to the garage in LaHoya so
11   the guy could sell his --
12   **A.**    Came in to us first.
13   **Q.**    Okay.
14   **A.**    And then went back out.
15   **Q.**    Okay.  And it was the Thorofare
16   operation?
17   **A.**    The Sewell location.
18   **Q.**    Sewell, New Jersey, correct?
19   **A.**    Correct.
20   **Q.**    If I got my New Jersey geography, is
21   that near Thorofare?
22   **A.**    Yes.  It's ten miles.
23   **Q.**    Okay.  During the whole time through
24   '05, '07, I guess, did your nephew continue to

22

1    be the CEO and in charge of the sales and
2    marketing operations?
3    **A.**    Yes.  That never changed.
4    **Q.**    Okay.  And did you and he continue the
5    same dichotomy where, basically, you were
6    production, logistics, he was sales, marketing,
7    and then --
8    **A.**    No.  Interesting enough, in 2005, I got
9    another promotion.  Since I had successfully
10   moved the operation offshore, and we now had a
11   handful of employees in our distribution center
12   because everything was coming in from China, it
13   was really a waste of my time to oversee that
14   on a day-to-day basis.  And I was put in charge
15   of Executive Vice President of New Business
16   Initiatives, and I also oversaw the
17   distribution facility.
18   **Q.**    All right.  So you were Executive Vice
19   President for New Business Initiatives?
20   **A.**    Yes.
21   **Q.**    It's a wonderful sounding title.  What
22   did it mean?
23   **A.**    It means I got paid a lot more, and I
24   had a lot less to do.

23

1    **Q.**    What is a new business initiative?  What
2    does that mean?  What did that mean at Electric
3    Mobility at that time?
4    **A.**    We had a very solid channel of sales of
5    products in the home, and I was to develop new
6    relationships with other vendors to add to our
7    existing product line that could be sold
8    through the same channel.
9    **Q.**    Okay.  So the new business initiatives,
10   a "new business," referenced there is not new
11   opportunities for sales of Rascal scooters but,
12   rather, new opportunities to sell different
13   products using the same sales model?
14   **A.**    Yes.  But there were a couple other
15   smaller initiatives.  We actually were thinking
16   of selling handicap vehicles where the side
17   door slid open, Braun vehicles, and we entered
18   into a contract.  It didn't work out as well as
19   we thought it would.
20   **Q.**    Did you say "Braun" vehicles?
21   **A.**    Braun is the name of the company that
22   does conversions.
23   **Q.**    B-r-a-u-n?
24   **A.**    Yes.

8  (Pages 20 to 23)

George Flowers

24

1   Q.   Okay.  So that was to be an additional
2   product line that Electric Mobility was going
3   to offer for sale utilizing its existing --
4   A.   Yeah.  We thought our sales reps, who
5   actually did the home demonstration, would pull
6   up in that vehicle, lower the door
7   automatically, drive the vehicle into the
8   customer's home.  We thought it made the
9   ultimate sense to do that, but it was awful
10  hard to put a $40,000 vehicle in the hands of
11  all the sales reps we had, so ...
12  Q.   I see how that would be a perilous
13  prospect.
14  A.   What was the most interesting job that I
15  had -- and at this time, I was working -- I was
16  probably not working full weeks.  I was on my
17  way to retirement, but one of the interesting
18  projects that I was given was to develop a
19  catalog for mailings to our customers.  At that
20  point, we had about 3,000,000 customer
21  prospects and about 60,000 Rascal customers,
22  and --
23  Q.   When you say 3,000,000 prospects, that
24  means a mailing list comprised of 3,000,000 --

25

1   A.   Yeah.  All the contacts we had made over
2   the years, and Orners, I believe, was a subset
3   of that, too.
4        So we saw additional
5   opportunities to develop a catalog, and they
6   put me in charge of that.  And what I did --
7   and this is certainly a tie-in to what we're
8   talking about today -- I'm a benchmarker.
9   That's what they taught us in all the different
10  educational classes we went to.  So I procured
11  all the catalogs that I could find that were
12  associated with the demographics that we're
13  trying to reach, and there was a stack of them
14  (indicating).  There's a lot of people that
15  tried to hit the same demographics as we were
16  trying to hit.
17  Q.   What is that demographic?
18  A.   73 year old, 60 percent female, 37
19  percent men.  That was our heart zone
20  demographics.
21  Q.   And 3 percent other?
22  A.   Yes.  I don't know.  I'm giving you
23  approximates.
24  Q.   Okay.

26

1   A.   But everybody in our company knew that
2   demographic.
3   Q.   From your description, it sounds to me
4   like the main way that Rascal products were
5   sold, marketed, distributed was direct mail to
6   customers or direct to customers primarily by
7   mail?
8   A.   Yes.
9        And they would call us and set
10  up a home demonstration, and we would try to
11  arrange two home demonstrations for each of our
12  sales reps every day.
13  Q.   Okay.  So the, I'm sorry, 3,000,000
14  prospect mailing list was people to whom direct
15  mail solicitations were sent; they would
16  generate X percent of a call in requesting
17  demonstration, and then your 200 sales guys in
18  the field would show up and do demonstrations,
19  and close the deal.  Is that the basic
20  business --
21  A.   Yes, sir.
22  Q.   Okay.  And there were 3,000,000 million
23  on the mailing list.  Is it 6,000,000 Rascal
24  owners?

27

1   A.   60,000.
2   Q.   Okay.  So you were charged -- and this
3   is what, 2005, 2007?  Is that the time period
4   we're talking about?
5   A.   Absolutely.  I know it was that time
6   frame.  Yes.
7   Q.   In charge of putting together a catalog;
8   you gathered, reviewed and analyzed catalogs
9   put out by others, presumably competitors,
10  seeking the same market, right?
11  A.   Yes.
12  Q.   Okay.
13  A.   But what was interesting about it, we
14  knew product placement.  We knew that what was
15  on the front cover was going to be the major
16  seller for a catalog, back cover, middle cover
17  next to the order form.  We were experienced in
18  advertising and marketing.
19  Q.   Had you ever done a catalog before --
20  A.   No.
21  Q.   -- or was it just one-page mailers?
22  A.   We did a couple pages, but we never --
23  this was a full blown catalog that we were
24  embarking upon.

DelCasale, Casey, Martin & Manchello
(215) 568-2211

George Flowers

48

1  Q.   Okay. Was that around the time that you
2  decided, I'm going to unretire?
3  A.   Yes.
4  Q.   Okay. Now, during that time period
5  between the date of your effective date of your
6  retirement, January 1, '07, and October-ish
7  '07, were you involved in any kind of business
8  ventures at all?
9  A.   Well, like I said, Electric Mobility was
10 a family business. And I mentored Mike and
11 Mike mentored me. We talked a lot, so I knew
12 what was going on with the family business.
13 Q.   So you remained informal adviser to
14 Electric Mobility?
15 A.   He's my nephew but we are really
16 brothers, you know. Yes.
17 Q.   As issues came up, he would consult with
18 you, but you weren't getting paid for it or
19 didn't have any official responsibility; is
20 that a fair statement?
21 A.   Yes.
22 Q.   All right. Other than Electric
23 Mobility, were you involved in any business
24 venture of any type prior to October 2007?

49

1  A.   Yeah. In October of 2007, I started a
2  company called Platinum Independence.
3  Q.   My question was, prior to October
4  2007. . I understand you changed or --
5  A.   Oh. Prior?
6  Q.   Between January and October.
7  A.   No.
8  Q.   January and September, let's say.
9  A.   No. I did nothing. I cleared my brain,
10 listened to a lot of classical music, fished,
11 traveled.
12 Q.   Played some golf?
13 A.   Played a lot of golf.
14 Q.   All right. That's enough to drive you
15 nuts.
16      Prior to your retirement from
17 Electric Mobility and, you know, during the
18 time when you were employed there, let's say
19 back to '82, '84, had you been involved in any
20 side businesses or private businesses, or
21 anything like that?
22      MR. PASS:  What specific time
23 period are you referring to?
24      MR. RODGER:  Let's say 1984 to

50

1       January 1st, 2007.
2            THE WITNESS:  No. I don't
3  believe so.
4            Could we go off the record?
5            (Discussion held off the record.)
6  BY MR. RODGER:
7  Q.   Okay. Prior to October 2007, had you
8  had any dealings whatsoever with Connect
9  America or anybody affiliated with Connect
10 America?
11 A.   You know, my memory is a little foggy on
12 this, but at one point in our time line, at
13 Electric Mobility, we thought about selling
14 medical alarms, and I wasn't on that side of
15 the business. And I think Ken may have come to
16 Electric Mobility, but I'm not sure if I was
17 involved or not.
18 Q.   When you say, "Ken," you mean Ken
19 Gross?
20 A.   Yes.
21 Q.   All right. What, if anything, occurred
22 with that? You had no involvement with it,
23 right?
24 A.   I'm not sure, because I was involved in

51

1  getting -- I'm a little uncertain about it, to
2  be honest with you.
3            MR. PASS:  If you're uncertain,
4  then you shouldn't testify. You should
5  testify about what you know.
6            THE WITNESS:  No.
7  BY MR. RODGER:
8  Q.   Okay. I'll second that, for what it's
9  worth. If the answer to any question I ask you
10 is, "I don't know," the truthful answer is, "I
11 don't know," that's a perfectly acceptable
12 answer, or "I don't remember." Whatever.
13 Okay?
14 A.   Okay.
15 Q.   I'm here to find out what you know, not
16 what you can speculate about or your opinions
17 on things. Okay. Just facts. All right?
18      Do you have any recollection of
19 having met Ken Gross at any time before, just
20 an artificial benchmark here, October 1st,
21 2007?
22 A.   No.
23 Q.   Okay. Prior to October 1st, 2007, had
24 you had any dealings with Dr. Leonard's other

15 (Pages 48 to 51)

George Flowers

---

52

1    than looking at their catalog as a benchmark?
2    **A.**    Yes.
3    **Q.**    What was the nature of your involvement
4    with the Dr. Leonard's company?
5    **A.**    They sold our scooters in their
6    catalogs.
7    **Q.**    Were you involved in that piece of it?
8    **A.**    No.
9    **Q.**    That was more the sales and marketing
10   part of Electric Mobility?
11   **A.**    Yes, sir.
12   **Q.**    So you, as the production operations
13   guy, were not directly involved in that
14   relationship with Dr. Leonard's?
15   **A.**    I knew their shipping. I know their
16   operations people, and I knew their receiving
17   people. I knew that part of the business, but
18   I wasn't responsible for the sales.
19   **Q.**    Okay. And what kind of business is Dr.
20   Leonard's?
21   **A.**    They're a catalog business, essentially,
22   and they sell products that help seniors.
23   **Q.**    So they target, essentially, the same
24   geriatric demographic you mentioned before?

---

53

1    **A.**    Yeah. Maybe a little younger.
2    **Q.**    All right. How about firstSTREET? You
3    mentioned them as well. Had you had any
4    involvement or dealings with firstSTREET before
5    October 1st, 2007? I'm just using that just as
6    an arbitrary time benchmark.
7    **A.**    No.
8    **Q.**    Okay. What is the nature of the
9    business of firstSTREET?
10           **MR. PASS:** Today or in 2007?
11   **BY MR. RODGER:**
12   **Q.**    Okay. Let me ask you, as of 2007, what
13   was the nature of firstSTREET, if you know?
14   **A.**    2007 I knew that they were an internet
15   marketer, and I also knew that they were a
16   cataloger to the same demographic. And I
17   continued to follow firstSTREET throughout the
18   years.
19   **Q.**    Okay. Follow from afar or as a
20   competitor? Why were you following firstSTREET
21   through the years?
22   **A.**    I was intrigued by them.
23   **Q.**    What was intriguing about firstSTREET to
24   you?

---

54

1    **A.**    What was intriguing about -- I assume
2    you're going to ask me about other things that
3    we can cover there, or I can do it here. But
4    the next step of --
5           **MR. PASS:** Your role is to
6    answer Bruce's questions --
7           **THE WITNESS:** Could you repeat
8    it.
9    **BY MR. RODGER:**
10   **Q.**    Rather than try to figure out what
11   question I may ask which I may not even know.
12   Keep it simple.
13   **A.**    Right.
14           **MR. PASS:** Madam Court Reporter,
15   could you please repeat the last
16   question.
17           (The court reporter read back as
18   requested.)
19           **THE WITNESS:** Ask a new
20   question.
21   **BY MR. RODGER:**
22   **Q.**    Okay. In your testimony a moment ago,
23   you said that you followed firstSTREET because
24   they were intriguing, and my follow-up question

---

55

1    was, why did you find them intriguing?
2    **A.**    In their catalogs, I thought they had
3    unique products that weren't sold by anyone
4    else. They had the best order forms, and the
5    quality of their catalogs exceeded others by
6    heads, you know, by a lot.
7    **Q.**    Okay. So firstSTREET was a company that
8    marketed through catalogs, and did you also say
9    through internet marketing?
10   **A.**    Yes.
11   **Q.**    Okay. Did you come to be familiar with
12   their catalogue during this benchmarking or
13   review process that you described before while
14   still employed at Electric Mobility?
15   **A.**    Yes.
16   **Q.**    From and after the time you terminated
17   your employment with Electric Mobility, did you
18   continue to follow firstSTREET?
19   **A.**    Yes.
20   **Q.**    All right. For the same reasons you
21   just said, because they had a unique catalog
22   and product line?
23   **A.**    No. Because of the next phase of my
24   employment history.

---

16 (Pages 52 to 55)

George Flowers

56

1   Q.   Okay. All right. Prior to, let's say,
2   October 1st, 2007, again, using that as a
3   purely arbitrary time benchmark, had you had
4   any involvement with Internet Alliance?
5   A.   No.
6   Q.   And I think I asked you this before, but
7   just -- I don't remember what you said. Prior
8   to October 1st --
9   A.   I'm sorry. I'm sorry. Yes, I did.
10  Q.   Okay. What was the nature of that
11  involvement?
12  A.   They were one of the largest sellers of
13  seat lift chairs on the internet, and they had
14  come to visit us at Electric Mobility during
15  that time period.
16  Q.   Seat lift chair is what?
17  A.   Is a lift chair for the elderly.
18  Q.   A traditional chair in which the seat
19  portion elevates to assist an elderly person to
20  get back on his or her feet?
21  A.   Yes.
22  Q.   As opposed to a chair that goes up the
23  steps or something?
24  A.   Yes. That's correct.

57

1   Q.   Okay. And Internet Alliance had come
2   to Electric Mobility while you were there for
3   some purpose, while you were at Electric
4   Mobility?
5   A.   Yes.
6   Q.   Were you involved with them in that
7   interaction?
8   A.   No.
9   Q.   Or that had been something falling into
10  the bailiwick of the sales and marketing
11  people?
12  A.   Yes.
13  Q.   All right. Prior to October 1st, 2007,
14  again, using that artificial arbitrary
15  benchmark, had you ever done anything in the
16  way of sales or marketing?
17  A.   Yes.
18  Q.   Describe what.
19  A.   I've helped my sons in their businesses,
20  made fliers, you know, to sell different
21  products during their early years out of
22  college.
23  Q.   What kind of business or businesses do
24  your sons have?

58

1   A.   During that time frame or currently?
2   Q.   Well, at any time when you were involved
3   in sales or marketing activities.
4   A.   Well --
5   Q.   Printing up fliers for baby-sitting
6   services or something?
7   A.   My younger son created a company where
8   he wanted to detail cars, and we came up with
9   the concept where he would go to companies and
10  do it while people were at work. You do it
11  on-site, that kind of stuff.
12  Q.   So a one-page flier type thing?
13  A.   Yeah. I told him how to reach the
14  companies and mentored him in the business, and
15  that kind of stuff.
16  Q.   Is he still involved in that business?
17  A.   No.
18  Q.   Okay. Other than that experience,
19  helping your son prepare fliers for the other
20  detailing business, what other sales and
21  marketing experience do you have --
22  A.   Well --
23  Q.   -- prior to October 1st '07?
24  A.   When I was at Electric Mobility, it was

59

1   a family owned business. We had a Strategic
2   Planning Committee, which was an executive
3   committee also, and we had to approve all the
4   sales and marketing materials, so I was
5   involved in that.
6   Q.   As part of the executive committee?
7   A.   Yes. We all had to sign-off on any
8   mailings that was more than X number of
9   quantity. And the same thing for our ads that
10  were placed in Modern Maturity. They were very
11  expensive, $250,000 per page, and I was
12  responsible for calling all the phone numbers
13  on the page to make sure they rang to our
14  company. And we had ad standards. We had
15  marketing standards.
16  Q.   Modern Maturity is a publication that is
17  in --
18  A.   That was AARP. We actually -- doesn't
19  have anything to do with this. I'm sorry. So
20  I have a lot of experience with sales and
21  marketing through Electric Mobility.
22  Q.   Okay. Other than what you've described,
23  anything else?
24  A.   No.

17 (Pages 56 to 59)

George Flowers

**60**

1    Q.   Okay. Again, this is prior to October
2   1st, 2007, the time period we're talking
3   about?
4    A.   Yes.
5    Q.   In or about October 2007, what changed
6   in your life?
7         **MR. PASS: Objection. Excuse**
8       **me. Rephrase that question.**
9   **BY MR. RODGER:**
10    Q.   That was a poorly phrased question.
11   Your Counsel is absolutely right.
12        In your earlier testimony, you
13   said that you effectively unretired as of
14   October 1st, 2007, thereabouts. Tell me about
15   that.
16    A.   I was tired of swinging golf clubs, and
17   I was bored. I was used to being around a lot
18   of people. A lot of people reported to me. I
19   was bored, so I got back in the business.
20    Q.   You got back into business. What kind
21   of business did you get back into?
22    A.   I started a company called Platinum
23   Independence, and it was basically founded
24   through my desire and love of seniors. I loved

**61**

1   helping them, and I really thought it was a
2   good thing to help keep seniors in their home,
3   because I knew the alternative wasn't very
4   nice.
5    Q.   Was the company or corporation called
6   Platinum Independence?
7    A.   Yes, sir.
8    Q.   Your role in that was what?
9    A.   Founder.
10    Q.   All right. Did you function as
11   president, CEO?
12    A.   Managing partner.
13    Q.   Okay. How many people are involved with
14   that company?
15    A.   Two.
16    Q.   Who is the other one?
17    A.   Walter Jacob.
18    Q.   Since you said that your role was
19   managing partner, can I conclude that Mr. Jacob
20   was the CEO?
21    A.   We had equal partners. We were both
22   managing partners.
23    Q.   Who was Mr. Jacob?
24    A.   He was a lifelong friend and compatriot

**62**

1   at Electric Mobility. He was in charge of our
2   Marketing Department.
3    Q.   All right. Had he also retired from
4   Electric Mobility around the time you did?
5    A.   He left for a different position.
6    Q.   He left Electric Mobility to go to a
7   different employer?
8    A.   Yes.
9    Q.   Did that happen around the same time you
10   left?
11    A.   No. It happened earlier.
12    Q.   When did he leave?
13    A.   I don't recall.
14    Q.   Like, lot of years earlier or a month
15   before?
16    A.   No. No. I'd say it was after the year
17   2000, before 2005.
18    Q.   Where did he go to work?
19    A.   He became a sales and marketing
20   consultant. He worked for a lot of different
21   companies.
22    Q.   Did he have his own consulting
23   business?
24    A.   Yes.

**63**

1    Q.   What was that business called?
2    A.   I don't know.
3    Q.   All right. While he was off doing his
4   sales and marketing consulting thing in the
5   early 2000s, did you stay in touch with him?
6    A.   No.
7    Q.   When did you and he reconnect after your
8   retirement?
9    A.   I called him because I was very good at
10   buying, selling, distributing, and he was very
11   good at sales and marketing. And I thought it
12   made a lot of sense for us to get together
13   again. I called him with a business concept
14   that I had.
15    Q.   Did this occur in October of '07, this
16   phone call?
17    A.   Plus or minus two months.
18    Q.   Okay. At the time when you called him,
19   what was he doing?
20    A.   He was consulting.
21    Q.   Consulting for whom?
22    A.   I can tell you companies that he did
23   consult for, but I don't know specifically when
24   they were.

18 (Pages 60 to 63)

George Flowers

68

1   venture into territory that you consider to be
2   confidential proprietary, you can let me know
3   that. Okay?
4   A.    Yes.
5   Q.    My intention was not to delve
6   unnecessarily into confidential proprietary
7   information that's not directly relevant to our
8   claims. Okay?
9   A.    Okay.
10  Q.    All right. When we got off on our side
11  discussion here, I believe you were explaining
12  to me that the business proposal you made to
13  Mr. Jacob involved functioning as a
14  consolidator for what you consider to be a
15  fragmented industry relating to helping elderly
16  people stay in their homes?
17  A.    That is correct.
18  Q.    Is that an accurate summary of what you
19  said?
20  A.    Yes.
21  Q.    Okay. What, in particular, did you have
22  in mind for this proposed business with Mr.
23  Jacob?
24  A.    Putting together products and services

69

1   that we could sell in the home.
2   Q.    Okay. You used the term
3   "consolidator." What do you mean by that?
4   A.    That came later in our development of
5   Platinum Independence. When we originally
6   started out, we were selling -- he was finding
7   customers through a marketing effort, and then
8   I was going into the home and trying to prove a
9   business model, that we could sell products in
10  the home using our sales and marketing
11  material, and my closing.
12  Q.    Well, I'm a little confused. I thought
13  my original question was, when you first made a
14  proposal to Mr. Jacob, what was it, and you
15  said it was a business that was sort of a
16  consolidator; offer a variety of products. Now
17  you're saying that happened later?
18  A.    That happened later.
19  Q.    Okay.
20  A.    We had a business plan, and that was the
21  first part of the business plan, to prove that
22  part of the operation.
23  Q.    Okay. So in October of '07 or
24  thereabouts when you contacted Mr. Jacob for

70

1   the first time, the business you were
2   proposing was not that of a consolidator, it
3   was more as a direct marketer to geriatric home
4   consumers?
5   A.    Right.
6   Q.    And what were you going to market?
7   A.    We were going to market walk-in tubs,
8   stair lifts, scooters, large button
9   telephones. Did I say walk-in tubs? Those
10  types of product.
11  Q.    Those products would be sourced from
12  someone other than Platinum Independence, I
13  assume?
14  A.    Yes.
15  Q.    Okay. Did you contemplate that Platinum
16  Independence would manufacturer any of those
17  products?
18  A.    No.
19  Q.    Was Platinum Independence's function to
20  market those products to prospective
21  purchasers, who were geriatric customers, in
22  their homes?
23  A.    Yes.
24  Q.    Okay. And the marketing would be by

71

1   means of what?
2   A.    Direct mail. Basically, direct mail at
3   that point.
4   Q.    Okay. On the product launch, you kind
5   of made it off scooters. Would they include
6   Electric Mobility scooters?
7   A.    Absolutely.
8   Q.    Okay. In the documentation related to
9   your parting of the ways with Electric
10  Mobility, did you have anything in the way of a
11  noncompete or limitation and ability to engage
12  in the geriatric marketing industry?
13  A.    No.
14  Q.    Okay.
15  A.    No restriction.
16  Q.    Okay. Did you have in place, as of the
17  time when you left, any --
18  A.    Left where?
19  Q.    I guess the time when you left Electric
20  Mobility (continuing) any relationship with a
21  company which authorized you to sell or market
22  their scooter?
23  A.    Yes. It was probably verbal through my
24  brother -- my nephew.

DelCasale, Casey, Martin & Manchello
(215) 568-2211

George Flowers

---

72

1   **Q.** Were you a distributor or licensee, or
2   whatever it would be, after the time when you
3   retired?
4   **A.** Nothing official. No.
5   **Q.** Okay. All right. As you were
6   discussing the marketing of, among other
7   things, scooters with Mr. Jacob, you
8   anticipated that a more formal relationship as
9   a, what would it be called, a dealer,
10  distributor?
11  **A.** I'm sorry. Repeat the question.
12          **MR. PASS: For which entity?**
13  **BY MR. RODGER:**
14  **Q.** As you were discussing business
15  proposals for Platinum Independence with Mr.
16  Jacob, which, as you said, contemplated selling
17  scooters manufactured by Electric Mobility, did
18  you contemplate that you would develop a
19  distributor or sales guy, or manufacturer's rep
20  type relationship with them, with Electric
21  Mobility?
22  **A.** No.
23  **Q.** How were you going to offer their
24  products for sale?

---

73

1   **A.** It was a free, open relationship. I
2   called up and said, "I need some pictures for
3   our advertising." He'd send them over. "Mike,
4   we sold a scooter. How much is it? Okay.
5   I'll pay you when I see you next Tuesday."
6   It's like that.
7   **Q.** During the time when you were there, to
8   your knowledge, did Electric Mobility say, "Any
9   Tom, Dick or Harry anywhere can market our
10  scooters, and if they make a sale, hey great.
11  Give us a call. We'll fulfill it"?
12  **A.** No. It was a family relationship.
13  **Q.** Okay. Other than with respect to family
14  members like you, Electric Mobility had in
15  place formal distribution agreements of some
16  sort with the people who were marketing and
17  selling their products, right?
18  **A.** Absolutely.
19  **Q.** All right. You described apparently, in
20  more detail than necessary, the initial
21  discussions with Mr. Jacob about your
22  business. What, if any, business venture did
23  you embark upon either with Mr. Jacob or not
24  with him?

---

74

1   **A.** We started selling products in the
2   home.
3   **Q.** All right. When did you actually start
4   selling products?
5   **A.** I would say after -- I don't know the
6   exact date, but I'd say the first quarter of
7   2008.
8   **Q.** All right. Now, when you say, "we," you
9   mean Platinum Independence, the company you had
10  formed?
11  **A.** Yes.
12  **Q.** Was Mr. Jacob involved with you in that
13  company?
14  **A.** Yeah. During the whole course of the
15  relationship, it was just the two of us. There
16  were never any other employees.
17  **Q.** Okay. But as of the first quarter of
18  '08, Mr. Jacob was already on board?
19  **A.** Yes.
20  **Q.** If you were marketing and selling things
21  to people, presumably you had in place by then
22  supplier relationships for the product you were
23  selling?
24  **A.** Yes.

---

75

1   **Q.** Did you have in place agreements with
2   suppliers of product?
3   **A.** Absolutely.
4   **Q.** Okay. What kind of agreements?
5   **A.** Whatever --
6          **MR. PASS: Objection. Could you**
7      **please be more specific in terms of what**
8      **kind of agreements.**
9   **BY MR. RODGER:**
10  **Q.** Okay. Well, were the agreements in the
11  nature of a manufacturers rep agreement, a
12  distributor agreement, a vendor agreement, a
13  dealer agreement, a free agent agreement?
14  **A.** Most of the products that we sold, we
15  had to go through an application process, and
16  some companies require a contract.
17  **Q.** Okay. To the extent the companies
18  required a contract -- you used the term
19  "contract." I assume you mean a written piece
20  of paper defining the rights and duties of the
21  parties, right?
22  **A.** Yes, sir.
23  **Q.** Okay. As differentiated from contract
24  in the abstract legal sense. I've not heard

---

21 (Pages 72 to 75)

DelCasale, Casey, Martin & Manchello
(215) 568-2211

George Flowers

76

1  you testify to any graduation or attendance at
2  law school --
3  **A.**   I'm not a contract expert for sure.
4  **Q.**   Okay.  Let's assume for the sake of this
5  deposition that if you use the term "contract,"
6  which can have legal ramifications, that's not
7  what you mean.  You're using it in plain old
8  common English.  Okay?
9         **MR. PASS:  I'm going to object**
10        **to that.  He'll use the term "contract"**
11        **in the way which he understands the**
12        **term.  If you need to drill down and ask**
13        **him what context he understands the**
14        **term, then I suggest you do that.**
15        **MR. RODGER:  Okay.  Well, that's**
16        **sort of what I was saying.**
17  **BY MR. RODGER:**
18  **Q.**   I'm not asking you for legal opinions
19  when you use the term contract, as I just did.
20  You mean a piece of paper signed off on by you
21  and the vendor?
22        **MR. PASS:  Same objection.**
23        **That's not what he said.**
24        **MR. RODGER:  All right.**

77

1         **MR. PASS:  For example, there**
2         **can be a verbal contract.  There can be**
3         **a written contract, so --**
4         **MR. RODGER:  Okay.  That's what**
5         **I was trying to clarify, Counsel, and I**
6         **don't know if it's particularly**
7         **productive for you to attempt to answer**
8         **my question.  Let me direct the question**
9         **to the witness.**
10        **If you have an objection to a**
11        **question that I ask, you can articulate**
12        **the objection.  Okay?**
13        **MR. PASS:  Just trying to**
14        **streamline the deposition.  Please**
15        **proceed.**
16        **MR. RODGER:  I appreciate your**
17        **help.  I haven't really been doing this**
18        **for that long, 34 years or so.  All**
19        **right.**
20  **BY MR. RODGER:**
21  **Q.**   My questioning with respect to Platinum
22  Independence, your company, in or about the
23  first quarter of '08, I think we were looking
24  at, related to the product lines you guys were

78

1  offering for sale to customers --
2  **A.**   That's correct.
3  **Q.**   -- and in particular, my follow-up
4  question had been, what kinds of relationships
5  did you have with the manufacturers or
6  suppliers of those products; to which you
7  responded with respect to some, we had
8  contracts, words to at that effect.  What did
9  you mean by "contract?"
10  **A.**   After we approached companies, we would
11  have to typically go through a credit
12  application and approval.  Once we did that,
13  they sent us a piece of paper.  I don't know
14  what it was called, whether it was an
15  agreement, contract or whatever.  They would
16  send me back something, I'd fill it out, and
17  sooner or later, we'd get product.
18  **Q.**   Okay.  By virtue of the piece of paper,
19  you would be authorized on behalf of that
20  company to offer their products for sale.  And
21  if somebody said, "I'd like to buy that," you
22  could remit the order to the company, and they
23  would fulfill it?
24  **A.**   Yes.

79

1  **Q.**   Okay.
2  **A.**   Is this a good time for me to take a
3  quick break?
4  **Q.**   Sure.
5         (Brief recess taken.)
6  **BY MR. RODGER:**
7  **Q.**   All right.  When we left off, I think I
8  was asking you about relationships you had with
9  suppliers of products for your, then, new
10  venture in early 2008 called Platinum
11  Independence.  What kinds of product were you
12  selling in-house?
13  **A.**   Scooters, power chairs, in-home
14  elevators, stair lifts.
15  **Q.**   All right.  And between you and Mr.
16  Jacob -- you said there were only the two of
17  you involved in the company, right?
18  **A.**   Yes.
19  **Q.**   What was the division of responsibility,
20  if there was one?
21  **A.**   He did sales and marketing.  I did the
22  rest.
23  **Q.**   All right.  The rest included sourcing,
24  distribution, logistics, orders for

22  (Pages 76 to 79)

George Flowers

84

1   yes.  We did have some.
2   Q.   Some kind of writing in place with
3   respect to each of the manufacturers whose
4   products you were offering for sale through
5   Platinum Independence, right?
6   A.   I don't know of all, but, yes, we did
7   have some.  Yes.
8   Q.   Okay.  And if I were to -- I'm not
9   requesting them now, but if I were to request
10  them, would you be able to produce them?  Do
11  they still exist?
12  A.   I believe some do.  Yes.
13  Q.   Okay.  Are there some that maybe
14  existed, but don't anymore?
15  A.   Yes.
16  Q.   Okay.  Why is that?
17  A.   Because the business was dissolved, and
18  there wasn't ...
19  Q.   Okay.  So for how long did the business,
20  Platinum Independence, function in the manner
21  in which you described?
22  A.   It was dissolved in April of 2009.
23  Q.   Okay.  Why was that?
24  A.   Walt's significant other's businesses

85

1   started to flourish.  He wasn't available for
2   me when I needed him.
3        His uncle owned Lancaster's
4   Farm, which is in West Chester.  After he gave
5   millions of dollars to his sons and daughters,
6   he started to give millions of dollars to his
7   nephews, and Walt was one of his nephews.  So,
8   Walt became independently wealthy, and the
9   amount of time he spent with me was harder and
10  harder to get.  And he lived in Atlanta, and he
11  just stopped answering his phone.
12  Q.   All right.  Up until that time, can you
13  estimate on a per week basis or per month basis
14  how much time Mr. Jacob was putting into the
15  business of Platinum Independence?
16  A.   A lot less than I thought I was.  No
17  idea.
18  Q.   Was the company profitable?
19  A.   No.
20  Q.   Did anybody ever take home a paycheck or
21  receive any kind of income or revenue from the
22  company?
23  A.   No.
24  Q.   Did the company make sales?

86

1   A.   Yes.
2   Q.   What happened to the proceeds from the
3   sales?
4   A.   Had to pay for the product, and we had
5   fixed costs.  We didn't make money.
6   Q.   Okay.  Did the company lose money?
7   A.   Yes.
8   Q.   How much?
9   A.   Do I have to answer that?
10  Q.   I mean, hundreds of thousands, tens of
11  thousands, 50 bucks?
12  A.   No.  No.
13  Q.   I don't need the specific number.
14  A.   Less than 5,000 bucks.
15  Q.   Total dollar sales volume for the
16  company approximately was what?  From your
17  quarter of magnitude --
18  A.   I don't know.
19  Q.   Under a million?
20  A.   Oh.  Under 30,000.
21  Q.   Okay.  When was the company finally
22  dissolved?
23  A.   4 of 2009, April.
24  Q.   April of 2009?

87

1        As of the time of the
2   dissolution of the company, were all of the
3   supplier contracts with vendors that you
4   alluded to before still in place?
5   A.   I don't know because we didn't buy that
6   much product.  I never remember getting
7   notification that they were ended.
8   Q.   Did you notify all the vendors, We're
9   out of business.  Let's terminate these
10  agreements"?
11  A.   No.
12  Q.   Did anybody care?
13  A.   No.
14  Q.   Okay.  Prior to April of '09, were you
15  involved in any other kinds of business
16  ventures?
17       MR. PASS:  Again, between what
18       period of time are you referring to?
19  BY MR. RODGER:
20  Q.   Let's say between October '07 and April
21  '09, which, as I understand it, was the time
22  period when Platinum Independence was, more or
23  less, functioning?
24  A.   No.

24  (Pages 84 to 87)

George Flowers

88

1    Q.   Okay.  From and after April of 2009,
2    did you become involved in any business
3    ventures?
4    A.   After April of '09?
5    Q.   After whatever date it was.
6    A.   Yes, I did.
7    Q.   When Platinum stopped being an entity,
8    what did you do, if anything?
9         Did you go back to playing
10   golf?
11   A.   This is a very interesting point in my
12   life. My sister, Rose Rowen, owns a company
13   called Rowan & Associates.  They do promotional
14   products, and I went to work for her.
15   Q.   Okay.  What kind of promotional
16   products?
17   A.   Pens, paper, cups.
18        I may have gotten that time
19   frame wrong.
20   Q.   If, at any time, you realize you
21   misspoke, feel free to go back and correct it.
22   We're looking for your best recollection here.
23   Okay?
24   A.   Okay.

89

1    Q.   I can't remember what I did last
2    Tuesday, so if you're off a little bit on a
3    date from '09, that's entirely understandable.
4         MR. PASS:  Do you need to go
5         back to the original question about the
6         time frame between October of '08 and
7         April '09?
8         THE WITNESS:  Oh.  Okay.  I'm
9         sorry.
10   BY MR. RODGER:
11   Q.   My current question is directed to --
12   you said, I think, that Platinum Independence
13   ceased functioning in April of '09?
14   A.   Yes.  And then you skipped from there.
15   Q.   I said "after that."
16   A.   Prior to that.  Prior to that, I had a
17   relationship with Connect America.
18   Q.   Okay.  I had asked you -- the time
19   period for the existence of Platinum
20   Independence, as I understand it, was,
21   inception in or about October of '07;
22   dissolution or termination in April of '09?
23   A.   That's correct.
24   Q.   During that period of time, that company

90

1    was functioning, more or less?
2    A.   Yes.
3    Q.   During that same period of time -- I
4    guess I should have asked you, during that
5    same period of time, did you have other
6    business ventures going on or other business
7    interests?
8    A.   Yes.
9    Q.   Okay.  And what other business interests
10   did you have?
11   A.   I found Connect America and started a
12   business relationship with them.
13   Q.   And that's the business relationship at
14   issue in our case?
15   A.   Yes.
16   Q.   Believe it or not, we're going to come
17   back to that.  Doesn't sound like it, but we
18   will.  For now, let me just round up what else
19   was going on.
20   A.   Okay.
21   Q.   Okay.  So, a business relationship of
22   some sort was formed prior to April of '09 and
23   during the time when Platinum Independence was
24   still functioning, more or less?

91

1    A.   That's correct.
2    Q.   Okay.  Other than the relationship with
3    Connect America, and we'll come back to that in
4    detail, did you have any other business
5    ventures going on, let's say, between October
6    '07 and April of '09?
7    A.   Yes.
8    Q.   Okay.  What other business ventures did
9    you have?
10   A.   I had a relationship with firstSTREET.
11   Q.   Okay.  What was the nature of the
12   relationship with firstSTREET?
13   A.   There was a bunch of different
14   relationships.  I was entering into a joint
15   venture agreement with them.
16   Q.   Okay.  Your relationship with
17   firstSTREET, when did that first come into
18   being?
19   A.   October 22nd.
20   Q.   Of what year?
21   A.   Or 23rd.  One of those two dates.
22   Q.   Of what year?
23   A.   2008.
24   Q.   All right.  You seem to be fairly

25 (Pages 88 to 91)

George Flowers

92

1  definitive about the date when the relationship
2  came into being.  How did the relationship come
3  into being with firstSTREET?
4          This is what we're talking about
5  now, right, firstSTREET?
6  A.    That's correct.
7  Q.    Okay.  How did the relationship come
8  into being?  Was there an agreement signed, for
9  example?
10 A.    No.  Presentation.
11 Q.    Okay.  So you made a presentation to
12 firstSTREET or vice versa?
13 A.    I made a presentation to firstSTREET.
14 Q.    Was that on behalf of Platinum
15 Independence, or was that you pursuing a
16 business interest independent of Platinum
17 Independence?
18 A.    It was with respect to Platinum
19 Independence.
20 Q.    Okay.  What was the nature of the
21 presentation?  Were you pitching something?
22 A.    I was pitching something.
23 Q.    What were you pitching?
24 A.    Walt and I had this theory that

93

1  companies spent a lot of money in advertising
2  and marketing, and, specifically, companies
3  that only had one product.  They may have
4  generated 100,000 leads, but only sold to
5  20,000 customers.  Okay.
6          Our premise was, we can help
7  you figure out what to do with those 80,000
8  leads.
9  Q.    Okay.  The "we" you used there is
10 Platinum Independence?
11 A.    Yes.  Walt and me.
12 Q.    Okay.  So you were going to be offering
13 a service to companies like firstSTREET to
14 maximize their close rate on leads?
15 A.    No.  Oh, yes.  Eventually that would
16 happen.  Yes.
17 Q.    Okay.  Tell me what it is you were
18 saying.  I'm not meaning to suggest things.
19 A.    No.  I understand.  It's actually pretty
20 easy once you understand it.
21          A company like, and I'd hate to
22 use Connect America but I am, Connect America
23 only sells one product.  Okay.  And they might
24 sell 2000 widgets, okay, but they may do

94

1  marketing and advertising and get 100,000
2  leads.  So, they have a whole bunch of leads
3  that are sitting there, all right, that they
4  didn't sell anything to nor will they.  They
5  might sell a little more to that base, but not
6  a lot, so our concept -- we called Connect
7  America a category killer.  They sold one
8  product, they did it well and they did it great
9  process.
10         So, Walt and I delineated a
11 whole bunch of these category killers, and we
12 were going to go to all of them.  The
13 presentation basically outlined how, by
14 combining the leads, and those companies
15 deciding their level of involvement with
16 Platinum Independence based on a membership
17 fee, all right -- they could be Platinum
18 members.  Depending on how much they wanted to
19 get involved, they could join Platinum
20 Independence, and we would be the marketing
21 company for all these category killers.
22         We would combine the data
23 basis.  We would do the marketing on television
24 under the brand Platinum Independence.  We

95

1  would develop the in-homes sales force for
2  these organizations, because that's what we
3  were good at, and we would take a profit from
4  that.  The presentation was basically getting
5  them interested in becoming a Platinum
6  Independence member.
7  Q.    All right.  Under the concept you just
8  described, would this be, for example, one home
9  medical alert company product and one scooter
10 product, and one of each --
11 A.    Yes.
12 Q.    -- product category?
13 A.    That was the concept that we were going
14 on because that made sense, that they had a lot
15 of excess leads that they couldn't sell.
16 Q.    All right.  How many people signed up to
17 be members of Platinum Independence?
18 A.    0.
19 Q.    Okay.  Do you know why that was?
20 A.    Yes.
21 Q.    Why?
22 A.    Because we only made the presentation to
23 two companies.
24 Q.    All right.  FirstSTREET you mentioned,

26 (Pages 92 to 95)

DelCasale, Casey, Martin & Manchello
(215) 568-2211

George Flowers

128

1   Mr. Gross on the other end?
2   **A.**   Yeah.
3   **Q.**   All right.  What did they say?
4   **A.**   I believe they made arrangements to talk
5   the next day.
6   **Q.**   All right.  How long did that
7   conversation occur, that phone conversation
8   between Mr. Medina and Mr. Gross, after the
9   time when you first handed the phone to Mr.
10  Medina and said this is Mr. Gross of Connect
11  America?
12  **A.**   Relatively short.
13  **Q.**   A minute?
14  **A.**   Couple minutes.
15  **Q.**   Could be less than a minute?
16  **A.**   I don't know.  I really don't know.  I
17  made the introduction.
18  **Q.**   Could you hear both sides of the
19  conversation?
20  **A.**   No.
21  **Q.**   Was it a conference call?
22  **A.**   No.
23  **Q.**   You could hear what Medina said?
24  **A.**   Yes.

129

1   **Q.**   What did Medina say?
2   **A.**   I don't know verbatim, but he said, "We
3   should talk."
4   **Q.**   All right.  What else, anything?
5   **A.**   That's all I recall.
6   **Q.**   Did he say, "We're thinking of doing
7   monitoring service" --
8   **A.**   No.
9   **Q.**   -- "offerings" --
10  **A.**   No.
11  **Q.**   "We're thinking of getting into PERS.
12  We want to get into business with Connect
13  America," or did he say, "Let's talk"?
14  **A.**   I'm sure they said more than, "Let's
15  talk," but I don't recall specifically what
16  they said.  And I couldn't hear both sides of
17  the conversation.
18  **Q.**   Okay.
19  **A.**   I can tell you -- well, okay.
20  **Q.**   Go ahead.
21  **A.**   No.  I'm sorry.
22  **Q.**   If you don't remember anything else, you
23  don't remember.
24  **A.**   I don't remember else anything.

130

1   **Q.**   All right.  Medina then hung up the
2   phone, and what happened that day?
3   **A.**   I went out to my car.  I called Dave
4   and --
5   **Q.**   Called Dave who?
6   **A.**   I mean Ken and told him about -- I
7   believe I told him everything that happened.  I
8   told him, "You've got to move on this thing."
9   I said, "I can't believe this happened."  I
10  didn't even know firstSTREET personally for a
11  week prior to that.  Ken made me this offer to
12  go down there and make the introduction, I did
13  it, and the next day, Ken and Dave spoke.  I
14  know they spoke because I was copied on an
15  e-mail, and off to the races.
16  **Q.**   All right.  Did you have any further
17  conversations with Dave Medina related to a
18  relationship between firstSTREET and Connect
19  America?
20  **A.**   That day, ever?
21  **Q.**   Ever?
22  **A.**   Yes.
23  **Q.**   When?
24  **A.**   I was probably -- it was probably my

131

1   next visit down to firstSTREET.
2   **Q.**   Which was when?
3   **A.**   It was in November.
4   **Q.**   November of '08?
5   **A.**   Yes.
6   **Q.**   What was the purpose of that visit?
7   **A.**   I think to show him the other scooter
8   that I told you about, the low price scooter.
9   **Q.**   Okay.
10  **A.**   And he gave me an update.  He said it
11  was still up.  He's still considering the other
12  two companies, and that was about the extent of
13  that conversation.
14  **Q.**   That was with respect to what, scooters
15  or --
16  **A.**   PERS units.
17  **Q.**   PERS units.  Okay.
18          So as of that time in November,
19  there had been no relationship reached between
20  Connect America and firstSTREET?
21          **MR. PASS:**  Objection.  That's
22  **not what he said.**
23  **BY MR. RODGER:**
24  **Q.**   All right.  Is that an inaccurate

35 (Pages 128 to 131)

**Page 132**

1  statement?
2       I understand you said that
3  firstSTREET told you, "We haven't made any
4  decision. We're still considering two other
5  companies for PERS units"?
6  **A.**  That's correct.
7  **Q.**  Did you understand that to mean that as
8  of that point in time, there has been no
9  relationship or no agreement entered into
10  between firstSTREET and Connect America?
11  **A.**  I did not know if the relationship had
12  been finalized.
13  **Q.**  If Medina told you they're still talking
14  to two other companies, did you have an
15  understanding as to whether that meant they had
16  sealed the deal with Connect America?
17  **A.**  No. To me, it was still undecided at
18  that point, and that was an update, basically.
19  **Q.**  Okay. When was the next time you saw
20  Dave Medina?
21  **A.**  At Medtrade where I introduced them.
22  That was later in -- yeah. That was later.
23  That was in October or November or something.
24  **Q.**  All right. What was the purpose of

**Page 133**

1  getting together with him there?
2  **A.**  To show him uniquely the Luggie Scooter
3  that folds down. You can sell them at --
4  **Q.**  Okay. So you made a demonstration of
5  the Luggie Scooter?
6  **A.**  Yes.
7  **Q.**  Was that at the show?
8  **A.**  Yes.
9  **Q.**  All right. What else did you and Medina
10  talk about?
11  **A.**  Well, I don't recall, to be honest with
12  you.
13  **Q.**  I have less idea than you do, so you're
14  going to have to inform both of us as to what
15  you were talking about.
16  **A.**  Nothing. Nothing other than the Luggie
17  Scooter.
18       Oh. We were talking about our
19  joint venture agreement, because I had done a
20  projection based on -- we were in intense
21  negotiations with this joint venture
22  agreement.
23  **Q.**  This is relating to what?
24  **A.**  Selling the Luggie Scooter. We had done

**Page 134**

1  projections. They had said that they were
2  going to spend $6,000,000 in advertising, so I
3  did a projection, and that related to
4  approximately $80,000,000 in sales of the
5  Luggie Scooter.
6       And we did talk about that at
7  the show, and at that time, it dwarfed any
8  expectations of any other business relationship
9  I had. And Connect America -- or firstSTREET
10  was very excited about entering into that joint
11  venture agreement with me.
12  **Q.**  Okay. Now, when you say, "with me," was
13  that me, Mr. Flowers, or was that me, Platinum
14  Independence?
15  **A.**  It was Platinum Independence.
16  **Q.**  Okay. So the joint venture agreement
17  that was under discussion related exclusively
18  to the Luggies?
19  **A.**  Luggie Scooter, because it fit in a
20  luggage.
21  **Q.**  So the discussion was between Platinum
22  Independence, with you as their representative,
23  and firstSTREET with Mr. Medina. What was
24  contemplated? Was a joint venture agreement

**Page 135**

1  under the terms of which firstSTREET would
2  invest $6,000,000 in advertising; Platinum
3  Independence would supply the scooters?
4  **A.**  Supply the scooters, the marketing,
5  warehousing.
6  **Q.**  Okay. And was that joint venture ever
7  reduced to writing?
8  **A.**  Yes.
9  **Q.**  Was it ever executed? Was the writing
10  ever executed, signed?
11  **A.**  We couldn't reach final terms in the
12  agreement. The bottom line is, it was too
13  vague for me to accept, and they opted not to
14  pay me any money until the company was
15  profitable. And there were a lot of problems
16  with the contract.
17  **Q.**  All right. The joint venture had become
18  forming a new entity, a new joint venture?
19  **A.**  Yes.
20  **Q.**  That would be different than Platinum
21  Independence and firstSTREET?
22  **A.**  That was one of the issues that couldn't
23  be decided either.
24  **Q.**  Was there a written proposal generated

36 (Pages 132 to 135)

George Flowers

136

1  by you, you or them?
2  A.  Yes.
3  Q.  But it was never signed, right?
4  A.  No, sir.
5  Q.  Do you still have a written proposal?
6  A.  Yes, I do.
7  Q.  Did you ever enter into any kind of
8  relationship with firstSTREET related to the
9  Luggies Scooter?
10 A.  No.  But I did find out that they went
11 around me and contacted the manufacturer
12 directly.
13 Q.  And did you ever take legal action
14 against them for doing that?
15 A.  No.  Because I don't like to sue
16 people.  I did make them aware of it.
17 Q.  Okay.  Did you have any kind of a
18 nondisclosure, noncompete arrangement with them
19 when you disclosed to them the Luggies
20 concept?
21        Sometimes when people
22 entrepreneur with an idea, before they tell the
23 other party about it, they make then sign some
24 kind of a nondisclosure --

137

1  A.  Yes, I did.
2  Q.  Okay.  So they signed a nondisclosure
3  before you disclosed to them the Luggies --
4  A.  Yes.
5  Q.  And what they did was then violate that
6  by going around a nondisclosure?  Noncircumvent
7  is also the other provision used in an
8  agreement like that.
9  A.  I may be naive, but yes.
10 Q.  Okay.  So if I understand you correctly,
11 firstSTREET entered into, with you and/or with
12 Platinum Independence, a nondisclosure
13 noncircumvent agreement before you told them
14 about the Luggies.  Your negotiations never
15 resulted in a deal, but then they circumvented
16 and now offered that product for sale directly
17 from the manufacturer?
18 A.  I don't know how they're getting the
19 product, but yes.
20 Q.  All right.  And as you said at the
21 meeting with Dave, that was such an exciting
22 opportunity, you didn't talk about anything
23 else, right?
24        MR. PASS:  Objection.

138

1  BY MR. RODGER:
2  Q.  I think that's what you said.
3  A.  I don't know what you're referring to.
4  Q.  All right.  At the meeting when you were
5  talking about the joint venture --
6  A.  The joint venture at Medtrade?
7  Q.  Yes (continuing) was anything else
8  talked about at that meeting?
9  A.  That was quite enough.  I don't
10 remember.
11 Q.  Okay.  So the answer to my question is
12 no?
13 A.  Right.
14        **MR. PASS:  The answer to the**
15 **question is -- he said he doesn't**
16 **remember.**
17        **MR. RODGER:  Well, I've heard**
18 **him say no twice, but I'm asking the**
19 **question.**
20        **Could you please read back the**
21 **question (addressing the court**
22 **reporter).**
23        **(The court reporter read back as**
24 **requested.)**

139

1  BY MR. RODGER:
2  Q.  Other than the discussions that you now
3  described in some detail with firstSTREET
4  relating to a possible joint venture agreement
5  involving the Luggies, did you have any other
6  discussions with him at the Medtrade meeting?
7  A.  No.
8  Q.  Okay.  Were there any other subjects
9  discussed during that meeting at Medtrade
10 between you and firstSTREET representatives?
11 A.  I don't recall.
12 Q.  Okay.  When was the next time you had
13 any communication with Dave or anybody else
14 from firstSTREET about anything?
15 A.  I don't recall what month it was, but
16 Michael Flowers called me and said, "I have an
17 exciting new scooter that was just introduced
18 from Taiwan, and it was virtually untipable."
19        So I took it down to
20 firstSTREET.  And they looked at it, and they
21 didn't think it was much different than the
22 scooter they currently had in their catalog.
23 And it didn't go anywhere.
24 Q.  About when was that?  The earlier things

37 (Pages 136 to 139)

George Flowers

144

1  people together. And, certainly, I was trying
2  to get their lighting business quota from my
3  former employee at Electric Mobility, and I had
4  a verbal agreement with him that I would get a
5  percentage if he was able to procure it.
6  **Q.**   Verbal agreement with the vendor of the
7  lighting equipment if you could get them into
8  firstSTREET?
9  **A.**   Yes.
10 **Q.**   Okay. It wasn't a written agreement?
11 **A.**   No.
12 **Q.**   Was that evidenced by e-mails or any
13 kind of written exchange of anything?
14 **A.**   No. Called him up and asked him.
15 **Q.**   All right. And he said, "Yeah. You get
16 them in." What was he going to pay you?
17 **A.**   It wasn't decided.
18 **Q.**   Something?
19 **A.**   Something.
20 **Q.**   Okay.
21 **A.**   Trailmate. Trailmate. I called Harry
22 Bakker, the president of Trailmate, and told
23 him. I said, "I have a company." I said, "I
24 would like an introduction fee," and Harry

145

1  said, "I don't pay them." He said, "but I'll
2  pay you commission on every product that you
3  sell." I said, "Okay. This is their name.
4  Call them."
5  **Q.**   What's Trailmate?
6  **A.**   Trailmate is the tricycle manufacturing
7  in Sarasota, Florida that I do.
8  **Q.**   Okay. Did you have a written agreement
9  or any kind of written confirmation of your
10 understanding with Trailmate?
11 **A.**   I believe there were e-mails. Yes.
12 **Q.**   Okay. Have you, in fact, been paid
13 money by Trailmate for whatever it is you did
14 on their behalf with respect to firstSTREET?
15 **A.**   No.
16 **Q.**   Have any sales, in fact, been made?
17 **A.**   When they got together, they realized
18 that Trailmate had been already quoted on the
19 product, and there was no sense in moving
20 forward on it.
21 **Q.**   Moving forward on a deal between
22 Trailmate and firstSTREET?
23 **A.**   That's correct.
24 **Q.**   Or they were going to move forward, but

146

1  not on the deal involving you?
2  **A.**   No. Trailmate had quoted the product
3  before, and it was too high, so their quote was
4  still too high.
5  **Q.**   Okay. You called Trailmate out of the
6  blue and said, "I can introduce" --
7  **A.**   No. I knew Trailmate. Believe it or
8  not, I know things. I knew Trailmate. I knew
9  Harry Bakker is the President.
10 **Q.**   All right. Let's go back to
11 firstSTREET. Has firstSTREET ever paid you any
12 money for anything you've ever done on their
13 behalf or in connection with them?
14 **A.**   No.
15 **Q.**   Okay. Are there any circumstances under
16 which, based on what you perceived to be some
17 kind of relationship with them, that if
18 something occurs, they owe you money?
19 **A.**   With them? No.
20 **Q.**   Yeah. Okay.
21       All right. When did you first
22 meet Ken Gross?
23 **A.**   I'd say September of '08.
24 **Q.**   How did it come to be that you met Mr.

147

1  Gross?
2  **A.**   We were looking for category killers.
3  **Q.**   "We," there's the problematic pronoun.
4  **A.**   Walt and I. Platinum Independence was
5  looking for category killers and the research.
6  His one product, large number of sales, lots of
7  leads.
8  **Q.**   Okay. So you became aware of Connect
9  America through that research, and then what
10 happened?
11 **A.**   And I called Ken and asked if we could
12 sell PERS units.
13 **Q.**   Okay. The "we" again.
14 **A.**   Platinum Independence.
15 **Q.**   All right. What did he say?
16 **A.**   "Sure."
17 **Q.**   All right. Was it Mr. Gross who you
18 actually spoke to?
19 **A.**   Yes.
20 **Q.**   Had you ever met him, or had you ever
21 met him before?
22 **A.**   No. Like I said before, he may have
23 visited Electric Mobility earlier than that,
24 but I don't believe I met him there.

39 (Pages 144 to 147)

George Flowers

148

1    Q.    Okay.  And you wouldn't have been
2    involved in that visit if he had visited,
3    right?
4    A.    That's correct.
5    Q.    Okay.  So you called Ken Gross out of
6    the blue and said, "We'd like to sell your PERS
7    units," right?
8              MR. PASS:  Objection.  He didn't
9          testify he called out of the blue.  He
10         testified that he called after --
11             THE WITNESS:  It was an
12         intentional call.  It was an intentional
13         call.
14   BY MR. RODGER:
15   Q.    I didn't mean to suggest otherwise.
16             Up until the time of your phone
17   call to Mr. Gross at Connect America, you had
18   no prior existing relationship with him?
19   A.    That's correct.
20   Q.    Did he have any idea of who you were?
21   A.    I don't know.
22   Q.    You knew who he is by virtue of your
23   category killer?
24   A.    Yes, sir.

149

1    Q.    And, so, you contacted him on or about
2    September for the purpose of seeing if your
3    company, Platinum Independence, could sell
4    your PERS units or Connect America's PERS
5    units?
6    A.    Yes.
7    Q.    All right.  What did he say?
8    A.    We set up an appointment, and I went to
9    visit him.
10   Q.    All right.  When was that visit?
11   A.    In September.
12   Q.    September '08?
13   A.    Yes.
14   Q.    All right.  Where was that visit?
15   A.    In his office.
16   Q.    Okay.  What happened there?
17   A.    He showed me around and I was quite
18   impressed.  And he said that we could become a
19   dealer, and part of the dealer agreement is,
20   you know, we could sell the PERS units
21   basically.  I was given a tour of the facility,
22   and that was pretty much it.
23   Q.    Were you given a written agreement?
24   A.    No.

150

1    Q.    Okay.  How was it left in terms of going
2    forward with that deal?
3    A.    Well, I went with him, and, basically, I
4    was there to basically decide if he was a
5    category killer.  So I did a tour of the
6    facility, and I thought everything looked
7    great.  I sent him an E-mail to that effect,
8    and we never did anything.
9              We set up another appointment
10   where I suggested that we give the presentation
11   for Platinum Independence, and I believe that
12   happened in the first or second week of October
13   of 2008.
14   Q.    All right.  And where did that second
15   meeting occur, at the Connect America
16   headquarters?
17   A.    Where?
18   Q.    Where are those headquarters located?
19   A.    One West Chester Pike in Broomall.
20   Q.    All right.  And how long did that
21   meeting last?
22   A.    I'd say an hour, hour and a half.
23   Q.    How long did the first meeting last?
24   A.    I don't remember.

151

1    Q.    More than an hour?
2    A.    Yes.
3    Q.    More than two hours?
4    A.    No.
5    Q.    All right.  Was it the first meeting
6    that you raised the possibility of Platinum
7    Independence becoming a dealer for Connect
8    America PERS?
9    A.    Yes.  The first meeting, it was
10   interesting because he offered, as part of the
11   dealer package, $15 a month recurring revenue,
12   and I had already been buying them from
13   Amcest.  And I knew the average length of a
14   contract was 30 months.
15             And I had already figured out,
16   you know, when he told me the most I could get
17   was $15 recurring revenue -- and I'd have to go
18   out and get the sale and take care of the unit
19   and all that stuff I was -- I had a better deal
20   with Amcest; because I was buying the unit for
21   $126, and the monitoring was costing me $6 a
22   month.  So, it was $450 versus $350, and his
23   deal wasn't very attractive to me.
24   Q.    So going with Connect America, you

40 (Pages 148 to 151)

George Flowers

152

1  concluded after the first meeting it was a bad
2  deal?
3  A.   No.  Because it qualified him as a
4  category killer.  That was under the dealer
5  agreement.  It has nothing to do with the
6  strategic alliance thing.  This was to sell our
7  10 or 20 little units to retail customers.
8  Q.   You're now talking about the
9  relationship between Platinum Independence and
10  Amcest?
11  A.   Platinum Independence and Connect
12  America.
13  Q.   All right.  You're losing me here.
14       All right.  At the first meeting
15  with Ken Gross, the subject of the conversation
16  was the possibility of Connect America PERS
17  products and services being sold as part of
18  this joint marketing effort by Platinum
19  Independence?
20  A.   What do you mean joint venture?
21  Q.   Marketing consortium or whatever.
22       MR. PASS:  Objection.  That's
23  not how he described it.
24  BY MR. RODGER:

153

1  Q.   All right.  Platinum Independence was
2  recruiting -- if I understand correctly, at the
3  first meeting, Platinum Independence was
4  contemplating bringing Connect America products
5  and services in as products that they would
6  market jointly with other manufacturers?
7  A.   No.
8  Q.   All right.  Go back again.
9  A.   Okay.
10  Q.   First meeting with Ken Gross was to
11  discuss what?
12  A.   Platinum Independence was doing home
13  sales.  I was selling directly to consumers,
14  and part of our product was PERS units.  I was
15  buying them from Amcest for $126, plus $6 a
16  month in monitoring fees.
17  Q.   And that was in place as of September
18  '08?
19  A.   That's correct.
20  Q.   And September '08, you contact Mr.
21  Gross, as you discussed, get together with him
22  for what purpose; what were you going to talk
23  about?
24  A.   What his deal was on being a Connect

154

1  America dealer and --
2  Q.   On who being a Connect America dealer?
3  A.   Platinum Independence being a Connect
4  America dealer.
5  Q.   Okay.  And at that time, you took the
6  floor and --
7  A.   He said that you can have $15 a month in
8  recurring revenue.
9  Q.   Okay.  And you concluded at that meeting
10  that that was not a good deal?
11  A.   Yes.
12  Q.   Okay.  Meeting ended; that was a meeting
13  that took a couple hours?
14  A.   Hour and a half.  Hour, hour and a half.
15  Q.   All right.  And at the end of that
16  meeting, what was agreed to, if anything?
17  A.   That we'd like to come back and
18  present the Platinum Independence program to
19  him.
20  Q.   Okay.  So the first meeting was to
21  discuss the possibility of you becoming a
22  dealer; second meeting was to discuss the
23  possibility of Connect America becoming part of
24  the Platinum Independence network?

155

1  A.   That's correct.
2  Q.   And those are different concepts,
3  right?
4  A.   Yes.
5  Q.   Okay.  The second meeting occurred in or
6  about the first or second week of October?
7  A.   That's correct.
8  Q.   All right.  Who was present at that
9  meeting?
10  A.   Ken.
11  Q.   All right.  And you?
12  A.   Yes.
13  Q.   Anybody else?
14  A.   No.
15  Q.   How about the first meeting, just you
16  and Ken?
17  A.   Yes.
18  Q.   All right.  Second meeting in October,
19  did you make the pitch for Connect America
20  becoming part of the Platinum Independence
21  marketing system?
22  A.   Yes.
23       (Brief recess taken.)
24  BY MR. RODGER:

41 (Pages 152 to 155)

George Flowers

188

1    Q.   All right. What was your understanding
2    of the scope and nature of the obligation Mr.
3    Gross made to you, the legal obligation Mr.
4    Gross committed to, with respect to the sale of
5    Connect America PERS products through
6    firstSTREET?
7         MR. PASS:  Other than what's in
8         the Complaint?
9    BY MR. RODGER:
10   Q.   Well, why don't you tell me what your
11   understanding is.
12   A.   The term "legal," I don't understand
13   what you mean by legal.
14   Q.   All right.
15   A.   I knew he made me an offer that I could
16   split -- I had $15 of monthly recurring revenue
17   to split between me and firstSTREET. And to
18   me, that meant I could go down to firstSTREET
19   and tell them about Connect America, and figure
20   out a split between me as an introducer and
21   what firstSTREET would accept.
22   Q.   Okay.
23   A.   And I wasn't negotiating. I was just
24   influencing.

189

1    Q.   What you were to do specifically was
2    what?
3    A.   Go down and introduce them.
4    Q.   Introduce them, okay.
5         What, if any, understanding do
6    you have as to the duration or manner of
7    payment from that $15 per sale?
8         MR. PASS:  Objection only
9         because it's a compound question. Could
10        you please split it up.
11   BY MR. RODGER:
12   Q.   All right. What, if any, understanding
13   do you have as to how long that 1$5 per sale
14   Connect America was committed to pay?
15   A.   I have no preconceived notions about
16   that. I assume it was forever.
17   Q.   Did Mr. Gross say it was forever?
18   A.   No.
19   Q.   You assumed it was forever. What was
20   the basis for your assumption?
21   A.   I don't have any basis for that
22   assumption.
23   Q.   Okay. Well, if Mr. Gross didn't say
24   that, why do you contend that it was

190

1    forever?
2    A.   Because it came up in subsequent
3    concepts that were presented well beyond the
4    initial date of the offer.
5    Q.   All right. When you say, "it came up in
6    subsequent concepts," I'm not sure I understand
7    your use of the term "concepts." Do you mean
8    communications?
9    A.   Yes.
10   Q.   What kind of communications?
11   A.   Well, future agreements. I'll let you
12   ask the questions.
13   Q.   Future agreements, okay. Agreements
14   between who?
15   A.   Connect America and myself.
16   Q.   Relating to what, firstSTREET?
17   A.   No. All strategic alliance clients that
18   I introduced to Connect America.
19   Q.   Are we in agreement that when you use
20   the term "concepts," you mean communications?
21   A.   Yes.
22   Q.   Okay. What communications are you
23   referring to?
24   A.   In February of '09, I was asked by Ken

191

1    to develop a dealer agreement.
2    Q.   February '09?
3    A.   Mm-hmm.
4    Q.   Okay. How was that request
5    communicated; verbal, written, e-mail, text?
6    A.   We were having an on and off
7    relationship for quite a while, and Ken asked
8    me where I was. And I wasn't -- I didn't
9    disappear. I was dealing with the joint
10   venture relationship between firstSTREET and
11   Platinum Independence, and that took up a
12   significant amount of time. And Ken sent me an
13   e-mail like, "Where are you. I thought you
14   wanted to be a dealer," so --
15   Q.   This is February '09?
16   A.   Yes.
17   Q.   That's, like, two months after the
18   November '08 initial conversation?
19   A.   Yes.
20   Q.   Okay. So he sent you an e-mail saying,
21   "Where are you. I thought you wanted to be a
22   dealer?"
23   A.   Yes.
24   Q.   All right. And you testified that he

DelCasale, Casey, Martin & Manchello
(215) 568-2211

**Exhibit 7**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - -
GEORGE G. FLOWERS,                    : No. 12-4787
                                      :
                       Plaintiff, :
       v.                             :
                                      :
CONNECT AMERICA.COM, LLC,             :
                                      :
                       Defendant. :
- - - - - - - - - - - - - - - - - - -
                       -   -   -
            MONDAY, JANUARY 7, 2013
                           -   -   -

            Oral deposition of GEORGE FLOWERS,
taken pursuant to notice, held at the LAW OFFICES
OF HENRY IAN PASS, 3 Bala Plaza, Suite 700A,
Bala Cynwyd, Pennsylvania, 19004, commencing at
3:25 a.m. before Shauna L. Detty, Court Reporter -
Notary Public there being present.
                       -   -   -


            KAPLAN, LEAMAN AND WOLFE
         Registered Professional Reporters
          Constitution Place, Suite 909
               325 Chestnut Street
             Philadelphia, PA 19106
                (215) 922-7112

George Flowers

24

1  occasionally getting calls, but not doing it full
2  time?
3  A.      No, I was doing it full time probably
4  from March or April through December.
5  Q.      Of 2010?
6  A.      Yes.
7  Q.      Other than the Platinum Independence
8  venture, which you've already described in detail
9  at your last deposition, and Rowan & Associates,
10 which you've talked about, and not including the
11 Anthony gate, which apparently got started sometime
12 after December 2010 --
13 A.      Correct.
14 Q.      All right.
15         -- in the '08/'09 time period, were
16 you involved with any other businesses in any way?
17 A.      What other businesses?
18 Q.      What other businesses?
19 A.      VRI.
20 Q.      Okay.
21         What is VRI?  Does that stand for
22 something?
23 A.      Value relationships something.
24 Q.      Value relationships something.

25

1          The something begins with an I?
2  A.      Something begins with an I.
3  Q.      All right.
4          When did you become affiliated with
5  VRI?
6  A.      April of 2009.
7  Q.      When did you cease being affiliated with
8  VRI?
9  A.      May of 2010.
10 Q.      What is the nature of the business of
11 VRI?
12 A.      They sell medical alarms.
13 Q.      You used the term "medical alarms."
14         Is that synonymous with P-E-R-S or
15 PERS, which is the term we've used before?
16 A.      That is correct.  They also sell other
17 health-related items for monitoring of chronically
18 ill individuals.
19 Q.      Okay.
20         Where is VRI?
21 A.      Columbus, Ohio.
22 Q.      How did you come to be affiliated with
23 them and what was the nature of your affiliation?
24 A.      I was doing some research on other

26

1  companies that I could do a program like I was
2  doing for Ken Gross.
3  Q.      What kind of program is that?
4  A.      A recurring revenue type program.
5  Q.      Earning introduction fees?
6  A.      Yes.
7  Q.      Did you have -- so you were looking
8  around for companies that you could do that for and
9  one of the companies that you found was VRI?
10 A.      That's correct.
11 Q.      And that was as of April '09?
12 A.      Yes.
13 Q.      Okay.
14         How did you come to find VRI?
15 A.      Very interestingly enough, I looked on
16 the MOMA website, which is an organization run by
17 Ken Gross.  It's Mobility Alarm Monitoring
18 Association, which he is the president of.  And
19 they provided a very nice list of companies that I
20 could contact to see if I could interest them in
21 finding new customers for them.
22 Q.      Why was it that, in April of 2009, you
23 were making this kind of an inquiry?
24 A.      Ken sent me an e-mail that told me if I

27

1  didn't like his deal, that I should go find another
2  one.
3  Q.      Is that the e-mail that was eluded to
4  before in Mr. Gross's deposition?
5  A.      If you show it to me, I'll. . .
6  Q.      I'm going to show you Gross-8.  I'll
7  describe that as being a single-page exhibit, which
8  has on it, appear to be, two e-mails at the top of
9  the page; an e-mail, Monday, March 23, 2009 at
10 1:05, and middle and on down from the page, an
11 e-mail from WeAlarmYou@aol.com to your address,
12 right?  And that one is sent Monday, March 23rd,
13 2009, at 9:17 a.m.
14         Is the latter e-mail, the lower
15 e-mail on that page, Gross-8, the e-mail you're
16 talking about?
17 A.      Yes, sir.
18 Q.      After you received this e-mail, why was
19 it that you felt it was in your interest to begin
20 exploring other relationships?
21 A.      From the content of this e-mail.
22 Q.      Well, tell me what -- I can read what the
23 e-mail says.  What was it about that that said to
24 you, "I should start looking for other

9 (Pages 24 to 27)

George Flowers

**28**

1  relationships"?
2  **A.**    I believe my offer was extremely fair
3  based on the same compensation package as two other
4  industry professionals who worked for us, so I am
5  not going to deviate from that policy.
6  **Q.**    For the record, let's note you just read
7  the second paragraph of that e-mail, right?
8  **A.**    Yes.
9  **Q.**    So I'll ask the question for the third
10  time.  What was it about the language you just read
11  or anything else about that e-mail that told you it
12  was time to start looking for a different
13  relationship?
14        **MR. PASS: Objection.  He's**
15  **answered.  You may not like the answer, but he's**
16  **answered.**
17  **BY MR. RODGER:**
18  **Q.**    All right.
19        Well, why did you perceive that
20  statement to be something that tells you it's time
21  to start looking elsewhere?
22  **A.**    Because I read the next line, "There's no
23  reason to meet further or discuss a dealer program
24  at this time."  It seemed pretty final to me.

**29**

1  **Q.**    All right.
2        Well, in between that sentence which
3  you just read and the one that you read previously,
4  there's another paragraph, right?  It says, "I wish
5  you good luck as you pursue a recurring revenue
6  deal."
7  **A.**    That's correct.
8  **Q.**    And it says, "We will continue to pay you
9  on this scale, as mentioned above, for sales
10  generated by Electric Mobility and First Street,"
11  right?
12  **A.**    Yes.
13  **Q.**    Did you understand that sentence as
14  telling you that other than Electric Mobility and
15  First Street, you had no business relationship with
16  Connect America related to anybody else?
17  **A.**    At that point, that is correct.
18  **Q.**    Okay.
19        And you did not have, and you were
20  not going to in the future have, relationships with
21  anybody -- with Connect America related to anybody
22  other than Electric Mobility and First Street,
23  right?
24        **MR. PASS: Same objection.  It**

**30**

1  **mischaracterizes the language of the e-mail, which**
2  **speaks for itself.**
3        **THE WITNESS:  Yeah.**
4  **BY MR. RODGER:**
5  **Q.**    All right.
6        Well, was that your understanding?
7  **A.**    At this point in time, yes.
8  **Q.**    Now, in the last sentence, as you say, it
9  says, "There is no reason to meet further or
10  discuss a dealer program at this time."
11        Did you understand that to relate to
12  the dealer relationship that you and Mr. Gross had
13  previously discussed that you testified about in
14  your first deposition session?
15  **A.**    If you're referring to dealer program as
16  a strategic alliance program, then yes.
17  **Q.**    Well, in your last deposition, you
18  testified about a -- about negotiations you had
19  with Mr. Gross proposing to have you or some entity
20  related to you, maybe Platinum Independence or
21  whatever -- actually, I think you had come up with
22  a different entity, FLOWCO or something like
23  that -- to become a traditional dealer of Connect
24  America.  You don't remember that?

**31**

1  **A.**    It was far from being a traditional
2  dealer of Connect America.  It was quite a
3  customized position that Ken was crafting for me.
4  **Q.**    All right.
5        Well, correct me if I'm wrong, my
6  recollection of your testimony was that Ken
7  presented you with the standard dealer agreement
8  and then you customized that, added on a lot of
9  other terms, which substantially broadened the
10  nature of the relationship, presented that back to
11  Mr. Gross, and it was at or around that time that
12  Mr. Gross said, "We're not interested in discussing
13  this anymore."
14  **A.**    To which question -- which answer -- I
15  don't understand what part of that you need me to
16  respond to.
17  **Q.**    Well, that's my recollection of your
18  testimony.  Is that an inaccurate -- the testimony
19  you gave with respect to the back and forth
20  dealings on the dealer agreement as originally
21  proposed and then as substantially modified by you?
22  **A.**    We had lots of conversations between our
23  initial agreement and the agreement that you're
24  referring to.

Kaplan, Leaman & Wolfe
www.KLWReporters.com

George Flowers

**40**

1  A.    Yes.

2  Q.    Okay.  All right.  Let's go back to

3  Rowan & Associates.

4         You were with them basically

5  calendar 2010, right?

6  A.    Yes, 10 months.

7  Q.    And then before that, you were with VRI,

8  right?

9  A.    That's correct.

10  Q.    When did you become affiliated with VRI?

11  You told me you started looking in -- well, do I

12  understand correctly -- and this is how we got off

13  on Gross-8 -- you said that you began to

14  investigate alternatives following your receipt of

15  this e-mail from Mr. Gross on March 23rd, 2009?

16  A.    That's correct.

17  Q.    And you've already testified how you

18  became aware of VRI.  You went to the website for

19  the trade group and, lo and behold, they were

20  listed there as a member of the association, right?

21  A.    Yes.  I may have done other internet

22  research, so -- I like to do internet research.

23  Q.    Okay.  All right.

24         Did there come a time when -- well,

**41**

1  up until that point, had you had any dealings with

2  VRI?

3  A.    None.

4  Q.    I don't know why I keep drawing a blank

5  on that.

6  A.    None.

7  Q.    So what, if anything, did you do to

8  initiate contact with VRI?

9  A.    I called the president and told him my

10  experience with seniors and what I thought was my

11  ability to get large accounts for him.

12  Q.    What was the nature of -- you've already

13  told me generically what the nature of VRI was,

14  that they sold, among other things, PERS and other

15  monitoring devices, essentially.

16  A.    Right, right.

17  Q.    They were based in Ohio?

18  A.    Yes.

19  Q.    National company?  Local company?

20  A.    National.

21  Q.    Were they competitors of Connect America?

22  A.    They sold medical alarms, but their

23  business was basically from referrals from places

24  like nursing homes and home care companies and

**42**

1  visiting nurses.  So they really didn't go after

2  the end user like Connect America did.  So, yes,

3  they sold medical alarms, but they really didn't

4  sell to the end user.

5  Q.    Did you tell Mr. Gross in or around March

6  or April of 2009, that you were exploring a

7  relationship with VRI?

8  A.    No.

9  Q.    Why not?

10  A.    Because of his e-mail, basically.

11  Q.    Did you understand this e-mail as, you

12  know, basically terminating the relationship you

13  thought you had with Connect America?

14         **MR. PASS:  Objection.  We're**

15  **rehashing -- it rehashes what we just went over**

16  **10 minutes ago.**

17  **BY MR. RODGER:**

18  Q.    Well, I guess I'm trying to get some

19  insight into why -- well, up until you got this

20  e-mail, did you feel you had a business

21  relationship with Connect America?

22  A.    Yes.

23  Q.    And the business relationship that you

24  felt you had with Connect America was as stated in

**43**

1  your modified version of the written proposed

2  dealer agreement that surfaced in your earlier

3  deposition?

4  A.    For the most part, yes.

5  Q.    After you received this e-mail in March,

6  what parts of that business relationship that you

7  perceived did you feel were no longer in place with

8  Connect America?

9  A.    Of what?  What document?

10  Q.    Well, I'm -- the document we referred to

11  in your last deposition that was a modified

12  counter-proposed version of the dealer agreement.

13  Do you remember we spent a fair amount of time

14  going over that?

15  A.    Yes.

16  Q.    You know what I'm talking about, right?

17  A.    Yes.

18  Q.    Now, I don't want to get bogged down in

19  going through it again, because I think we went

20  through it already, but if I understand correctly,

21  you are telling me that document reflected

22  what your understanding was of the terms and

23  conditions of the relationship you had with Connect

24  America?

13  (Pages 40 to 43)

George Flowers

52

1  from Mr. Gross, March 23rd, 2009, to be telling you
2  this is what we're agreeable to and we're not going
3  to agree to other things?
4  A.    At that point in time, yes.
5  Q.    Okay. All right.
6        So you're in or about March/April of
7  2009. You attempted to initiate a relationship
8  with VRI?
9  A.    Yes.
10 Q.    Let's go back to that. We keep getting
11 sidetracked from them.
12 A.    Yes.
13 Q.    Tell me the sequence of events related to
14 VRI. You looked them up. You became aware of
15 them. You contacted the president. Then what
16 happened?
17 A.    I volunteered to fly myself out there to
18 tell my story, and I did.
19 Q.    There was somewhere in Ohio?
20 A.    Yes.
21 Q.    Where in Ohio?
22 A.    Columbus, Ohio.
23 Q.    And who were you meeting with there? Who
24 were you dealing with for VRI?

53

1  A.    Mr. Torrance and Mr. Schoonover, the
2  president.
3  Q.    When did you meet with them? When did
4  you fly yourself out there and meet with them?
5  A.    April of '09.
6  Q.    Do you recall early, late April or what
7  the specific date was?
8  A.    I would say it was the first week in
9  April.
10 Q.    Would you have a record of that
11 specifically somewhere in a calendar or --
12 A.    Probably on a credit card statement. I
13 charged the airline bill.
14 Q.    Were any documents generated in
15 connection with that reaching out process that you
16 described and the agreement to come out and meet
17 with them? By "documents," I mean e-mails,
18 letters, faxes, things of that nature.
19 A.    There was an independent rep agreement
20 drawn up between this.
21 Q.    Well, did that happen before you went out
22 there?
23 A.    No, after.
24 Q.    Is there documentation relating to the

54

1  initial "I'm volunteering to fly myself out there
2  to meet with you guys"?
3  A.    No, that was all phone calls.
4  Q.    No e-mails?
5  A.    I don't believe so.
6  Q.    In the course of looking for documents
7  for production in this case, I take it you have not
8  made a specific effort to find those documents, if
9  they exist?
10 A.    That's correct.
11 Q.    Okay.
12        You flew out there early April.
13 What happened?
14 A.    They were very interested and drew up an
15 agreement, sent it to me and I signed it.
16 Q.    And what were you pitching to them?
17 A.    Well, I knew that I had the potential of
18 getting a relationship with Wal-Mart and that was
19 something that Ken couldn't do. Ken couldn't deal
20 with the top 10 retailers. And I told them that I
21 had the opportunity to get in there and also a
22 company called Apria.
23 Q.    Apria?
24 A.    Apria, A-P-R-I-A. And they're one of the

55

1  largest home medical equipment dealers in the
2  country.
3  Q.    How was it that you had an in at Wal-Mart
4  and/or Apria?
5  A.    My -- the wife of my son's employer, her
6  husband worked for Wal-Mart.com and was going to be
7  as an introduction.
8  Q.    Did you have any history of dealings with
9  Wal-Mart.com or any part of Wal-Mart, or you just
10 had somebody who would introduce you?
11 A.    No, it was actually through Electric
12 Mobility. We tried to sell them scooters and we
13 signed up with their vendor program, so I was a
14 little bit familiar about the difficulties of
15 dealing with Wal-Mart.
16 Q.    All right.
17        Well, you weren't involved in the
18 sales operations of Electric Mobility, right?
19 A.    I did a lot of different things.
20 Q.    Tell me what you did with Wal-Mart while
21 at Electric Mobility.
22 A.    We did research into some --
23 Q.    Not "we." What you did.
24 A.    I provided some input for the vendor

16 (Pages 52 to 55)

George Flowers

136

1    **THE WITNESS: I'm sure of that.**
2    **BY MR. RODGER:**
3    Q.    All right.  You're positive of that.
4          So that was like 14 months/15 months
5    after the first statement, right?
6    A.    Yes.
7    Q.    And you were laid off when?
8    A.    July of 2012.
9    Q.    When you were laid off, did you receive
10   any kind of severance?
11   A.    Yes.
12   Q.    What was your severance?
13   A.    $524.
14   Q.    Total?
15   A.    Yes.
16   Q.    All right.
17         What have you been doing since then?
18   A.    I have been looking for employment and --
19   no, no.
20   Q.    All right.
21         You have no job, you haven't started
22   any business, you don't have business affiliations
23   or relationships?
24   A.    No.

137

1    Q.    Nothing like that since July of 2012?
2    A.    That's correct.
3    Q.    All right.
4          During the time when you were
5    working with Anthony, did you have any other
6    relationships, business deals, employment
7    companies, anything like that going on?
8    A.    Only the monies I was getting from
9    Connect America.
10   Q.    But that had pretty much ended, right?
11   A.    I think there was a little overlap, but
12   that's about it.
13   Q.    Well, your money from Connect America
14   pretty much ended at the end of '09, didn't it?
15   A.    You're correct.  It's an overlap.
16   There's no other income.
17   Q.    Have you made an effort to find
18   employment?
19   A.    Yes.
20   Q.    Why have you not been successful?
21         **MR. PASS: Objection.**
22         **THE WITNESS: Tough market.**
23   **BY MR. RODGER:**
24   Q.    Okay.  All right.

138

1          Tell me -- you claim that you were
2    the effective procuring cause for First Street's
3    relationship with Connect America.  And I think
4    we've sort of gone through that in some detail in
5    your earlier deposition.
6          Do I understand correctly -- and if
7    I'm wrong, tell me -- that aside from the initial
8    meeting that you had with Mr. Modena in or about
9    October of 2008 at which you were present to pitch
10   a nonConnect America product or service during
11   the course of which he mentioned they were thinking
12   about going to medical alarms, you then made a call
13   to Mr. Gross and Mr. Modena and Mr. Gross then
14   followed up.  That's a summary, but I think an
15   accurate summary of how you described that meeting.
16   A.    Yes.
17   Q.    Other than that, did you do anything to
18   contribute to, foster, develop, advance the
19   business relationship between Connect America and
20   First Street?
21   A.    No.
22   Q.    Okay.
23         With respect to Electric Mobility, I
24   think we touched on that to some extent, and this

139

1    is where I sort of wish we had more reliable access
2    to the earlier transcript.
3          I know you had gone into at some
4    length testimony describing your employment with
5    Electric Mobility and your relationship with the
6    company.
7          What role, if any, did you play in
8    securing a relationship between Connect America and
9    Electric Mobility from which you contend you were
10   entitled to be paid?
11   A.    All right.  This is when Electric
12   Mobility told them about the Connect America
13   medical alarm plan with its recurring revenue.
14   Being a family member of the Flowers family who
15   control Electric Mobility, I knew about the
16   relationship they had with Response Link, which is
17   another medical alarm supplier which I had a
18   contract with, and I knew what the terms of that
19   contract were.  I knew Connect America could beat
20   that.  I told that to Electric Mobility.  Electric
21   Mobility and I called Ken and set up the meeting
22   that he attended with Linda.
23   Q.    When you say Electric Mobility and you
24   called Ken --

37 (Pages 136 to 139)

George Flowers

140

1  A.    Michael Flowers is the -- my nephew.
2  Q.    And when was that?
3  A.    That was the week after we set up First
4  Street. Everybody was all excited about all these
5  big accounts I was bringing in.
6  Q.    Did Electric Mobility prove to be a big
7  account?
8  A.    Not over time, but that's not what we
9  thought at that moment in time. There was perfect
10 demographics.
11 Q.    Did Electric Mobility prove to be a large
12 account for Connect America?
13 A.    No, I think it was bad implementation by
14 Connect America.
15 Q.    It was what?
16 A.    Bad implementation of the programs. And
17 the same thing with Internet Alliance.
18 Q.    Bad implementation of the programs by
19 Connect America?
20 A.    Yes.
21 Q.    What did Connect America do badly?
22 A.    They didn't pursue two companies that
23 should have had a lot of potential.
24 Q.    One being Electric Mobility?

141

1  A.    And one being Internet Alliance.
2  Q.    When was the Electric Mobility
3  relationship formed?
4  A.    I think it was January of 2010.
5  Q.    2010?
6  A.    2009; January 2009.
7  Q.    Here's a version of the contract which is
8  incorporated into composite Exhibit Gross-4.
9  A.    When was it signed?
10 Q.    It was signed, but not dated.
11 A.    My recollection, it was January.
12 Q.    Of 2009 or 2010?
13 A.    2009. It's very close to First Street's
14 signing. It was probably within two months,
15 one month.
16 Q.    It looks like, again, in this Gross
17 Exhibit 4, composite exhibit, there is a cash
18 disbursements ledger -- cash disbursements journal
19 reflecting payments made on account of --
20       MR. PASS: I think that's Internet
21 Alliance.
22       MR. RODGER: It says "Electric
23 Mobility Corporation."
24       MR. PASS: Oh, I'm sorry.

142

1        THE WITNESS: I'm sure it was in
2  January of that year. I don't know why --
3  BY MR. RODGER:
4  Q.    Well, these are all dated October 2010,
5  November 2010, December 2010.
6  A.    It's got to be '09. It's less than a
7  month after First Street was signed, and Ken was
8  very excited about these two accounts.
9  Q.    I stand corrected. There are also as
10 part of this composite exhibit on page Connect
11 America 98, composite Exhibit Gross-4 are entries
12 showing some sales September '09 and then October
13 '09, November '09 and then December '09 and then
14 continuing on through the rest of 2010 until the
15 end of December -- the last one is December 6,
16 2010.
17       MR. PASS: And let me remind counsel
18 that there isn't always a correlation between the
19 date the agreement would have been signed and when
20 sales would have first been generated.
21 BY MR. RODGER:
22 Q.    Okay.
23       Well, first entry on this I note is
24 September '09 as far as cash being disbursed, but

143

1  your testimony remains that the agreement was
2  entered into and the relationship formed in January
3  of '09?
4  A.    Best of my recollection.
5  Q.    How much money were you paid as a result
6  of that relationship between Connect America and
7  Electric Mobility?
8  A.    That's interesting.
9  Q.    It not that interesting. It's a
10 straightforward question. Tell me how much you
11 were paid.
12 A.    Well, I thought the agreement for
13 Electric Mobility and First Street was $10 per unit
14 or the lesser -- or $15 and whatever we finally
15 settled with First Street and Electric Mobility. I
16 had known what the Response Link recurring revenue
17 was, and I was sure that I could get them for $10 a
18 month recurring revenue, which is $5 more than
19 what --
20 Q.    You said you could get them. What do you
21 mean?
22 A.    I could get Electric Mobility to accept
23 double the monthly recurring revenue.
24 Q.    So this was as you were negotiating on

38  (Pages 140 to 143)

George Flowers

188

1  Q.    Well, that was in a document that you
2  forwarded to Mr. Gross in February of 2009, right?
3  A.    That's correct.
4  Q.    And Mr. Gross said, "No, we're not going
5  to talk about that anymore"?
6  A.    That's why we're here today.
7  Q.    It was never signed, right?
8        MR. PASS:  Objection.  That's been
9  discussed probably half a dozen times today.
10 BY MR. RODGER:
11 Q.    Is it your contention that any company
12 that you may have listed on that Addendum A
13 forwarded to Mr. Gross in February of 2009 would be
14 a company which, if Connect America later entered
15 into a relationship with them, you would be
16 entitled to be paid money?
17 A.    Absolutely.
18 Q.    Interesting.
19       Now, when was the agreement with
20 Amerimark actually entered into?
21 A.    I don't know.
22       MR. PASS:  How would he know?
23       MR. RODGER:  Well --
24       MR. PASS:  I mean, other than by

189

1  looking at --
2  BY MR. RODGER:
3  Q.    Well, Gross-2, there's an agreement
4  between Connect America and Amerimark Holdings
5  dated September 12th, 2009.
6        Between August -- or I'm sorry,
7  between March, maybe April and September, what did
8  you do to bring this deal about?
9  A.    What do you mean "between April" --
10       MR. PASS:  Objection.  He didn't
11 bring the deal about.  He introduced the parties.
12 The deal was brought about by the parties.  Whether
13 the agreement was signed in September of 2009 or
14 September of 2012 is irrelevant for purposes of
15 what brings us here today.
16 BY MR. RODGER:
17 Q.    Well, who did you introduce --
18 A.    This is the telling line:  "Any potential
19 customer on this list contacted directly by the
20 company after dealer engages and/or introduces
21 customer to company will result in the payment of
22 $10 per sale."
23       This doesn't say I had to get a
24 contract signed.

190

1  Q.    Well, let's just make it clear.  Again,
2  the language you just read is Addendum A to the
3  proposed dealer agreement that you forwarded to
4  Mr. Gross in February of 2009, right?
5  A.    Yes.
6  Q.    And which we all agree wasn't signed?
7  A.    Agreed.
8  Q.    And which on March 23rd, per Gross-8,
9  Mr. Gross referenced when he said, "There is no
10 reason to meet further or discuss a dealer program
11 at this time"?
12       MR. PASS:  Objection.  Bruce, you're
13 rehashing issues that have no relevance to the
14 issues before this suit.  The issue is did George
15 Flowers introduce Connect America and
16 Dr. Leonard's.  Whether the distributor agreement
17 was signed is irrelevant.  It's evidence going back
18 to the time it was submitted to Mr. Gross that
19 George Flowers was making an introduction of
20 Dr. Leonard's to Connect America.
21       MR. RODGER:  All right.
22       MR. PASS:  That's for the jury to
23 decide.
24 BY MR. RODGER:

191

1  Q.    Who at Dr. Leonard's did you introduce to
2  who at Connect America?
3  A.    No one.
4  Q.    Who at Connect America did you introduce
5  to who at Dr. Leonard's?
6  A.    Say that again.
7  Q.    The converse of the question I just asked
8  you.  Who at Dr. Leonard's did you introduce to
9  Connect America, or who at Connect America did you
10 introduce to Dr. Leonard's?
11       MR. PASS:  Besides the individuals
12 he's already testified to -- about?
13       MR. RODGER:  I haven't heard him
14 mention anybody at Connect America.  I've heard him
15 mention people who he made overtures to,
16 unsuccessful, at Dr. Leonard's.
17       MR. PASS:  And other than the
18 e-mails and materials that were sent to Ken Gross?
19       MR. RODGER:  That he was soliciting,
20 that he was intending to solicit?
21       MR. PASS:  Is the question did
22 George Flowers, either in person -- introduce Ken
23 Gross to Vilma or the head honcho face to face
24 where they could shake hands and say, "Ken Gross,

50 (Pages 188 to 191)

**Exhibit 8**

Connect America                                         1/13/2010
2193 West Chester Pike
Broomall, Pa. 19008
Attn:  Ken Gross, President

Dear Ken,

I received you letter and I do not agree that you can terminate my commission payments after one year.  This clearly was never your intent.  There was never any discussion of a time limit in any of our conversations or correspondence.  I expect that you will continue to make the monthly payments on all my referral accounts.  My referral accounts are First Street, Electric Mobility, and Internet Alliances.

In addition, I would like an accounting of the monthly sales volume (units) of all my accounts from the date of signing their contracts.

Clearly, $10 per unit was the minimum amount you were to pay me under our agreement without time limit or restrictions.   For First Street you were to pay me the difference between $15 per month and what was finally settled with First Street.  If there is no spread, then I would earn $10 per unit sold.    This is very well documented and since you have never provided me a copy of the contract with First Street, I do not know the final terms of the agreement.   Therefore, I would appreciate receiving a copy of the executed contracts for First Street, Electric Mobility, and Internet Alliances.

I would appreciate a response by 1/31/2010.

Thanks,


George Flowers
517 Fordham Rd,
Woodbury Hts., NJ 08097

FLOWERS DEF EXHIBIT P 000066

In a message dated    /2010 4:54:48
P.M. Eastern Daylight time,
ggf517@aol.com writes:
Dear Ken,
     I have not recieved a response from
my previous certified letters
sent to Connect America and today,
3/25/2010, was the date I requested a
response from you concerning non-
payment on my second certified letter sent
and recieved on March 6th, 2010 to your
firm.
     Connect America and First Street
alone should generate over
$5,000,0000 in revenue on units already
sold by my referral accounts.  This
opportunity would have never occurred if it
were not for my efforts.   Ken,
this is not going away.   Please call me in
the next five days to discuss.

Sincerely,

George Flowers
609-980-1100

CONFIDENTIALITY NOTICE:

This message is intended only for the use
of the individual or entity to
which it is addressed, and may contain
information that is privileged,
confidential and exempt from disclosure
under applicable law. If the reader
of the message is not the intended
recipient, or the employee or agent
responsible for delivering the message to
the intended recipient, you are
hereby notified that any dissemination,
distribution or copying of this
communication is strictly prohibited. If you
have received this
communication in error, please notify us
immediately by telephone at (631)
414-4000 or (212) 485-5500 and destroy
this message.


IRS CIRCULAR 230 DISCLOSURE
NOTICE:

Unless specifically stated otherwise, the
written advice in this e-mail or
its attachments is not intended or written
to be used for the purpose of
avoiding penalties that may be imposed
under the Internal Revenue Code.

Connect America                          3/23/2011

2193 West Chester Pike

Broomall, Pa. 19008

Ken and Ciaran,

This is my final effort to collect commissions due me from sales made by my referral accounts before pursuing legal remedies. Each of First Street and Internet Alliance has added great value to your company since I introduced them to you, along with my introduction efforts that assured you the Electric Mobility and Dr. Leonard's accounts (each of First Street, Internet Alliance, Electric Mobility and Dr. Leonard's is referred to individually in this email as a "Referral Source" and collectively as the " Referral Sources").   My demand is that you pay me the commissions to which you agreed for the duration of the relationship with each Referral Source, i.e., the greater of (i) $10.00 per unit sold, or (ii) the portion of monthly recurring revenue in excess of $15.00 per month that Connect America requires and is not otherwise paid to the Referral Source. .

Although I would prefer to resolve this amicably, if I do not hear from you by the close of business on Friday, April 1, 2011 with a copy of all contracts with the Referral Sources, along with all financial records reflecting the relevant information concerning units sold and monthly recurring revenue, I will be forced to involve counsel to resolve this matter.

I hope this will not be necessary.

Thank you.

George Flowers

609-980-1100

**FLOWERS DEP EXHIBIT 1  000070**

# *MillCrest Law LLP*

### Counselors and Attorneys-at-Law

150 North Radnor Chester Road
Suite F-200
Radnor, PA 19087
610-977-0043  Facsimile
www.millcrestlaw.com

Kimon C. Hatza
610-977-2425  Office
267-679-7347  Mobile
*hatza@millcrestlaw.com*

April 1, 2011

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Kenneth S. Gross, President
Connect America
2193 West Chester Pike
Broomall, PA  19008

Re:  George G. Flowers / Breach of Contract Matter

Dear Mr. Gross:

We are counsel to George G. Flowers. In that capacity, we have examined his relationship with Connect America, beginning in late 2008 and continuing thereafter. Based upon discussions between the parties that were confirmed in writings and by the parties' course of conduct, it is clear that Connect America had a contractual relationship with Mr. Flowers pursuant to which it agreed to pay him commissions for introductions and/or referrals to prospective clients with which Connect America entered into contracts for products and/or services. Specifically, Connect America agreed to pay Mr. Flowers a commission equal to the greater of (i) $10.00 per unit sold, or (ii) the portion of monthly recurring revenue related to each such unit in excess of $15.00 per month that is not otherwise paid to the referred client ("Commission Calculation Method"). Such commissions were to be paid for the duration of the relationship between Connect America (and any successor in interest to Connect America by virtue of a sale of Connect America's business or by operation of law) and the referred client.

In reliance on this agreement, Mr. Flowers introduced and/or referred to Connect America each of the following prospective customers: First Street, Electric Mobility, Internet Alliance and Dr. Leonard's (each, a "Referral" and collectively, the "Referrals"). As a direct result of the introduction and/or referral provided to you by Mr. Flowers, each of the Referrals has entered into a business relationship with Connect America and the amount of business generated by the Referrals has been substantial. Moreover, the relationships with the Referrals significantly enhanced the value of Connect America's business and the purchase price it was able to achieve in its recent sale. We understand from Mr. Flowers that the relationships with those Referrals are ongoing.

**FLOWERS DEP EXHIBIT 1  000071**

Consistent with the terms of the contractual arrangement, Connect America made commission payments to Mr. Flowers in 2009 and early 2010 with regard to its contractual relationship with First Street. However, for reasons which lack legal support, no such payments were made for any of the other Referrals. We understand from Mr. Flowers that the First Street payments were calculated in accordance with the Commission Calculation Method referenced above, but that Connect America was unwilling to provide him with evidence of its contractual arrangements with First Street or any of the other Referrals to enable him to verify if the amounts paid to him with respect to First Street (and the failure to pay him anything with respect to the other Referrals) were correct. We further understand that you refused to provide such information to Mr. Flowers following repeated requests for it. In November of 2009, you unilaterally terminated your contract with Mr. Flowers prior to the completion of your continuing obligations under the contract. Such unilateral termination constituted a breach of your contractual obligations to Mr. Flowers entitling him to any and all remedies available as a consequence of such breach.

Our preference is to resolve this matter amicably with you. To that end, we will need you to provide us with copies of all contractual arrangements with the Referrals, as well as all financial records (including, without limitation, all financial records from and after the date Connect America was sold) relevant to determining (i) the number of units sold pursuant to Connect America's contracts with each Referral, (ii) the number of units returned in the first thirty (30) days from customers of the Referrals, and (iii) any and all other records necessary to verify the commissions due and payable to Mr. Flowers by virtue of your contract.

If we do not hear back favorably from you by April 15, 2011 (including with such favorable response the documentation requested above), we will consider pursuing any and all remedies available to us at law or in equity, including without limitation claims for an accounting, breach of contract and unjust enrichment. These claims will likely be asserted against you, individually, Connect America, and the current owner of the Connect America business by virtue of its being a successor in interest.

Nothing in this letter shall constitute a waiver of any right of Mr. Flowers in connection with the subject matter of this letter or an agreement to forbear with respect to any available rights or remedies he may have against Connect America or any other party. Any and all remedies and rights are fully reserved.

Very truly yours,


Kimon C. Hatza

cc: Mr. George G. Flowers
    Mr. Kevin Prokop

**FLOWERS DEP EXHIBIT 1  000072**

# EXHIBIT J

FLOWERS DEP EXHIBIT 1  000073



# "My Medical Alarm saved my life 3 times! I'm sure glad I didn't wait."

*The Designed For Seniors® Medical Alarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today. Don't wait until its too late... read a real life saving story below!*

*"I'm 79 years old and live alone in a small town. I own and wear the firstSTREET Medical Alarm button. The Medical Alarm has saved my life not once but three times! The first incident was on May 15th, when I had a stroke. The second incident was on Oct 15th, I found myself on the floor, with a knot on my head and a hole in the wall. The third incident was on Oct 23rd, I felt strange sitting in the chair. I could not move my right arm or leg. I learned that the hole in my heart (from birth), was forcing the high blood pressure through the hole and right up to my brain, this was the reasons for all three strokes. I can walk and talk with the exception of a weak right arm. If it was not for the Medical Alarm, who knows what the outcome could've been."*

W. Blackledge

### Help when you need it *most*:
## Medical Emergency – Accident – Fire – Burglar

**Why wait, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.



"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"

*wear as a pendant, or on your belt, or on your wrist*

**Plus it's reliable.** From the water-proof pendant to the sophisticated base unit to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.

**Best of all, it's affordable.** There is no equipment charge, no activation fee, and no long term contract. Call now and within a week you or someone you love will have the peace of mind and independence that comes with this remarkable system.

| Simple, Reliable, and Affordable | | Designed for Seniors® MedicalAlarm | Competition |
|---|---|---|---|
| Equipment Cost | ✓ | FREE | $30-$300 |
| Activation | ✓ | FREE | $10-$30 |
| Contract | ✓ | NONE | 1-2 Years |
| UL Approved Call Center | ✓ | YES | Some |
| Warranty | ✓ | LIFETIME | Varies |
| Free Shipping | ✓ | YES | ? |

Order now and receive free shipping and a free gift – valued at $35. It's yours to keep.

**Designed For Seniors®**
**Medical Alarm**

*Please mention promotional code*
**44380.**

# 1-877-686-1528



*firstSTREET*
for Boomers and Beyond®

1998 Ruffin Mill Road
Colonial Heights, VA 23834

Copyright ©2011 by firstSTREET for Boomers and Beyond, Inc.
All rights reserved.

**AARP BULLETIN**
**April 2012**

FLOWERS DEP EXHIBIT 1   000074

ADVERTISEMENT

**FREE GIFT** valued at $35

# "My Medical Alarm saved my life 3 times!
# I'm sure glad I didn't wait."

*The Designed For Seniors® Medical Alarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today. Don't wait until its too late... read a real life saving story below!*

*"I'm 79 years old and live alone in a small town. I own and wear the firstSTREET Medical Alarm button. The Medical Alarm has saved my life not once but three times! The first incident was on May 15th, when I had a stroke. The second incident was on Oct 15th, I found myself on the floor, with a knot on my head and a hole in the wall. The third incident was on Oct 23rd, I felt strange sitting in the chair. I could not move my right arm or leg. I learned that the hole in my heart (from birth), was forcing the high blood pressure through the hole and right up to my brain, this was the reasons for all three strokes. I can walk and talk with the exception of a weak right arm. If it was not for the Medical Alarm, who knows what the outcome could've been."*

W. Blackledge

"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"



wear as a pendant, or on your belt, or on your wrist

Help when you need it *most*:

*Medical Emergency – Accident – Fire – Burglary*

**Why wait, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

**Plus it's reliable.** From the waterproof pendant to the sophisticated base unit to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.

someone you love will have the peace of mind and independence that comes with this remarkable system.

Order now and receive free shipping and a free gift – valued at $35. It's yours to keep.

**Designed For Seniors® Medical Alarm**

*Please mention promotional code* 44555.

# 1-877-391-0560

*first*STREET
for Boomers and Beyond

1998 Ruffin Mill Road
Colonial Heights, VA 23834

Copyright ©2011 by firstSTREET for Boomers and Beyond, Inc.
All rights reserved

56882

**Best of all, it's affordable.** There is no equipment charge, no activation fee, and no long term contract. Call now and within a week you or

| Simple, Reliable, and Affordable | | |
|---|---|---|
| | Designed For Seniors® Medical Alarm | Competition |
| Equipment Cost | ✓ FREE | $30-$300 |
| Activation | ✓ FREE | $10-$30 |
| Contract | ✓ NONE | 1-2 Years |
| UL Approved Call Center | ✓ YES | Some |
| Warranty | ✓ LIFETIME | Varies |
| Free Shipping | ✓ YES | ? |

## *Cartoon Parade*®



"And now for today's Top Ten Commandments..."



"If you can't feel sorry for yourself, you'll never be able to feel sorry for somebody else."

### DON'T WAIT TILL SUNDAY!

Get exclusive columns from Connie Schultz and the best stories from our Parade of Papers every day at Parade.com



Play free brain games
Parade.com/games

Like us on Facebook
Facebook.com/parademag

Follow us on Twitter
Twitter.com/ParadeMagazine

18 • April 15, 2012

FLOWERS DEP EXHIBIT 1  000075



# "My Medical Alarm saved my _fe 3 times! I'm sure glad I didn't wait."

*The Designed For Seniors® Medical Alarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today. Don't wait until its too late... read a real life saving story below!*

*I'm 79 years old and live alone in a small town. I own and wear the firstSTREET Medical Alarm button. The Medical Alarm has saved my life not once but three times! The first incident was on May 15th, when I had a stroke. The second incident was on Oct 15th, I found myself on the floor, with a knot on my head and a hole in the wall. The third incident was on Oct 23rd, I felt strange sitting in the chair. I could not move my right arm or leg. I learned that the hole in my heart (from birth), was forcing the high blood pressure through the hole and right up to my brain, this was the reasons for all three strokes. I can walk and talk with the exception of a weak right arm. If it was not for the Medical Alarm, who knows what the outcome could've been."*

W. Blackledge

> "Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"

*wear as a pendant, or on your belt, or on your wrist*

## Help when you need it most:
### Medical Emergency – Accident – Fire – Burglary

**Why wait, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

**Plus it's reliable.** From the waterproof pendant to the sophisticated base unit to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.

**Best of all, it's affordable.** There is no equipment charge, no activation fee, and no long term contract. Call now and within a week you or someone you love will have the peace of mind and independence that comes with this remarkable system.

### Simple, Reliable, and Affordable

|  | Designed For Seniors® Medical Alarm | Competition |
|---|---|---|
| Equipment Cost | ✓ FREE | $30-$300 |
| Activation | ✓ FREE | $10-$30 |
| Contract | ✓ NONE | 1-2 Years |
| UL Approved Call Center | ✓ YES | Some |
| Warranty | ✓ LIFETIME | Varies |
| Free Shipping | ✓ YES | ? |

**Order now and receive free shipping and a free gift – valued at $35. It's yours to keep.**

### Designed For Seniors®
### Medical Alarm

*Please mention promotional code*
**43675.**

## 1-877-671-5848



1998 Ruffin Mill Road
Colonial Heights, VA 23834

Copyright © 2011 by firstSTREET for Boomers and Beyond, Inc.
All rights reserved.

**AARP BULLETIN
March 2012**

FLOWERS DEP EXHIBIT 1   000076

 FREE GIFT valued at $35

# "My Medical Alarm saved my life 3 times! I'm sure glad I didn't wait."

*The Designed For Seniors® Medical Alarm provides emergency notification that is simple, reliable, and affordable. It's simply the best value on the market today. Don't wait until its too late... read a real life saving story below!*

*"I'm 79 years old and live alone in a small town. I own and wear the firstSTREET Medical Alarm button. The Medical Alarm has saved my life not once but three times! The first incident was on May 15th, when I had a stroke. The second incident was on Oct 15th, I found myself on the floor, with a knot on my head and a hole in the wall. The third incident was on Oct 23rd, I felt strange sitting in the chair. I could not move my right arm or leg. I learned that the hole in my heart (from birth), was forcing the high blood pressure through the hole and right up to my brain, this was the reasons for all three strokes. I can walk and talk with the exception of a weak right arm. If it was not for the Medical Alarm, who knows what the outcome could've been."*

W. Blackledge

"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"

*wear as a pendant, or on your belt, or on your wrist*

## Help when you need it *most*:
### *Medical Emergency – Accident – Fire – Burglary*

**Why wait, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

**Plus it's reliable.** From the waterproof pendant to the sophisticated base unit to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.

**Best of all, it's affordable.** There is no equipment charge, no activation fee, and no long term contract. Call now and within a week you or someone you love will have the peace of mind and independence that comes with this remarkable system.



Order now and receive free shipping and a free gift – valued at $35. It's yours to keep.

**Designed For Seniors®**
**Medical Alarm**
*Please mention promotional code*
**43449.**
# 1-888-834-8610
 firstSTREET
*for Boomers and Beyond®*

1998 Ruffin Mill Road
Colonial Heights, VA 23834
Copyright © 2010 by firstSTREET for Boomers and Beyond, Inc. All rights reserved.

| Simple, Reliable, and Affordable | | Designed For Seniors® MedicalAlarm | Competition |
|---|---|---|---|
| Equipment Cost | ✓ | FREE | $30-$300 |
| Activation | ✓ | FREE | $10-$30 |
| Contract | ✓ | NONE | 1-2 Years |
| UL Approved Call Center | ✓ | YES | Some |
| Senior Approved™ | ✓ | YES | No |
| Warranty | ✓ | LIFETIME | Varies |
| Free Shipping | ✓ | YES | ? |

**AARP BULLETIN**
**January/February 2012**

**FLOWERS DEP EXHIBIT 1  000077**



# "My Medical Alarm saved my life 3 times! I'm sure glad I didn't wait."

*The Designed For Seniors® Medical Alarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today. Don't wait until its too late... read a real life saving story below!*

*"I'm 79 years old and live alone in a small town. I own and wear the firstSTREET Medical Alarm button. The Medical Alarm has saved my life not once but three times! The first incident was on May 15th, when I had a stroke. The second incident was on Oct 15th, I found myself on the floor, with a knot on my head and a hole in the wall. The third incident was on Oct 23rd, I felt strange sitting in the chair. I could not move my right arm or leg. I learned that the hole in my heart (from birth), was forcing the high blood pressure through the hole and right up to my brain, this was the reasons for all three strokes. I can walk and talk with the exception of a weak right arm. If it was not for the Medical Alarm, who knows what the outcome could've been."*

W. Blackledge

## Help when you need it *most*:
*Medical Emergency – Accident – Fire – Burglary*

"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"

**Why wait, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

*wear as a pendant, or on your belt, or on your wrist*

**Plus it's reliable.** From the waterproof pendant to the sophisticated base unit to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.

**Best of all, it's affordable.** There is no equipment charge, no activation fee, and no long term contract. Call now and within a week you or someone you love will have the peace of mind and independence that comes with this remarkable system.



Order now and receive free shipping and a free gift – valued at $35. It's yours to keep.

## Designed For Seniors®
## Medical Alarm

*Please mention promotional code*
**43331.**

# 1-877-444-1095



1998 Ruffin Mill Road
Colonial Heights, VA 23834

Copyright © 2011 by firstSTREET for Boomers and Beyond, Inc.
All rights reserved.

| Simple, Reliable, and Affordable | Designed For Seniors® Medical Alarm | Competition |
|---|---|---|
| Equipment Cost | ✓ FREE | $30-$300 |
| Activation | ✓ FREE | $10-$30 |
| Contract | ✓ NONE | 1-2 Years |
| UL Approved Call Center | ✓ YES | Some |
| Senior Approved™ | ✓ YES | No |
| Warranty | ✓ LIFETIME | Varies |
| Free Shipping | ✓ YES | ? |

**AARP BULLETIN
December 2011**

FLOWERS DEP EXHIBIT 1  000078



# "My Medical Alarm saved my life 3 times!
# I'm sure glad I didn't wait."

*The Designed For Seniors® Medical Alarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today. Don't wait until its too late... read a real life saving story below!*

*"I'm 79 years old and live alone in a small town. I own and wear the firstSTREET Medical Alarm button. The Medical Alarm has saved my life not once but three times! The first incident was on May 15th, when I had a stroke. The second incident was on Oct 15th, I found myself on the floor, with a knot on my head and a hole in the wall. The third incident was on Oct 23rd, I felt strange sitting in the chair. I could not move my right arm or leg. I learned that the hole in my heart (from birth), was forcing the high blood pressure through the hole and right up to my brain, this was the reasons for all three strokes. I can walk and talk with the exception of a weak right arm. If it was not for the Medical Alarm, who knows what the outcome could've been."*

W. Blackledge

"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"

*wear as a pendant, or on your belt, or on your wrist*

### Help when you need it *most*:
### *Medical Emergency – Accident – Fire – Burglary*

**Why wait, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

**Plus it's reliable.** From the waterproof pendant to the sophisticated base unit to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.

**Best of all, it's affordable.** There is no equipment charge, no activation fee, and no long term contract. Call now and within a week you or someone you love will have the peace of mind and independence that comes with this remarkable system.



### Order now and receive free shipping and a free gift – valued at $35. It's yours to keep.

### Designed For Seniors®
### Medical Alarm

*Please mention promotional code*
**43219.**

## 1-888-848-7419


*first*STREET
*for Boomers and Beyond*

1998 Ruffin Mill Road
Colonial Heights, VA 23834

Copyright © 2010 by firstSTREET for Boomers and Beyond, Inc.
All rights reserved.

**AARP BULLETIN
November 2011**

| Simple, Reliable, and Affordable | Designed For Seniors® MedicalAlarm | Competition |
|---|---|---|
| Equipment Cost | ✓ FREE | $30-$300 |
| Activation | ✓ FREE | $10-$30 |
| Contract | ✓ NONE | 1-2 Years |
| UL Approved Call Center | ✓ YES | Some |
| Senior Approved™ | ✓ YES | No |
| Warranty | ✓ LIFETIME | Varies |
| Free Shipping | ✓ YES | ? |

FLOWERS DEP EXHIBIT 1  000079

ADVERTISEMENT

FREE GIFT valued at $35

## "My Medical Alarm saved my life 3 times!
## I'm sure glad I didn't wait."

**The Designed For Seniors® Medical Alarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today. Don't wait until its too late... read a real life saving story below!**

*"I'm 79 years old and live alone in a small town. I own and wear the firstSTREET Medical Alarm button. The Medical Alarm has saved my life not once but three times! The first incident was on May 15th, when I had a stroke. The second incident was on Oct 15th, I found myself on the floor, with a knot on my head and a hole in the wall. The third incident was on Oct 23rd, I felt strange sitting in the chair. I could not move my right arm or leg. I learned that the hole in my heart (from birth), was forcing the high blood pressure through the hole and right up to my brain, this was the reasons for all three strokes. I can walk and talk with the exception of a weak right arm. If it was not for the Medical Alarm, who knows what the outcome could've been."*

W. Blackledge



"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"

wear as a pendant, or on your belt, or on your wrist

**Help when you need it** *most*:

*Medical Emergency – Accident – Fire – Burglary*

**Why wait, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

**Plus it's reliable.** From the waterproof pendant to the sophisticated base unit to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.

you or someone you love will have the peace of mind and independence that comes with this remarkable system.

**Order now and receive free shipping and a free gift – valued at $35. It's yours to keep.**

## Designed For Seniors®
## Medical Alarm

*Please mention promotional code*
43428.

## 1-877-732-5006

*first*STREET
for Boomers and Beyond

1998 Ruffin Mill Road
Colonial Heights, VA 23834

Copyright © 2011 by firstSTREET for Boomers and Beyond, Inc.
All rights reserved

**Best of all, it's affordable.** There is no equipment charge, no activation fee, and no long term contract. Call now and within a week

### Simple, Reliable, and Affordable

| | Designed For Seniors® MedicalAlarm | Competition |
|---|---|---|
| Equipment Cost | ✓ FREE | $30-$300 |
| Activation | ✓ FREE | $10-$30 |
| Contract | ✓ NONE | 1-2 Years |
| UL Approved Call Center | ✓ YES | Some |
| Senior Approved™ | ✓ YES | No |
| Warranty | ✓ LIFETIME | Varies |
| Free Shipping | ✓ YES | ? |

## Cartoon Parade



WORK APNEA

"I try to stay asleep, but every few minutes my job wakes me up."

DAVE COVERLY



"Promise me you'll never turn into your mother."

IVAN & BARSTOW

### Numbrix

Complete 1 to 81 so the numbers follow a horizontal or vertical path—no diagonals.
*By Marilyn vos Savant*

| 7 | | 21 | | 23 | | 25 | | 31 |
|---|---|---|---|---|---|---|---|---|
| 9 | | | | | | | | 33 |
| 53 | | | | | | | | 39 |
| 59 | | | | | | | | 79 |
| 61 | | 65 | | 69 | | 75 | | 81 |

❶ Play a new puzzle every day at Parade.com/numbrix .

20 • November 27, 2011

PARADE MAGAZINE
11/27/11



# "New medical alarm can save you money ...and save your life!"

**The Designed For Seniors® Medical Alarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today.**

Are you concerned about being helpless in an emergency? Are you and your loved ones anxious about what would happen if you were unable to get to a phone? Have you considered moving out of the home you love and into some kind of assisted living because of these worries? If you answered "yes" to any of these questions, you are not alone. Millions of seniors are concerned about their safety. There are products out there that claim to help, but they are difficult to use and even more difficult to afford. Why mess with complicated installations and long term contracts when there's a product that's simple, reliable and affordable? The product is the *Designed For Seniors®* Medical Alarm, read on and we'll explain why every senior in America should have one.

"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"

**First of all, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

**It's reliable.** From the waterproof pendant to the sophisticated base unit to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.

**Best of all, it's affordable.** There is no equipment charge, no activation fee, no long term contract. Call now and within a week you or someone you love will have the peace of mind and independence that comes with this remarkable system. ▨

• *Free shipping*
• *Free activation*
• *No equipment cost*

**What will you do in case of an emergency?** If you have *Designed For Seniors®* Medical Alarm, all you do is push a button, and you'll immediately get the help you need, quickly and reliably. That's because it has been "designed for seniors" by the industry leader in providing helpful and affordable solutions for millions of aging Americans.

| Simple, Reliable, and Affordable | | |
|---|---|---|
| | **Designed For Seniors® Medical Alarm** | **Competition** |
| Equipment Cost | ✓ FREE | $30-$300 |
| Activation | ✓ FREE | $10-$30 |
| Contract | ✓ NONE | 1-2 Years |
| UL Approved Call Center | ✓ YES | Some |
| Senior Approved™ | ✓ YES | No |
| Warranty | ✓ LIFETIME | Varies |
| Free Shipping | ✓ YES | ? |

Order now and receive free shipping and a free gift – valued at $35. It's yours to keep.

**Designed For Seniors®
Medical Alarm**

*Please mention promotional code*
**43110.**

# 1-877-451-1606



1998 Ruffin Mill Road
Colonial Heights, VA 23834

Copyright © 2011 by firstSTREET for Boomers and Beyond, Inc. All rights reserved.

**AARP BULLETIN
October 2011**



**FREE GIFT valued at $35**

# "This medical alarm saved my mom's life!
# ...and it's affordable"

**The Designed For Seniors® MedicalAlarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today.**

Are you concerned about being helpless in an emergency? Are you and your loved ones anxious about what would happen if you were unable to get to a phone? Have you considered moving out of the home you love and into some kind of assisted living because of these worries? If you answered "yes" to any of these questions, you are not alone. Millions of seniors are concerned about their safety. There are products out there that claim to help, but they are difficult to use and even more difficult to afford. Why mess with complicated installations and long term contracts when there's a product that's simple, reliable and affordable? The product is the *Designed For Seniors®* Medical Alarm. Read on and we'll explain why every senior in America should have one.

**What will you do in case of an emergency?** If you have a *Designed For Seniors®* Medical Alarm, all you do is push a button, and you'll immediately get the help you

*"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"*

need, quickly and reliably. That's because it has been "designed for seniors" by the industry leader in providing helpful and affordable solutions for millions of aging Americans.

**First of all, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and. play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

**It's reliable.** From the waterproof pendant to the sophisticated base unit, to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center,

and there's a battery backup in case of a power failure.



**Best of all, it's affordable.** You get the complete system for only pennies per day. No equipment charge, no activation fee, no long term contract. Call now and within a week you or someone you love will have the peace of mind and independence that comes with this remarkable system.

Be one of the first 100 to order and get FREE Shipping and a FREE Gift– valued at $35. It's yours to keep.

## Simple, Reliable, and Affordable

| | Competition | | Designed For Seniors® Medical Alarm |
|---|---|---|---|
| Equipment Cost | $30-$300 | ✓ | FREE |
| Activation | $10-$30 | ✓ | FREE |
| Contract | 1-2 Years | ✓ | NONE |
| UL Approved Call Center | Some | ✓ | YES |
| Senior Approved™ | No | ✓ | YES |
| Warranty | Varies | ✓ | LIFETIME |
| Free Shipping | ? | ✓ | YES |

## Designed For Seniors®
## Medical Alarm

*Please mention promotional code*
*42914.*

# 1-877-696-5511



*first*STREET
*for Boomers and Beyond®*

1998 Ruffin Mill Road

**AARP MAGAZINE**
September/October 2011

**FLOWERS DEP EXHIBIT 1 000082**

**FREE GIFT** valued at $35

# "New medical alarm can save you money
## ...and save your life!"

*The Designed For Seniors® Medical Alarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today.*



Are you concerned about being helpless in an emergency? Are you and your loved ones anxious about what would happen if you were unable to get to a phone? Have you considered moving out of the home you love and into some kind of assisted living because of these worries? If you answered "yes" to any of these questions, you are not alone. Millions of seniors are concerned about their safety. There are products out there that claim to help, but they are difficult to use and even more difficult to afford. Why mess with complicated installations and long term contracts when there's a product that's simple, reliable and affordable? The product is the *Designed For Seniors®* Medical Alarm, read on and we'll explain why every senior in America should have one.

*"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"*

**What will you do in case of an emergency?** If you have *Designed For Seniors®* Medical Alarm, all you do is push a button, and you'll immediately get the help you need, quickly and reliably. That's because it has been "designed for seniors" by the industry leader in providing helpful and affordable solutions for millions of aging Americans.

**First of all, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

**It's reliable.** From the waterproof pendant to the sophisticated base unit to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.

**Best of all, it's affordable.** You get the complete system for only pennies per day. No equipment charge, no activation fee, no long term contract. Call now and within a week you or someone

you love will have the peace of mind and independence that comes with this remarkable system. ☒

• *Free shipping*
• *Free activation*
• *No equipment cost*

| | Competition | Designed For Seniors® Medical Alarm |
|---|---|---|
| **Simple, Reliable, and Affordable** | | |
| Equipment Cost | $30-$300 | ✓ FREE |
| Activation | $10-$30 | ✓ FREE |
| Contract | 1-2 Years | ✓ NONE |
| UL Approved Call Center | Some | ✓ YES |
| Senior Approved™ | No | ✓ YES |
| Warranty | Varies | ✓ LIFETIME |
| Free Shipping | ? | ✓ YES |

Be one of the first 100 to order and get FREE Shipping and a FREE Gift– valued at $35.
It's yours to keep.

**Designed For Seniors®**
*Medical Alarm*

*Please mention promotional code*
**42852.**

# 1-877-720-9906



1998 Ruffin Mill Road
Colonial Heights, VA 23834
Copyright © 2009 by firstSTREET for Boomers and Beyond, Inc.
All rights reserved.

**AARP BULLETIN**
**July/August 2011**

FLOWERS DEP EXHIBIT 1   000083

FREE GIFT valued at $35

# "New medical alarm can save you money
## ...and save your life!"

*The Designed For Seniors® Medical Alarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today.*

Are you concerned about being helpless in an emergency? Are you and your loved ones anxious about what would happen if you were unable to get to a phone? Have you considered moving out of the home you love and into some kind of assisted living because of these worries? If you answered "yes" to any of these questions, you are not alone. Millions of seniors are concerned about their safety. There are products out there that claim to help, but they are difficult to use and even more difficult to afford. Why mess with complicated installations and long term contracts when there's a product that's simple, reliable and affordable? The product is the *Designed For Seniors®* Medical Alarm, read on and we'll explain why every senior in America should have one.

"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"

**What will you do in case of an emergency?** If you have *Designed For Seniors®* Medical Alarm, all you do is push a button, and you'll immediately get the help you need, quickly and reliably. That's because it has been "designed for seniors" by the industry leader in providing helpful and affordable solutions for millions of aging Americans.

**First of all, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

**It's reliable.** From the waterproof pendant to the sophisticated base unit to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.



• *Free shipping*
• *Free activation*
• *No equipment cost*

within a week you or someone you love will have the peace of mind and independence that comes with this remarkable system.

### Simple, Reliable, and Affordable

| | Competition | Designed For Seniors® Medical Alarm |
|---|---|---|
| Equipment Cost | $30-$300 | ✓ FREE |
| Activation | $10-$30 | ✓ FREE |
| Contract | 1-2 Years | ✓ NONE |
| UL Approved Call Center | Some | ✓ YES |
| Senior Approved™ | No | ✓ YES |
| Warranty | Varies | ✓ LIFETIME |
| Free Shipping | ? | ✓ YES |

**Best of all, it's affordable.** You get the complete system for only pennies per day. No equipment charge, no activation fee, no long term contract. Call now and

Be one of the first 100 to order and get FREE Shipping and a FREE Gift– valued at $35. It's yours to keep.

### Designed For Seniors®
### *Medical Alarm*

*Please mention promotional code*
42154.

# 1-877-686-1530


*first*STREET
for Boomers and Beyond®

1998 Ruffin Mill Road
Colonial Heights, VA 23834

66803 Copyright © 2008 by firstSTREET for Boomers and Beyond, Inc. All rights reserved.

**AARP BULLETIN**
**June 2011**

# "New medical alarm can save you money ...and save your life!"

**The Designed For Seniors® Medical Alarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today.**



Are you concerned about being helpless in an emergency? Are you and your loved ones anxious about what would happen if you were unable to get to a phone? Have you considered moving out of the home you love and into some kind of assisted living because of these worries? If you answered "yes" to any of these questions, you are not alone. Millions of seniors are concerned about their safety. There are products out there that claim to help, but they are difficult to use and even more difficult to afford. Why mess with complicated installations and long term contracts when there's a product that's simple, reliable and affordable? The product is the *Designed For Seniors®* Medical Alarm, read on and we'll explain why every senior in America should have one. What will you do in case of an emergency? If you have *Designed For Seniors®* Medical Alarm, all you do is push a button, and you'll immediately get the help you need, quickly and reliably. That's because it has been "designed for seniors" by the industry leader in providing helpful and affordable solutions for millions of aging Americans.

"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"

**First of all, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

**It's reliable.** From the waterproof pendant to the sophisticated base unit to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing that you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.

- Free shipping
- Free activation
- No equipment cost

**Best of all, it's affordable.** You get the complete system for only pennies per day. No equipment charge, no activation fee, no long term contract. Call now and within a week you or someone you love will have the peace of mind and independence that comes with this remarkable system.

## Simple, Reliable, and Affordable

| | Competition | Designed For Seniors® Medical Alarm | |
|---|---|---|---|
| Equipment Cost | $30-$300 | ✓ | FREE |
| Activation | $10-$30 | ✓ | FREE |
| Contract | 1-2 Years | ✓ | NONE |
| UL Approved Call Center | Some | ✓ | YES |
| Senior Approved™ | No | ✓ | YES |
| Warranty | Varies | ✓ | LIFETIME |
| Free Shipping | ? | ✓ | YES |

Be one of the first 100 to order and get FREE Shipping and a FREE Gift– valued at $35. It's yours to keep.

**Designed For Seniors®**
*Medical Alarm*
*Please mention promotional code*
**42048.**

# 1-877-444-1994
*www.DFSmedicalalarm.com*

*first*STREET
*for Boomers and Beyond®*

1998 Ruffin Mill Road
Colonial Heights, VA 23834

**AARP BULLETIN
May 2011**

FLOWERS DEP EXHIBIT 1   000085

PARADE MAGAZINE
5/15/11

## ALTH HERO

### r. Anne Camp

*venting diabetes by*
*wing—not just telling—*
*patients how to eat right*

RY DAY, endocrinologist
Anne Camp sees people in
ger of developing diabetes,
the typical prevention advice
sn't work in her low-income
nnecticut neighborhood.
The residents can't afford to
gyms, and many buy their
d in bodegas that have few
its and vegetables," Camp
s. So she worked with staff to
e patients more than just
ice by starting a free diabetes
vention program at the Fair
ven Community Health Center.
While attending bilingual
trition and exercise classes,
rticipants can grow their own
duce. A neighborhood bakery
nated space for a garden, and
cess heat from the ovens is
nted into a greenhouse. And an
ea cycling club is refurbishing
nated bikes for participants.
Since the program began in
07, 200 families have enrolled,
id a pilot study found that the

> average partici-
> pant lost 6.5
> pounds, reducing
> his or her diabe-
> tes risk by a
> third. —Colleen
> Shaddox

HERE New
ven, Conn.
HAT SHE'S
NNG Helping
w-income
nilies reduce
eir risk for
abetes

"TO MAKE
HEALTHY
BEHAVIORS
STICK, IT PAYS
TO ENGAGE
THE WHOLE
COMMUNITY.'

ADVERTISEMENT

FREE GIFT valued at $35

# "New medical alarm can save you money
# ...and save your life!"

### The Designed For Seniors® MedicalAlarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today.

Are you concerned about being helpless in an emergency? Are you and your loved ones anxious about what would happen if you were unable to get to a phone? Have you considered moving out of the home you love and into some kind of assisted living because of these worries? If you answered "yes" to any of these questions, you are not alone. Millions of seniors are concerned about their safety. There are products out there that claim to help, but they are difficult to use and even more difficult to afford. Why mess with complicated installations and long term contracts when there's a product that's simple, reliable and affordable? The product is the *Designed For Seniors®* Medical Alarm. Read on and we'll explain why every senior in America should have one. What will you do in case of an emergency? If you have a *Designed For Seniors®* Medical Alarm, all you do is push a button, and immediately get the help you need, quickly

"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"

and reliably. That's because it has been "designed for seniors" by the industry leader in providing helpful and affordable solutions for millions of aging Americans.

**First of all, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

**It's reliable.** From the waterproof pendant to the sophisticated base unit, to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.

• *Free shipping*
• *Free activation*
• *No Equipment cost*

**Best of all, it's affordable.** You get the complete system for only pennies per day. No equipment charge, no activation fee, no long term contract. Call now and within a week you or someone you love will have the peace of mind and independence that comes with this remarkable system.

Be one of the first 100 to order and get FREE Shipping and a FREE Gift– valued at $35.
It's yours to keep.

### Simple, Reliable, and Affordable

| | Competition | | Designed For Seniors® MedicalAlarm |
|---|---|---|---|
| Equipment Cost | $30-$300 | ✓ | FREE |
| Activation | $10-$30 | ✓ | FREE |
| Contract | 1-2 Years | ✓ | NONE |
| UL Approved Call Center | Some | ✓ | YES |
| Senior Approved™ | No | ✓ | YES |
| Warranty | Varies | ✓ | LIFETIME |
| Free Shipping | ? | ✓ | YES |

### Designed For Seniors®
### *MedicalAlarm*

*Please mention promotional code*
42206.

# 1-888-848-7418
www.DFSmedicalalarm.com

*first*STREET
for Boomers and Beyond®



1998 Ruffin Mill Road
Colonial Heights, VA 23834
Copyright © 2010 by firstSTREET for Boomers and Beyond, Inc. All rights reserved.

# "New medical alarm can save you money ...and save your life!"

**FREE GIFT valued at $35**

**The Designed For Seniors® Medical Alarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today.**

Are you concerned about being helpless in an emergency? Are you and your loved ones anxious about what would happen if you were unable to get to a phone? Have you considered moving out of the home you love and into some kind of assisted living because of these worries? If you answered "yes" to any of these questions, you are not alone. Millions of seniors are concerned about their safety. There are products out there that claim to help, but they are difficult to use and even more difficult to afford. Why mess with complicated installations and long term contracts when there's a product that's simple, reliable and affordable?

The product is the *Designed For Seniors®* Medical Alarm, read on and we'll explain why every senior in America should have one. What will you do in case of an emergency? If you have *Designed For Seniors®* Medical Alarm, all you do is push a button, and you'll immediately get the help you need, quickly and reliably. That's because it has been "designed for seniors" by the industry leader in providing helpful and affordable solutions for millions of aging Americans.

**First of all, it's simple** to install and use. Unlike other products that require

> "Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"

professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons. **It's reliable.** From the waterproof pendant to the sophisticated base unit to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.



- Free shipping
- Free activation
- No equipment cost

week you or someone you love will have the peace of mind and independence that comes with this remarkable system.

## Simple, reliable, and affordable

|  | Competition | Designed For Seniors® Medical Alarm |
|---|---|---|
| Equipment Cost | $30-$300 | ✓ FREE |
| Activation | $10-$30 | ✓ FREE |
| Contract | 1-2 Years | ✓ NONE |
| UL Approved Call Center | Some | ✓ YES |
| Senior Approved™ | No | ✓ YES |
| Warranty | Varies | ✓ LIFETIME |
| Free Shipping | ? | ✓ YES |

**Best of all, it's affordable.** You get the complete system for only pennies per day. No equipment charge, no activation fee, no long term contract. Call now and within a

Be one of the first 100 to order and get a FREE Gift– valued at $35. It's yours to keep.

**FREE SHIPPING** with your order

**Designed For Seniors® Medical Alarm**
*Please mention promotional code 41837.*
To order or learn more
**1-888-834-8022**
www.DFSmedicalalarm.com

*first*STREET

AARP BULLETIN
March 2011

**FLOWERS DEP EXHIBIT 1  000087**

ADVERTISEMENT

**FREE GIFT** valued at $35

# "New medical alarm can save you money ...and save your life!"

*The Designed For Seniors® Medical Alarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today.*



Are you concerned about being helpless in an emergency? Are you and your loved ones anxious about what would happen if you were unable to get to a phone? Have you considered moving out of the home you love and into some kind of assisted living because of these worries? If you answered "yes" to any of these questions, you are not alone. Millions of seniors are concerned about their safety. There are products out there that claim to help, but they are difficult to use and even more difficult to afford. Why mess with complicated installations and long term contracts when there's a product that's simple, reliable and affordable? The product is the *Designed For Seniors®* Medical Alarm, read on and we'll explain why every senior in America should have one. What will you do in case of an emergency? If you have *Designed For Seniors®* Medical Alarm, all you do is push a button, and you'll immediately get the help you need, quickly and reliably. That's because it has been "designed for seniors" by the industry leader in providing helpful and affordable solutions for millions of aging Americans.

"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"

**First of all, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

**It's reliable.** From the waterproof pendant to the sophisticated base unit to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.

• *Free shipping*
• *Free activation*
• **No equipment cost**

**Best of all, it's affordable.** You get the complete system for only pennies per day. No equipment charge, no activation fee, no long term contract. Call now and within a week you or someone you love will have the peace of mind and independence that comes with this remarkable system.

Be one of the first 100 to order and get FREE Shipping and a FREE Gift– valued at $35. It's yours to keep.

## Simple, Reliable, and Affordable

|  | Competition | | Designed For Seniors® Medical Alarm |
|---|---|---|---|
| Equipment Cost | $30-$300 | ✓ | FREE |
| Activation | $10-$30 | ✓ | FREE |
| Contract | 1-2 Years | ✓ | NONE |
| UL Approved Call Center | Some | ✓ | YES |
| Senior Approved™ | No | ✓ | YES |
| Warranty | Varies | ✓ | LIFETIME |
| Free Shipping | ? | ✓ | YES |

**Designed For Seniors®**
*Medical Alarm*
*Please mention promotional code 41531.*

## 1-877-470-2864
*www.DFSmedicalalarm.com*

*first*STREET
for Boomers and Beyond

1998 Ruffin Mill Road
Colonial Heights, VA 23834

PARADE MAGAZINE
11/28/10

ADVERTISEMENT

**FREE GIFT** valued at $35

# "New med al alarm can save you money ...and save your life!"

**The Designed For Seniors® MedicalAlarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today.**

Are you concerned about being helpless in an emergency? Are you and your loved ones anxious about what would happen if you were unable to get to a phone? Have you considered moving out of the home you love and into some kind of assisted living because of these worries? If you answered "yes" to any of these questions, you are not alone. Millions of seniors are concerned about their safety. There are products out there that claim to help, but they are difficult to use and even more difficult to afford. Why mess with complicated installations and long term contracts when there's a product that's simple, reliable and affordable? The product is the *Designed For Seniors®* Medical Alarm. Read on and we'll explain why every senior in America should have one. What will you do in case of an emergency? If you have a *Designed For Seniors®* Medical Alarm, all you do is push a button, and you'll immediately get the help you need, quickly

*"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"*

and reliably. That's because it has been "designed for seniors" by the industry leader in providing helpful and affordable solutions for millions of aging Americans.

**First of all, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

**It's reliable.** From the waterproof pendant to the sophisticated base unit, to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.

• Free shipping
• Free activation
• No Equipment cost

**Best of all, it's affordable.** You get the complete system for only pennies per day. No equipment charge, no activation fee, no long term contract. Call now and within a week you or someone you love will have the peace of mind and independence that comes with this remarkable system.

Call now to order and get FREE Shipping and a FREE Gift – valued at $35. It's yours to keep.

**Designed For Seniors®**
**MedicalAlarm**
*Please mention promotional code*
**41312**
**1-877-689-6654**
*www.DFSmedicalalarm.com*

*first*STREET
*for Boomers and Beyond®*

1998 Ruffin Mill Road
Colonial Heights, VA 23834
Copyright © 2010 by firstSTREET for Boomers and Beyond, Inc. All rights reserved.

## Simple, reliable, and affordable

| | Competition | Designed For Seniors® MedicalAlarm |
|---|---|---|
| **Equipment Cost** | $30-$300 | ✓ FREE |
| **Activation** | $10-$30 | ✓ FREE |
| **Contract** | 1-2 Years | ✓ NONE |
| **UL Approved Call Center** | Some | ✓ YES |
| **Senior Approved™** | No | ✓ YES |
| **Warranty** | Varies | ✓ LIFETIME |
| **Free Shipping** | ? | ✓ YES |

Ask**Marilyn**® continue

### WORDS WE NEED

**haggly** (adjective)
in the mood to bargain

**maxi-me** (noun)
the individual described on one's résumé

**assify** (verb)
to make someone look ridiculous

**Answer:** *Three steps per second. So the trip up took 7.5 seconds; the trip down took 15 seconds.*

*If x stands for the man's speed then 30 ÷ (x + 1) is the time in seconds for the trip up. (The escalator added to his speed.) And 30 ÷ (x – 1) is the time for the trip down. (The escalator slowed his progress.) We know that the trip down took twice as long as the trip up, so two times 30 ÷ (x + 1) equals 30 ÷ (x – 1). Now you can solve for x.*

# Cartoon Parade®
Parade.com/cartoons



*"I had my colors done, and I'm a fall."*

DONNA BARSTOW

Visit us at PARADE.COM


FLOWERS DEP EXHIBIT 1  000089

# EXHIBIT K

FLOWERS DEP EXHIBIT 1  000090



# " My Medical Alarm saved my life 3 times!
# I'm sure glad I didn't wait."

*The Designed For Seniors® Medical Alarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today.  Don't wait until its too late... read a real life saving story below!*

*"I'm 79 years old and live alone in a small town. I own and wear the firstSTREET Medical Alarm button.  The Medical Alarm has saved my life not once but three times! The first incident was on May 15th, when I had a stroke.  The second incident was on Oct 15th, I found myself on the floor, with a knot on my head and a hole in the wall.  The third incident was on Oct 23rd, I felt strange sitting in the chair.  I could not move my right arm or leg.  I learned that the hole in my heart (from birth), was forcing the high blood pressure through the hole and right up to my brain, this was the reasons for all three strokes. I can walk and talk with the exception of a weak right arm. If it was not for the Medical Alarm, who knows what the outcome could've been."*

W. Blackledge

"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"

*wear as a pendant, or on your belt, or on your wrist*

## Help when you need it most:
### Medical Emergency – Accident – Fire – Burgla

**Why wait, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

**Plus it's reliable.** From the water-proof pendant to the sophisticated base unit to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.

**Best of all, it's affordable.** There is no equipment charge, no activation fee, and no long term contract. Call now and within a week you or someone you love will have the peace of mind and independence that comes with this remarkable system. ⌘



Order now and receive free shipping and a free gift – valued at $35. It's yours to keep.

## Designed For Seniors®
## Medical Alarm

*Please mention promotional code*
44380.

# 1-877-686-1528



1998 Ruffin Mill Road
Colonial Heights, VA 23834

Copyright © 2011 by firstSTREET for Boomers and Beyond, Inc.
All rights reserved.

AARP BULLETIN
April 2012

| Simple, Reliable, and Affordable | | |
|---|---|---|
| | **Designed For Seniors® Medical Alarm** | **Competition** |
| Equipment Cost | ✓ FREE | $30-$300 |
| Activation | ✓ FREE | $10-$30 |
| Contract | ✓ NONE | 1-2 Years |
| UL Approved Call Center | ✓ YES | Some |
| Warranty | ✓ LIFETIME | Varies |
| Free Shipping | ✓ YES | ? |

FLOWERS DEP EXHIBIT 1   000091

ADVERTISEMENT



# "My Medical A___rm saved my life 3 tin__s!
# I'm sure glad I didn't wait."

*The Designed For Seniors® Medical Alarm provides emergency notification that is simple, reliable and affordable. It's simply the best value on the market today. Don't wait until its too late... read a real life saving story below!*

**Help when you need it most:**

*Medical Emergency – Accident – Fire – Burglary*

I'm 79 years old and live alone in a small town. I own and wear the firstSTREET Medical Alarm button. The Medical Alarm has saved my life not once but three times! The first incident was on May 5th, when I had a stroke. The second incident was on Oct 15th, I found myself on the floor, with a knot on my head and a hole in the wall. The third incident was on Oct 23rd, I felt strange sitting in the chair. I could not move my right arm or leg. I learned that the hole in my heart (from birth), was forcing the high blood pressure through the hole and right up to my brain, this was the reasons for all three strokes. I can walk and talk with the exception of a weak right arm. If it was not for the Medical Alarm, who knows what the outcome could've been."

— W. Blackledge

"Good morning. This is Nancy with Medical Alarm. Do you need assistance Mrs. Smith?"



wear as a pendant, or on your belt, or on your wrist

**Why wait, it's simple** to install and use. Unlike other products that require professional installation, this product is "plug and play." The unit is designed for easy use in an emergency, with large, easy-to-identify buttons.

**Plus it's reliable.** From the waterproof pendant to the sophisticated base unit to the state-of-the-art 24/7 call center, the entire system is designed to give you the peace of mind in knowing you are never alone in an emergency. You get two-way communication with a live person in our Emergency Response Center, and there's a battery backup in case of a power failure.

someone you love will have the peace of mind and independence that comes with this remarkable system.

> **Order now and receive free shipping and a free gift – valued at $35. It's yours to keep.**

**Designed For Seniors®**
**Medical Alarm**

*Please mention promotional code*
**44555.**
# 1-877-391-0560


for Boomers and Beyond

1998 Ruffin Mill Road
Colonial Heights VA 23834
Copyright © 2011 by firstSTREET for Boomers and Beyond, Inc.
All rights reserved.

**Best of all, it's affordable.** There is no equipment charge, no activation fee, and no long term contract. Call now and within a week you or

| Simple, Reliable, and Affordable | | |
|---|---|---|
| | Designed For Seniors® Medical Alarm | Competition |
| Equipment Cost | ✓ FREE | $30-$300 |
| Activation | ✓ FREE | $10-$30 |
| Contract | ✓ NONE | 1-2 Years |
| UL Approved Call Center | ✓ YES | Some |
| Warranty | ✓ LIFETIME | Varies |
| Free Shipping | ✓ YES | ? |

# *Cartoon Parade*



"And now for today's Top Ten Commandments..."



"If you can't feel sorry for yourself, you'll never be able to feel sorry for somebody else."

**DON'T WAIT TILL SUNDAY?**
Get exclusive columns from Connie Schultz and the best stories from our Parade of Papers every day at Parade.com

Play free brain games
Parade.com/games

Like us on Facebook
Facebook.com/parademag

Follow us on Twitter
Twitter.com/ParadeMagazine

10 • April 15, 2012

Parade Magazine
4/15/12

**FLOWERS DEP EXHIBIT 1   000092**

# EXHIBIT L

FLOWERS DEP EXHIBIT 1  000093

**Emergency Alert Technology** ● Philips Lifeline with AutoAlert is the only Medical Alarm pendant that automatically calls for help if it detects a fall.

# "I was so amazed to see the ambulance and wondered, How did they know I fell?"

**Arlene A.**

For millions of Americans, the fear of falling in and around their home, when they are all alone, is one of the greatest fears of all. Many have tried to protect themselves by purchasing PERS, or Personal Emergency Response Systems. That's a smart move... but it wouldn't have done Arlene any good. She fell in her driveway on a cold winter morning. She hit her head and was so dazed that she didn't think to press the button on her PERS pendant. Suddenly she was amazed to see an ambulance coming up the street. She wondered, "How did they know I fell?"

**Lifeline with AutoAlert™... for an added layer of protection.** Luckily for Arlene, her doctor had recommended Lifeline with AutoAlert. This revolutionary system features the only Medical Alarm pendant that can automatically call Philips Lifeline's state-of-the-art response center, if it detects your fall. There, expert emergency response operators quickly call friends, family or local ambulance, police or firefighters to summon help... quickly and reliably.

**Remarkably sophisticated... easy to use.** Philips has been around for over 100 years, and since the early 70's has led the way in PERS innovations and has more subscribers than any other medical alarm company. Now, they've introduced AutoAlert. All you do is plug the base unit into a power outlet and a phone land line. Then, you wear the AutoAlert pendant: If you experience any kind of emergency, from fires to falls, a break-in or even just shortness of breath, press the button and it calls the Philips Lifeline Emergency



"Good morning. This is Brenda with Lifeline. Do you need assistance Mrs. Jones?"



**America's #1 Medical Alarm Service***

Response Center. If you fall and can't press the button for any reason, AutoAlert can automatically call for you, if it detects your fall. Philips Lifeline Response Center Associates are trained to assess the situation and will summon help quickly.

**Don't wait another minute... call now!** firstSTREET is proud to offer Lifeline with AutoAlert at a special introductory price. There's no equipment to buy, no long-term contract and the setup takes only seconds. Call now and find out how you or a loved one can get this added layer of protection to help you stay living independently in your home.

• No Equipment Cost • No Installation fee • Just Pay as you go!

**Call now and get Free Shipping**
*Please mention promotional code 44609.*
## 1-888-604-7293

*firstSTREET* for Boomers and Beyond  **PHILIPS Lifeline**

| Evolution of the Personal Medical Alarm | | | | |
|---|---|---|---|---|
| Time | Product | Wireless | Range | AutoAlert |
| Early 1970s | W. Hormanns "Elder alarm" | No | ? | No |
| 1974 | Lifeline | Yes | ? | No |
| 1999 | 911 Cell Phone | Yes | where service available | No |
| 2010 | Philips Lifeline with AutoAlert | Yes | 800 ft*** | YES |

*Based on number of U.S. subscribers December 2011. **AutoAlert does not detect 100% of all falls. If able users should always push their button when they need help. ***Based on open field test. Copyright © 2012 by firstSTREET for Boomers and Beyond, Inc. All rights reserved.

**AARP BULLETIN**
**June 2012**

FLOWERS DEP EXHIBIT 1  000094