**Exhibit 9**

## Henry Pass Esq

| | |
|---|---|
| **From:** | Henry Pass Esq [hip@hipesq.com] |
| **Sent:** | Monday, December 17, 2012 2:01 PM |
| **To:** | 'Bruce Rodger' |
| **Cc:** | 'George Flowers'; 'George Flowers' |
| **Subject:** | Flowers v. Connect America.com, LLC |
| **Attachments:** | Flowers Disclosure Documents re Dealer Agreement.pdf; Flowers Disclosure Documents Supp 000001.pdf |

| | |
|---|---|
| **Importance:** | High |

Bruce,

While reviewing documents for this week's deposition, I noticed that "Addendum A," referenced in a draft Dealer Agreement sent by George Flowers on February 24, 2009 (Bates stamped Flowers Disclosure Documents 000253 and 000457-000460) was not attached. Here it is (Bates stamped Flowers Disclosure Documents Supp 00001) along with a copy of the Dealer Agreement.

Best regards,

Henry

Henry I. Pass
LAW OFFICES OF HENRY IAN PASS
3 Bala Plaza East, Suite 700A
Bala Cynwyd, PA 19004
Telephone: 610-660-8001
Facsimile: 610-660-8004
hip@hipesq.com

*********************************************************************************

INFORMATION CONTAINED IN THIS E-MAIL TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL.  IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS EMAIL, DO NOT READ, DISTRIBUTE OR REPRODUCE THIS TRANSMISSION (INCLUDING ANY ATTACHMENTS).  IF YOU HAVE RECEIVED THIS EMAIL IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE OR EMAIL REPLY.

*********************************************************************************

EXHIBIT
Flowers-1
12/18/12
PENGAD 800-631-6989

## George Flowers

| | |
|---|---|
| From: | George Flowers [ggf@comcast.net] |
| Sent: | Tuesday, February 24, 2009 9:13 AM |
| To: | Ken Gross |
| Subject: | Dealer Contract for George Flowers |
| Attachments: | DEALER AGREEMENT GeorgeFlowers.doc; ADDENDUMA.docx |

Dear Ken,

Looking forward to seeing you at 10.  Here is an advanced copy for you.  I am excited about getting started.

George

Flowers Disclosure Documents 000253

CONFIDENTIAL!



Connect America.Com
2193 W. Chester Pike
Broomall, PA 19008
1-800-90-60-USA

## CONNECT AMERICA.COM, LLC

## DEALER AGREEMENT

THIS AGREEMENT dated ____/____ day of 2009____, by and between CONNECT AMERICA.COM, LLC with its Corporate

Office location at 2193 West Chester Pike, Broomall, Pennsylvania 19008 (hereinafter referred to as "COMPANY")

And ___FLOWCO aka_____, with its address at__517 Fordham Rd.
Woodbury Hts., NJ 08097_____

_____(hereinafter referred to as "DEALER").

THE COMPANY is engaged in the business of selling, marketing, installing, monitoring and servicing Medical Alert Systems and selling Dealerships in accordance with the terms and conditions of this Agreement.

THE DEALER is engaged in the business of selling, marketing and installing (optional) Medical Alert Systems in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements contained herein, the parties hereto, do mutually agree as follows:

COMPANY'S RESPONSIBILITIES:
____. COMPANY will support Dealer to promote large accounts as found on Addendum A.

COMPANY will provide DEALER with necessary sales agreements, marketing collateral and kits as listed on "easy start-up" sheet.

COMPANY will provide DEALER with proprietary sales and marketing training manual as listed on "easy start-up" sheet as well as ongoing assistance as necessary

COMPANY will provide Medical Alert equipment to be installed by DEALER (optional) or provide for shipment of equipment to customer directly for self-installation and troubleshooting all customer installation problems.

COMPANY will provide DEALER with Medical Alert monitoring services, toll free number and answering service.

COMPANY will provide DEALER with custom web site page- and domain name-

COMPANY will provide DEALER with customer billing and collection service.

COMPANY will provide liability insurance as required to monitor Medical Alert Systems. A certificate of insurance will be made available to the Dealer on an annual basis in the amount of $1,000,000 naming him as co-insured.

COMPANY will issue monthly compensation payment to DEALER for all active/paid up accounts. If an account is paid in advance, Dealer will receive his portion of the advanced payments during the next regular payment period. Cancellations shall be deducted on the pro-rata remaining balance of the refunded payment to the customer.

DEALER'S RESPONSIBILITIES:

DEALER will aggressively market and sell Medical Alert Systems to the residential retail customers, and assisted living marketplaces, pharmacies (not top 10), sub dealers, and any other approved channels available to the dealer.

1

Flowers Disclosure Documents 000457

DEALER or Telemarketer assigned by Company will complete customer order sheet and electronically send or fax completed order to COMPANY to begin order processing.

DEALER may install (optional) Medical Alert System in order to maintain customer relationship and generate strong referral base -or- unit will be shipped directly to customer and Company will handle all installation. If problems arise, the company will provide instructions and solve customer problems at the Company expense.

## INDEPENDENT CONTRACTOR:

DEALER is an independent contractor and is not an agent, employee, servant, partner, or joint venturer of COMPANY. DEALER is not authorized to make any promise, agreement, representations or contract on behalf of COMPANY. DEALER acknowledges full responsibility for all the debts and obligations of the business operated pursuant to this Dealership, including, but not limited to, all bills, debts, taxes, licenses, permits, governmental required fees and/or financial obligations and various business expenses. COMPANY shall not be liable for any of the debts or obligations of DEALER'S business. Dealer will complete IRS Form W-9 to be forwarded to COMPANY upon execution of this agreement.

## DEALERSHIP FEE:

DEALER agrees to pay the initial Dealership fee of $2,995.00 1 upon execution of this Agreement. Dealership fee includes the all materials and services listed on the "Easy Start-Up Sheet".

Additional Sales and Marketing Materials may be purchased as necessary from time to time. These products and pricing are listed on the "Additional Material Price List" and are not to be construed with the Simple Start-Up.

The COMPANY will supply all necessary sales order forms at no charge to the DEALER and an electronic order form for Dealer's web site(s). A customer should be able to supply the proper information to activate the account and to ship the order.                    — Formatted: Indent: Left: 0"

## COMPENSATION:

COMPANY will pay DEALER Recurring Revenue of $10$15.00 per month per active/paid up Medical Alert System sold by DEALER. Recurring Revenue will increase to $12.50 per month per active/paid up Medical Alert System after 50 cumulative sales by DEALER. Recurring Revenue will increase to $15.00 per month per active/paid up Medical Alert System after 100 cumulative sales by DEALER. All revenue in excess of $29.95 per month will be paid to the Dealer.

New and renewal accounts will be paid the 30th of the month following payments received from said account.

In the event of a delinquent customer account, and after reasonable effort has been asserted by COMPANY, the DEALER will be notified prior to customer termination to personally attempt to make the collection and bring account current so the he/she may be paid on said account.

DEALER may, at his/her option, charge customer an installation fee (not to exceed $50$100.00). Installation consists of plugging in the electric cord, phone cord, and sending a test signal to central monitoring station....few minutes plus travel time......no tools required. This charge will be collected by the DEALER and retained as 100% income.

DEALER may, at his/her option, charge customer an activation fee (not to exceed $99.00). This charge will be collected by the DEALER and retained as 100% DEALER income. This activation fee may consist of collecting medical data, including prescription medicine, medical history and physician information of the customer.

## ORIGINAL TERM:

This agreement will be effective as of the date executed below. The initial term will be for one year, and the agreement will be automatically renewed for additional one-year terms.

DEALER is required to produce a minimum of 12 sales per year continuing revenue to maintain full Dealer Benefits such as Web Site(s) Hosting, Answering Service and Toll Free Telephone Number(s). If DEALER does not reach minimum requirement of 12 systems not have continuing revenue in a one-year period, DEALER will be charged a monthly service fee of $99 1 to cover expenses of COMPANY to continue providing these services.

Either Party, with 30 days prior written notice to the other Party, may terminate this agreement, with or without cause. Upon proper notice of termination, all DEALER'S accounts will continue to generate the same revenue from COMPANY

2

for as long as each customer's account is active and paid-up. and DEALER is not in violation of content in this Agreement; or COMPANY will pay DEALER, in one lump sum, the amount equal to one year Dealer Revenue.

Formatted: Normal, Indent: Left: 0.5"

**TRADEMARKS:**

COMPANY'S trademarks, trade names, domain names, toll free numbers, customer contracts and logo's (collectively referred to as "Marks") are crucial to its reputation, good will and business, therefore, will always remain the property of the COMPANY. DEALER shall cooperate fully with COMPANY in protecting and maintaining its Marks. DEALER shall not remove or alter any mark from equipment or materials. DEALER shall only use the Marks in the sale or promotion of COMPANY'S products or services. DEALER shall not use COMPANY'S Marks on "self-created" or advertising materials without prior written consent from the COMPANY.

**ADVERTISING:**

DEALER will adhere to specifications provided by the COMPANY for advertising and promotions, which may include placement of newspaper ads, television ads, radio spots, billboards, direct mail, flyers and promotional pieces. COMPANY will furnish templates or sample ads for these types of advertising that have proven successful in the past and it would be in the best interest of the DEALER to request this type of assistance as necessary

**CONFIDENTIALITY:**

All business information and materials containing information disclosed to DEALER by COMPANY, its representatives or agents, shall be deemed CONFIDENTIAL and shall be treated by the DEALER as CONFIDENTIAL information during the period of this agreement and at all times thereafter unless the information becomes public knowledge in the normal course of business. DEALER shall be liable to COMPANY for damages caused by any breach of this provision or by any unauthorized disclosure of CONFIDENTIAL information and/or materials by DEALER'S officers, employees or agents. All written materials and discussions between the parties marked confidential will be covered under this clause.

**NON-COMPETE:**

Dealer is already engaged in Medical Alarm business. DEALER agrees upon termination of this agreement, notwithstanding the cause of termination, shall not shall not can-compete with the business of the COMPANY, or it's successors or assigns, and shall not directly or indirectly engage in the business of Medical Alarms or another business competitive to the business of the COMPANY. This non compete agreement shall extend nationwide and shall be in full force and effect for five years commencing with the date of termination. pursue existing customers of Company and Company agrees not to pursue existing customers of Dealers for a period of 5 years after termination of this contract.

**INDEMNIFICATION:**

DEALER is fully responsible for all of his/her verbal and/or written statements made regarding the COMPANY products, services, and business plan which are not expressly contained in the official COMPANY materials. DEALER agrees to indemnify the COMPANY and the COMPANY'S directors, officers, employees and agents, and hold them harmless from any and all liability including judgments, cause of action, execution, debt, litigation, any loss, civil penalties, attachment, demand, refunds, attorney fees, court costs, or other obligation of any kind arising out of the DEALER'S acts, words, conduct, or omission as an independent contractor for the sale of the COMPANY'S products and services. It is further understood that the COMPANY, MANUFACTURER and CENTRAL STATION are not insurers. DEALER understands that a Medical Alert System is a preventative measure and cannot guarantee that no loss will occur. This provision shall survive the termination of this agreement.

**OTHER:**

This agreement is non-transferable by DEALER and shall be governed by the laws of the state of Pennsylvania. Addendum A is considered part of this agreement.

AGREEMENT SIGNED this _____ day of _____, 20 _____.

3

CONNECT AMERICA.COM, LLC                    DEALER:

By:_____               By:_____

Print Name                                Print Name

Title                                     Title

Date                                      Date

4

Flowers Disclosure Documents 000460

Connect America and Flowco AKA

Addendum A

Dealer will provide a list of his potential customer contacts to Company. The Company agrees to permit the Dealer to solicit these potential customers and protect Dealer's interest when engaging in contract negotiations.

Any potential customer on this list contracted directly by the Company after Dealer engages and/or introduces customer to Company will result in a payment of $10 per sale. Additional compensation equal to $5 monthly recurring revenue for all current paid up subscribers will be paid to the Dealer.

Company will supply a toll free number and website for each Dealer's customers that have a potential of over 100 units annually. All sales made through these assigned phone numbers and websites will be credited to Dealer for as long as the sub dealer has current paid up accounts. Dealer will pay his sub dealer once payment is received from Company.

Company will supply Website, toll free number, 5000 bi-fold brochures, and insure the advertising theme and message is consistent. The web site will also have an electronic order form which will be capable of taking an order from the website. Our intention is avoid a telemarketer's commission being paid and the unit being shipped directly to the customer for installation.

Company will advise Dealer that his contacts will be protected by the Company in writing. Additional new Dealer Contacts can be added at any time and will be requested in writing by Dealer. New Contacts must be approved in writing and can be approved by Ken Gross or Ninon.

List of Dealer Contacts:

Scooter Store
Hoveround
Dr. Leonards

Telemarketing Services:

Company will provide telemarketers to answer phones and take orders. The telemarketers will sell and take the order for processing. The telemarketer will be employees of the Company . Dealer will pay the Company according to the schedule below for Company Services:

$50 for each successful sale on an order that includes payment for one year annual subscription.
$30 for each successful sale on an order that includes payment for semi annual subscription.
$20 for each successful sale on an order that includes payment for monthly subscription.

Orders must be error free to be paid in full. All missing information from the order must be obtained by Company and commission will not be paid until correction order is accepted by the Company.

Telemarketers must achieve close atleast 60% sales to call ratio on contracted or they will be replaced. A corrective action program to

Chargebacks will be made if customer cancels the order in the first 120 days. Telemarketer or Company is responsible to save the order and if successful, no chargeback will be made.

Flowers Disclosure Documents Supp 1

**Exhibit 10**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


- - - - - - - - - - - - - - - - - -

GEORGE G. FLOWERS,                     : No. 12-4787

                                       :

                         Plaintiff, :

        v.                             :

                                       :

CONNECT AMERICA.COM, LLC,              :

                                       :

                         Defendant. :

- - - - - - - - - - - - - - - - - -

                         -   -   -

             THURSDAY, FEBRUARY 7, 2013

                         -   -   -

                Oral deposition of NINON PROZONIC,
taken pursuant to notice, held at the LAW OFFICES
OF HENRY IAN PASS, 3 Bala Plaza, Suite 700A,
Bala Cynwyd, Pennsylvania, 19004, commencing at
10:25 a.m. before Shauna L. Detty, Court Reporter -
Notary Public there being present.

                         -   -   -


             KAPLAN, LEAMAN AND WOLFE
          Registered Professional Reporters
             Constitution Place, Suite 909
                 325 Chestnut Street
               Philadelphia, PA 19106
                  (215) 922-7112

Ninon Prozonic

24

1  don't remember exactly the date.
2  **Q.**      Okay.
3          Do you recall the circumstance under
4  which you first met Mr. Flowers?
5  **A.**      I called him, I phoned him.
6  **Q.**      For what purpose?
7  **A.**      To see if there was possibility and a
8  good fit for a partnership between the company that
9  he was and Connect America.
10 **Q.**      And do you recall the name of the company
11 that Mr. Flowers was at that time?
12 **A.**      Yes.
13 **Q.**      What was that company?
14 **A.**      I remember it as Rascal.
15 **Q.**      Did there come a time when you learned
16 that the company was Electric Mobility?
17 **A.**      Yes.
18 **Q.**      How did you learn that Mr. Flowers was
19 someone to contact at Electric Mobility?
20 **A.**      How?
21 **Q.**      Yes.
22 **A.**      I was given papers, documents like, you
23 know, pieces of paper with many different names and
24 companies to contact when I first started my job

25

1  and I started going through all of those and one of
2  those names and companies was Mr. Flowers and
3  Rascal and I contacted him.
4  **Q.**      And who gave you the name?
5          Who actually gave you the name?
6  **A.**      Ken.
7  **Q.**      Are you familiar with the term lead list?
8  **A.**      No.
9  **Q.**      When you learned about the identity of
10 Mr. Flowers at Electric Mobility, had you also been
11 given a list of other perspective strategic
12 alliance partners for you to contact?
13 **A.**      Yes.
14 **Q.**      Are you familiar with the term leads?
15 **A.**      Yes.
16 **Q.**      At that time did you consider Electric
17 Mobility a lead?
18 **A.**      No.
19 **Q.**      When you learned about the identity of
20 Mr. Flowers, were you also provided with the
21 identity of other people to contact?
22 **A.**      I don't understand what -- please can you
23 clarify.
24 **Q.**      Sure.

26

1          As I understand it, Ms. Prozonic,
2  you learned about the identity of George Flowers
3  and that he worked for Electric Mobility through a
4  piece of paper that Ken Gross gave to you?
5  **A.**      Right.
6  **Q.**      On that piece of paper were there other
7  companies for you to contact?
8  **A.**      Not on the same piece of paper.
9  **Q.**      Okay, but other pieces of paper?
10 **A.**      Yes.
11 **Q.**      What did you call the possible
12 relationship with Electric Mobility at the time?
13          What would you refer to that
14 relationship as?
15 **A.**      I would refer as potential partner.
16 **Q.**      Okay.
17          So is it correct to say that from
18 time to time you would be given pieces of paper
19 with potential -- lists of potential partners?
20 **A.**      Yes.
21 **Q.**      Okay.
22          And other than Ken Gross who
23 provided you with those pieces of paper listing
24 potential partners?

27

1  **A.**      Anyone in the company that would see
2  something that might be a good idea and a good fit
3  would forward to me.
4  **Q.**      Okay.
5          While you were employed by Connect
6  America did anyone at Connect America ever give you
7  the name First Street as a potential partner?
8  **A.**      No.
9  **Q.**      While you were at Connect America did
10 anyone ever give you the name Dr. Leonard's as a
11 potential partner?
12 **A.**      No.
13 **Q.**      While you were employed at First Street
14 did anyone ever provide you with the name Internet
15 Alliance as a potential partner?
16 **A.**      I recall Internet Alliance.
17 **Q.**      And how did you learn about Internet
18 Alliance as a potential partner?
19 **A.**      I am not one hundred percent sure.  I
20 think but I am not sure that it came from
21 Mr. Flowers.
22 **Q.**      Okay.
23          While you were employed at Connect
24 America --

9 (Pages 24 to 27)

Ninon Prozonic

32

1     But there are none that you recall?
2  **A.**    I don't remember.
3  **Q.**    Did there come a time when you became
4  familiar with a company called First Street?
5  **A.**    I heard of the company, yes.
6  **Q.**    Okay.
7     You had heard of the company?  Under
8  what circumstances had you heard of the company?
9  **A.**    Just that it was a new partner.
10 **Q.**    And when was the first time that you
11 learned that First Street was a new partner?
12 **A.**    Couple of years, several years.  I don't
13 remember now very well.
14 **Q.**    Do you recall under what circumstances
15 you learned about it?
16 **A.**    Just that it was a new partner, that's
17 all.
18 **Q.**    Okay.
19     Were you in any way involved in
20 bringing about the relationship between First
21 Street and Connect America?
22 **A.**    No.
23 **Q.**    Are you familiar with a gentleman named
24 David Modena?

33

1  **A.**    No.
2  **Q.**    Did there come a time when you learned
3  that George Flowers had introduced First Street to
4  Connect America or Connect America to First Street?
5  **A.**    No.
6  **Q.**    Did there come a time when you learned
7  that George Flowers had been involved in the -- in
8  bringing about the partnership that ultimately
9  occurred between Connect America and First Street?
10 **A.**    No.
11 **Q.**    Did you ever have any discussions with
12 Kenneth Gross about First Street?
13 **A.**    No.  It was not in my -- it was not my
14 responsibility.
15 **Q.**    Okay.
16     Was First Street considered a
17 strategic partner?
18 **A.**    I don't know.
19 **Q.**    Was the relationship between First Street
20 and Connect America a strategic alliance?
21 **A.**    If it was I didn't put it together.  I
22 can't tell you.
23 **Q.**    Okay.
24     Is it correct to say that not only

34

1  didn't you put it together, but you had nothing to
2  do with it?
3  **A.**    Correct.
4  **Q.**    Okay, fair enough.
5     Did there come a time when you
6  became familiar with a company called Internet
7  Alliance?
8  **A.**    Yes.
9  **Q.**    And when did you first become familiar
10 with Internet Alliance?
11 **A.**    I don't remember the date.
12 **Q.**    Okay.
13     Do you recall the circumstances
14 under which you learned about Internet Alliance?
15 **A.**    I don't recall it one hundred percent
16 other than I called them.
17 **A.**    I'm sorry.
18 **A.**    Other than I called them.  I don't
19 remember how it came together.
20 **Q.**    Okay.
21     Do you have any recollection about
22 George Flowers having introduced Internet Alliance
23 to Connect America?
24 **A.**    I don't have the recollection, but it's

35

1  possible.
2  **Q.**    Did you ever have any conversations with
3  Mr. Flowers about Internet Alliance?
4  **A.**    I think so, but I don't remember.
5  **Q.**    Did there come a time when Connect
6  America entered into a business relationship with
7  Internet Alliance?
8  **A.**    Yes.
9  **Q.**    Okay.
10     Was that business relationship under
11 the purview of your department or your job as Vice
12 President of Strategic Alliances?
13 **A.**    Yes.
14 **Q.**    So is it correct to say that Internet
15 Alliance was a strategic alliance partner of
16 Connect America?
17 **A.**    Yes.
18 **Q.**    Did there come a time when you became
19 familiar with a company called Dr. Leonard's?
20 **A.**    Yes.
21 **Q.**    Under what circumstances did you first
22 become familiar with Dr. Leonard's?
23 **A.**    Just that it was another partner that had
24 been brought on board.

11 (Pages 32 to 35)

**Exhibit 11**



Connect America.Com
2193 W. Chester Pike
Broomall, PA 19008
1-800-90-60-USA

## CONNECT AMERICA.COM, LLC

## DEALER AGREEMENT

THIS AGREEMENT dated ____/____ day of 2009_____, by and between CONNECT AMERICA.COM, LLC with its Corporate

Office location at 2193 West Chester Pike, Broomall, Pennsylvania 19008 (hereinafter referred to as "COMPANY")

And ___FLOWCO aka_____, with its address at ___517 Fordham Rd.
Woodbury Hts., NJ 08097_____

_____—(hereinafter referred to as "DEALER").

THE COMPANY is engaged in the business of selling, marketing, installing, monitoring and servicing Medical Alert Systems and selling Dealerships in accordance with the terms and conditions of this Agreement.

THE DEALER is engaged in the business of selling, marketing and installing (optional) Medical Alert Systems in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements contained herein, the parties hereto, do mutually agree as follows:

COMPANY'S RESPONSIBILITIES:
_____. COMPANY will support Dealer to promote large accounts as found on Addendum A.

COMPANY will provide DEALER with necessary sales agreements, marketing collateral and kits as listed on "easy start-up" sheet.

COMPANY will provide DEALER with proprietary sales and marketing training manual as listed on "easy start-up" sheet as well as ongoing assistance as necessary

COMPANY will provide Medical Alert equipment to be installed by DEALER (optional) or provide for shipment of equipment to customer directly for self-installation and troubleshooting all customer installation problems.

COMPANY will provide DEALER with Medical Alert monitoring services, toll free number and answering service.

COMPANY will provide DEALER with custom web site page- and domain name.

COMPANY will provide DEALER with customer billing and collection service.

COMPANY will provide liability insurance as required to monitor Medical Alert Systems. A certificate of insurance will be made available to the Dealer on an annual basis in the amount of $1,000,000 naming him as co-insured.

COMPANY will issue monthly compensation payment to DEALER for all active/paid up accounts. If an account is paid in advance, Dealer will receive his portion of the advanced payments during the next regular payment period. Cancellations shall be deducted on the pro-rata remaining balance of the refunded payment to the customer.

DEALER'S RESPONSIBILITIES:

DEALER will aggressively market and sell Medical Alert Systems to the residential retail customers, and assisted living marketplaces, pharmacies (not top 10), sub dealers, and any other approved channels available to the dealer.

**Formatted:** Indent: Left: 0.5", First line: 0"

**Formatted:** Indent: Left: 0.5", First line: 0"

**Formatted:** Indent: First line: 0"

1

Flowers Disclosure Documents 000457

DEALER or Telemarketer assigned by Company will complete customer order sheet and electronically send or fax completed order to COMPANY to begin order processing.

DEALER may install (optional) Medical Alert System in order to maintain customer relationship and generate strong referral base -or- unit will be shipped directly to customer and Company will handle all installation. If problems arise, the company will provide instructions and solve customer problems at the Company expense.

## INDEPENDENT CONTRACTOR:

DEALER is an independent contractor and is not an agent, employee, servant, partner, or joint venturer of COMPANY. DEALER is not authorized to make any promise, agreement, representations or contract on behalf of COMPANY. DEALER acknowledges full responsibility for all the debts and obligations of the business operated pursuant to this Dealership, including, but not limited to, all bills, debts, taxes, licenses, permits, governmental required fees and/or financial obligations and various business expenses. COMPANY shall not be liable for any of the debts or obligations of DEALER'S business. Dealer will complete IRS Form W-9 to be forwarded to COMPANY upon execution of this agreement.

## DEALERSHIP FEE:

DEALER agrees to pay the initial Dealership fee of $2,995.00 1 upon execution of this Agreement. Dealership fee includes the all materials and services listed on the "Easy Start-Up Sheet".

Additional Sales and Marketing Materials may be purchased as necessary from time to time. These products and pricing are listed on the "Additional Material Price List" and are not to be construed with the Simple Start-Up.

The COMPANY will supply all necessary sales order forms at no charge to the DEALER and an electronic order form for Dealer's web site(s). A customer should be able to supply the proper information to activate the account and to ship the order.   `Formatted: Indent: Left: 0"`

## COMPENSATION:

COMPANY will pay DEALER Recurring Revenue of $10 15.00 per month per active/paid up Medical Alert System sold by DEALER. Recurring Revenue will increase to $12.50 per month per active/paid up Medical Alert System after 50 cumulative sales by DEALER. Recurring Revenue will increase to $15.00 per month per active/paid up Medical Alert System after 100 cumulative sales by DEALER.   All revenue in excess of $29.95 per month will be paid to the Dealer.

New and renewal accounts will be paid the 30th of the month following payments received from said account.

In the event of a delinquent customer account, and after reasonable effort has been asserted by COMPANY, the DEALER will be notified prior to customer termination to personally attempt to make the collection and bring account current so the he/she may be paid on said account.

DEALER may, at his/her option, charge customer an installation fee (not to exceed $50 100.00). Installation consists of plugging in the electric cord, phone cord, and sending a test signal to central monitoring station....few minutes plus travel time......no tools required. This charge will be collected by the DEALER and retained as 100% income.

DEALER may, at his/her option, charge customer an activation fee (not to exceed $99.00). This charge will be collected by the DEALER and retained as 100% DEALER income. This activation fee may consist of collecting medical data, including prescription medicine, medical history and physician information of the customer.

## ORIGINAL TERM:

This agreement will be effective as of the date executed below. The initial term will be for one year, and the agreement will be automatically renewed for additional one-year terms.

DEALER is required to produce a minimum of 12 sales per year continuing revenue to maintain full Dealer Benefits such as Web Site(s) Hosting, Answering Service and Toll Free Telephone Number(s). If DEALER does not reach minimum requirement of 12 systems not have continuing revenue in a one-year period, DEALER will be charged a monthly service fee of $99 1 to cover expenses of COMPANY to continue providing these services.

Either Party, with 30 days prior written notice to the other Party, may terminate this agreement, with or without cause. Upon proper notice of termination, all DEALER'S accounts will continue to generate the same revenue from COMPANY

2

for as long as each customer's account is active and paid-up. and DEALER is not in violation of content in this Agreement; or COMPANY will pay DEALER, in one lump sum, the amount equal to one year Dealer Revenue.

**Formatted:** Normal, Indent: Left: 0.5"

TRADEMARKS:

COMPANY'S trademarks, trade names, domain names, toll free numbers, customer contracts and logo's (collectively referred to as "Marks") are crucial to its reputation, good will and business, therefore, will always remain the property of the COMPANY. DEALER shall cooperate fully with COMPANY in protecting and maintaining its Marks. DEALER shall not remove or alter any mark from equipment or materials. DEALER shall only use the Marks in the sale or promotion of COMPANY'S products or services. DEALER shall not use COMPANY'S Marks on "self-created" or advertising materials without prior written consent from the COMPANY.

ADVERTISING:

DEALER will adhere to specifications provided by the COMPANY for advertising and promotions, which may include placement of newspaper ads, television ads, radio spots, billboards, direct mail, flyers and promotional pieces. COMPANY will furnish templates or sample ads for these types of advertising that have proven successful in the past and it would be in the best interest of the DEALER to request this type of assistance as necessary

CONFIDENTIALITY:

All business information and materials containing information disclosed to DEALER by COMPANY, its representatives or agents, shall be deemed CONFIDENTIAL and shall be treated by the DEALER as CONFIDENTIAL information during the period of this agreement and at all times thereafter unless the information becomes public knowledge in the normal course of business. DEALER shall be liable to COMPANY for damages caused by any breach of this provision or by any unauthorized disclosure of CONFIDENTIAL information and/or materials by DEALER'S officers, employees or agents. All written materials and discussions between the parties marked confidential will be covered under this clause.

NON-COMPETE:

Dealer is already engaged in Medical Alarm business. DEALER agrees upon termination of this agreement, notwithstanding the cause of termination, shall not shall not can compete with the business of the COMPANY, or it's successors or assigns and shall not directly or indirectly engage in the business of Medical Alarms or another business competitive to the business of the COMPANY. This non-compete agreement shall extend nationwide and shall be in full force and effect for five years commencing with the date of termination. pursue existing customers of Company and Company agrees not to pursue existing customers of Dealers for a period of 5 years after termination of this contract.

INDEMNIFICATION:

DEALER is fully responsible for all of his/her verbal and/or written statements made regarding the COMPANY products, services, and business plan which are not expressly contained in the official COMPANY materials. DEALER agrees to indemnify the COMPANY and the COMPANY'S directors, officers, employees and agents, and hold them harmless from any and all liability including judgments, cause of action, execution, debt, litigation, any loss, civil penalties, attachment, demand, refunds, attorney fees, court costs, or other obligation of any kind arising out of the DEALER'S acts, words, conduct, or omission as an independent contractor for the sale of the COMPANY'S products and services. It is further understood that the COMPANY, MANUFACTURER and CENTRAL STATION are not insurers. DEALER understands that a Medical Alert System is a preventative measure and cannot guarantee that no loss will occur. This provision shall survive the termination of this agreement.

OTHER:

This agreement is non-transferable by DEALER and shall be governed by the laws of the state of Pennsylvania. Addendum A is considered part of this agreement.

AGREEMENT SIGNED this _____ day of_____, 20_____ .

3

**Exhibit 12**

# EXHIBIT C

2/5/09

Connect America
2193 West Chester Pike
Broomall, PA. 19008
Via Certified Mail
Attn: Ken Gross, President

Dear Ken,

Thank you for the opportunity to work with Connect America and introducing my contacts to you. I am so happy to hear that First Street and Electric Mobility have started their marketing campaigns to promote and sell Connect America's Medical Alarms. After talking to Dave at First Street, I understand they have sold several hundred units since December 2008. There was no doubt in my mind that with my experience and insight into the Senior Marketplace that our relationship would yield results like this.

After placing several unsuccessful phone calls and emails to you in the past few weeks, I wanted to get an update on sales activity by First Street and Electric Mobility and pursue the introduction of other potential category killers. I am interested in promoting Connect America to my other contacts with some other type of agreement with you or becoming a special dealer for you as we discussed previously. Please call or email me.

I am enclosing a W-9 in my name, a copy of my passport and driver's license in order to facilitate any payments that may have accrued for sales. Please send it to the address below.

Best regards and thanks,

George Flowers
517 Fordham Rd.
Woodbury Hts. NJ 08097

Enclosures: W9, Passport, and Driver's License

**George Flowers**

**From:** George Flowers [ggf@comcast.net]
**Sent:** Wednesday, March 18, 2009 8:45 PM
**To:** wealarmyou@aol.com
**Subject:** Fwd: Had a great show

From: George Flowers <ggf@comcast.net>
Date: March 18, 2009 5:33:50 PM PDT
Subject: Had a great show

Ken,

When we talked last week u said I could say I represented connect America.  I believe I did a very good job of it here!  I would really like to talk tomorrow and come and see you on Friday.  I Really found some opportunities and need to know how to proceed!

Dr leonards is in my sights also!!  Flying home on the red eye!!!  Yikes!  Talk to u tomorrow.

Thanks


George

Sorry for the spelling or short response!  This was sent from my iPhone by George Flowers

## George Flowers

**From:** George Flowers [ggf@comcast.net]
**Sent:** Monday, March 23, 2009 1:05 PM
**To:** WeAlarmYou@aol.com
**Subject:** RE: a note from ken gross

Ken,
  I understand your position.  When I am at Medtrade this week, I am meeting with three of my
killer accounts, including HDIS, I would still like to pursue these deals and look for any
other opportunities for you at the show under the $10 agreement.

Thanks

George

**George Flowers**

| | |
|---|---|
| **From:** | George Flowers [ggf@comcast.net] |
| **Sent:** | Friday, March 27, 2009 11:17 PM |
| **To:** | George Flowers; vhampton@drleonards.com |
| **Subject:** | RE: Connect America Medical Alarm Program $150 sales revenue! |

Hi Vilma,

   I was trying very hard to find you and Jess at Med trade.   Sorry we could
not get together.  I hope the show was good for you!  It was a not what I expected and there
were very few new and exciting revenue producing items there.
   This is why our Connect America medical alarm is just the right revenue producing program
for Dr. Leonard's!  If you can see us in the next two weeks, I will show you a way you
can make $300 per sale!   I bet there is not one product in your catalog that can
do that!

I will call you early next week!

Best regards,

George Flowers
Strategic Alliance Development
Connect America
609 980 1100


-----Original Message-----
From: George Flowers [mailto:ggf@comcast.net]
Sent: Friday, March 20, 2009 2:21 PM
To: vhampton@drleonards.com
Subject: Connect America Medical Alarm Program $150 sales revenue!
Importance: High


Vilma,
   Thanks for taking the time to talk to me today!  Dr. Leonard's can easily make $150.00 or
more per sale and we do all the work.  We carry the inventory and close the sale for you.  I
am attaching a link to our website to make it easier to understand our program and Connect
America's Medical Alarm Sales Model.
http://www.medicalalarm.com/
   We would supply you a free website and a dedicated phone number to track your sales!
   The website would look similar to this with your name Dr. Leonard's replacing
MedicalAlarm.com.
How to get recurring revenues from sales!
We answer all calls and close the sale.  We are the experts! You can:
-Sell it in your catalog (First Street on Line is doing a great job) -Direct your customers
to your custom website that we create for free -Put our free Package inserts into your
shipments or blow it into your catalogs -Put our Medical Alarm as a featured item on your
email blast
   Why does this make sense for Dr. Leonard's?  Medical Alarms are very hot due to the Obama
Stimulus program and has gotten a great deal of exposure lately.  Take advantage of this and
our national reputation and call me today!
   I would love to meet you at Medtrade!

Thanks

1

George Flowers
Strategic Alliance Development
Connect America
1-877-365-2548
1-609-980-1100 Cell

**George Flowers**

| | |
|---|---|
| From: | George Flowers [ggf@comcast.net] |
| Sent: | Friday, March 27, 2009 11:40 AM |
| To: | Ninon@connectamerica.com |
| Cc: | Ken Gross |
| Subject: | FW: Online Medical Alarm Sales |
| Attachments: | jeffshefferproposal.xls |

Hi Ninon,

Hope all is well with you!  I see EMC is finally starting the process.   Hopefully, with a little prodding, I can help move that project along too.

On another note, I contacted my old friend, Jeff Sheffer at Internet Alliances, and they love the Connect America Program.  He wants to start right away!
These guys are crafty internet professionals that supply everything medical, from lift chairs to stairlifts, including aids to daily living.  We are great match for them.   They do not maintain any inventories or handle any returns from any vendors.   They handle all transactions electronically.  Maybe we can learn something from them to automate the ordering process.  As you can see from their email, they want to get started ASAP.   They have close to 100 sites and 60 of them generate a ton of traffic and they believe they can do quite well with the program.   Best of all, they want to take the order!

They understand they will receive $5 MRR for every sale we close and $40 for every sale they close.   I told them we would print package inserts for their shipments at no charge.   I am attaching a schedule that I gave to Jeff so you can see the program that he was given.   I don't think they are interested in a website.  They do not link to other websites or direct customer away from their sites.  He was very interested in making sure they get credit for all their sales.   Jeff is the decision maker and he made that very clear!

Call me when you can squeeze  me in,,,,Ken said you had a conference call with CVS at 11:30 and I know that will create some work for you!

Thanks
George

609 980 1100

## George Flowers

| | |
|---|---|
| **From:** | George Flowers [ggf@comcast.net] |
| **Sent:** | Friday, March 27, 2009 12:11 PM |
| **To:** | Alan Grady |
| **Cc:** | Ninon@connectamerica.com |
| **Subject:** | RE: Online Medical Alarm Sales |

Hi Alan,

　Jeff had a lot of great things to say about you!  Jeff tried to give me an Internet 101 lesson when I saw him, but said you were the true guru!  I have known Jeff for many years and I really admire what you all have accomplished over the years!

　I just got back to the East Coast on the RED EYE from Las Vegas and I trying to get back to normal.  However, I still got the ball rolling this morning and I will be meeting with Ninon, the Vice President of the company, to figure out the best way to move this opportunity forward with Internet Alliances.  I will be contacting you shortly with an update and a time when we can talk about rolling out a plan!

　In the meantime, could you forward us some information about your company and the website you will be using so we can get a better idea of an approach that will work for both our companies.

Thanks

George
609 980 1100

Strategic Alliance Development
Connect America

**George Flowers**

| | |
|---|---|
| From: | George Flowers [ggf@comcast.net] |
| Sent: | Tuesday, March 31, 2009 10:36 AM |
| To: | Alan Grady |
| Cc: | Ninon@connectamerica.com |
| Subject: | RE: Online Medical Alarm Sales conference call 4/2 Thursday at 2 PM |

Hi Alan,

I know how much Jeff wants to get this program started ASAP. I hope you understand this process takes more than a few days to get going! Implementing this program is much more than just a product placement on your sites. Connect America looks at each opportunity as a solid base to build a long term relationship. We have a very well defined process that we must follow so you get credit for all referrals and sales made by your company. That is a good thing!

Ninon and I will host a conference call on Thursday April 2 at 2:00 pm. Please invite Jeff by forwarding this email to him and have him follow the instructions below:

Everyone dial 1-218-844-8230 at the specified time. You will be prompted to enter 365538#. Please announce yourself after the tone.
If you have any problems connecting please call me at 609-980-1100.

We are looking forward to a great call to get this program moving!

Thanks

George
Connect America
Strategic Alliance Development
609 980 1100

## George Flowers

**From:** George Flowers [ggf@comcast.net]
**Sent:** Thursday, April 02, 2009 2:40 PM
**To:** George Flowers; Ninon@connectamerica.com
**Subject:** RE: Online Medical Alarm Sales conference call 4/2 Thursday at 2 PM

Ninon,

Great Job on the call! A few things that I talked to Jeff about that may be interesting!

1)They have email addresses on all their customers (hundreds of thousands) and I told him *that it is possible to do an email campaign to them. I can arrange and administer this.*
2)Jeff said he would have his biggest drop ship vendors include the bi-fold BRA in all of his shipments.

*Would it be possible to be copied on emails to them so I can better understand the process?*

*Thanks*

**George Flowers**

From:          Ninon Prozonic [Ninon@connectamerica.com]
Sent:          Thursday, April 02, 2009 2:41 PM
To:            ggf@comcast.net; alan.grady@inetalliance.net
Cc:            CIARAN123@aol.com
Subject:       US Medical Supplies - next steps

George, Alan,

Thank you for arranging this conference call and taking time to meet
with Ciaran and I.   As discussed, we feel there is an excellent fit
between our services and based on the information I now have I'll have a something ready for
Jeff and Alan by tomorrow to review and choose between a strategic alliance format or
affiliate program format.

In the meantime, if you have any questions you still need clarity on, please feel free to
call me.

Best regards,

Ninon


Ninon Prozonic, CA-AM
Vice President, Strategic Alliances
2193 West Chester Pike
Broomall, PA 19008
1.800.90.60.USA
Direct: 610.797.0809
Cell: 610.392.6560
www.connectamerica.com

CONFIDENTIAL

**George Flowers**

From:          Ninon Prozonic [ninon@connectamerica.com]
Sent:          Monday, April 06, 2009 10:56 AM
To:            George Flowers
Subject:       Re: Connect America/Internet Alliance Inc. Alliance Doc.

George. I'll call you half an hour.


On Apr 6, 2009, at 10:43 AM, "George Flowers" <ggf@comcast.net> wrote:

Hi,
   Can I help in any way?  Jeff is very, very impatient and making Alan crazy.  I can call Jeff and calm his
expectations down if there will be any delays.  Let me know if you need me to call him.  I have know him
for years and perhaps a call may not be a bad idea.

George

## George Flowers

| | |
|---|---|
| **From:** | Ninon Prozonic [Ninon@connectamerica.com] |
| **Sent:** | Monday, April 06, 2009 1:00 PM |
| **To:** | George Flowers |
| **Cc:** | Ninon Prozonic; Ken Gross; CIARAN123@aol.com |
| **Subject:** | RE: Connect America/Internet Alliance Inc. Alliance Doc. |

George,

thanks for your help too.

I've also brought Ciaran up to date - he will work with Alan on web content requirements.
I'll let them decide on how to contact each other - whoever is free first while I work on the
Agreement.

NInon


Ciaran - Quoting George Flowers <ggf@comcast.net>:

> Thanks Ninon,
>    I talked to Alan and he said they would use their toll own free
> number to collect the same information as on CA's web form and
> electronically send it to CA.  He was glad that Ciaran will work with him to get started on his
> websites even before the contract is signed.  I gave him Ciaran's number
> but if Ciaran is available, it probably would be better to call him.
> His numbers are below!
>    Thanks, this looks like a good one!
>
> George
>

## George Flowers

| | |
|---|---|
| **From:** | George Flowers [ggf@comcast.net] |
| **Sent:** | Wednesday, April 08, 2009 4:01 PM |
| **To:** | Alan Grady |
| **Subject:** | RE: Connect America/Internet Alliance Agreement DRAFT V.1 |

Hi Alan,
   I am on the road and cant get Ninon.   Could you send me a copy of the latest contract and I will see what I can do!

George
-----Original Message-----
**From:** Alan Grady [mailto:alan.grady@inetalliance.net]
**Sent:** Wednesday, April 08, 2009 3:37 PM
**To:** Ninon Prozonic
**Cc:** Jeff Sheffer; George Flowers
**Subject:** Re: Connect America/Internet Alliance Agreement DRAFT V.1

Ninon,

I'm sorry to say that the Non Compete section is going to be a show stopper.  It doesn't matter how we reword it.

We just can't do business with that section in the contract.

--
Alan Grady
Web & Product Director
Internet Alliance, Inc.
3901 Commerce Park Dr.
Raleigh, NC 27610
Phone: 919.926.5304 - Mobile: 919.624.7952

On Apr 7, 2009, at 4:10 PM, Ninon Prozonic wrote:

**George Flowers**

| | |
|---|---|
| From: | George Flowers [ggf@comcast.net] |
| Sent: | Thursday, April 09, 2009 2:33 PM |
| To: | Ninon Prozonic |
| Cc: | WeAlarmYou@aol.com |
| Subject: | RE: Non Compete - New wording -Internet Alliance agreement |

Ninon,
    I am glad to help!  Let me know if I should call anyone!  I haven't talked to Jeff since Las Vegas and he probably is wondering why?  Can you keep me in the loop so I can call him when he signs the contract.

Thanks

George

-----Original Message-----
From: Ninon Prozonic [mailto:Ninon@connectamerica.com]
Sent: Thursday, April 09, 2009 2:16 PM
To: ggf@comcast.net
Cc: WeAlarmYou@aol.com
Subject: Fwd: Non Compete - New wording -Internet Alliance agreement

Hi George,

  From my last conversation with Alan earlier today, I understand that Jeff was not going to accept a Non Compete written in any form.

I would like to also thank you for providing the new wording below which I've provided to Alan to take forward to Jeff Sheffer.

As you know, we have bent our agreement rules extensively to accommodate his requirements and hope he will be agreeable so that we can all move forward with the partnership.


Thanks!

Ninon

## George Flowers

| | |
|---|---|
| **From:** | WeAlarmYou@aol.com |
| **Sent:** | Friday, April 17, 2009 10:36 AM |
| **To:** | ninon@connectamerica.com |
| **Cc:** | ggf@comcast.net |
| **Subject:** | Fwd: Non Compete - New wording -Internet Alliance agreement |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

I signed contract before I left.  It is signed and both copies are on my desk!

Ken

From: ninon@connectamerica.com
To: ggf@comcast.net
Sent: 4/17/2009 10:33:29 A.M. Eastern Daylight Time
Subj: Re: Non Compete - New wording -Internet Alliance agreement

George. It should be. Ken is away so I am not sure if someone else is signing on his behalf.    Either way we consider it done

I'm away from the office today but will advise as soon as I am able to

Thanks

Ninon

On Apr 17, 2009, at 8:23 AM, "George Flowers" <ggf@comcast.net> wrote:

Good Morning,

   Any word on the contract?   I am calling Jeff today for my other business, I don't want to appear uninformed.

Have a great day

George

From: Ninon Prozonic [mailto:Ninon@connectamerica.com]
Sent: Thursday, April 09, 2009 3:38 PM
To: ggf@comcast.net
Subject: Fwd: Re: Non Compete - New wording -Internet Alliance agreement

CONFIDENTIAL!

## George Flowers

| | |
|---|---|
| **From:** | George Flowers [ggf@comcast.net] |
| **Sent:** | Tuesday, June 23, 2009 1:49 PM |
| **To:** | 'WeAlarmYou@aol.com' |
| **Subject:** | RE: Great Paycheck! |

Hi Ken,

Things in general are working out.   I visited Mike Flowers at EMC to find out what was holding up this great program and he was generally in the dark.   Linda is the lead.   I volunteered to take the package inserts to the shipper with instructions and he said he would take care of it.   The website looks good and I did some searches and it came up pretty quickly.   The major problem is  they are offering too little to their outside reps to get them interested.   I suggested more commissions for more sales.   I also gave them the email campaign I designed for them a while ago.    I don't know what more to do for them?

Has IA turned on the volume yet?    I could use an update.   I thought the picture they have of the unit is horrible and would suggest replacing it with a picture with a person with a pendant on instead of the unit.    I would look at a picture faster than a unrecognizable bad picture of a box.

Hard to believe they can't get leads,  maybe they should go for a sale on the sites?   Are they mad?

Thanks
George

**From:** WeAlarmYou@aol.com [mailto:WeAlarmYou@aol.com]
**Sent:** Saturday, June 06, 2009 7:42 PM
**To:** ggf@comcast.net
**Subject:** Fwd: Great Paycheck!

First Street relationship GREAT!

EMC and Internet Alliances....ZERO!

How are things working out for you at VRI?

Ken

## George Flowers

**From:** ninon@connectamerica.com
**Sent:** Tuesday, June 23, 2009 4:52 PM
**To:** ggf@comcast.net
**Cc:** WeAlarmYou@aol.com
**Subject:** FW: Great Paycheck!

Hi George,

Good to hear from you and glad things are working out so well for you. First Street is a great program!

With regard to Electric Mobility, thank you for your suggestions – they are good. We are aware that the program is having a slow start and are working on additional avenues within Electric Mobility to bolster the entire program. We will also be training their call center to promote directly as well. Your suggestions regarding sales agent commission is good, we are not aware of what commissions are being paid to sales agents since these are internal decisions., but its good to know.. and I'll mention it to Linda and see if they would consider raising them to get more traction on the program. Email campaign is also in the planning stages and we're hoping to have something done pretty soon.

With regard to Internet Alliance – Unfortunately there has not been much traction on that front – it is disappointing – Especially since they had promised to give the offer full visibility in several parts of their site – So far, I've not seen anything that would compel me to buy. I'll be talking to them this week so we can work on making changes.

Thanks,

Ninon

**From:** WeAlarmYou@aol.com [mailto:WeAlarmYou@aol.com]
**Sent:** Tuesday, June 23, 2009 2:00 PM
**To:** ninon@connectamerica.com
**Subject:** Fwd: Great Paycheck!

From: ggf@comcast.net
To: WeAlarmYou@aol.com
Sent: 6/23/2009 1:50:01 P.M. Eastern Daylight Time
Subj: RE: Great Paycheck!

Hi Ken,

Things in general are working out. I visited Mike Flowers at EMC to find out what was holding up this great program and he was generally in the dark. Linda is the lead. I volunteered to take the package inserts to the shipper with instructions and he said he would take care of it. The website looks good and I did some searches and it came up pretty quickly. The major problem is they are offering too little to their outside reps to get them interested. I suggested more commissions for more sales. I also gave them the email campaign I designed for them a while ago. I don't know what more to do for them?

Has IA turned on the volume yet? I could use an update. I thought the picture they have of the unit is horrible and would suggest replacing it with a picture with a person with a pendant on instead of the unit. I would look at a picture faster than a unrecognizable bad picture of a box.

## George Flowers

From:        George Flowers [ggf@comcast.net]
Sent:        Tuesday, June 23, 2009 5:13 PM
To:         'ninon@connectamerica.com'
Subject:    RE: Great Paycheck!

Ninon,

   All these accounts should be winners and I will help as much as I can!

   One other thing with EMC, just remind Linda how easy this program is compared to the Responslink program they had before!  All the outside reps  have to do is get a qualified lead to us and CA does the rest.  Have you ever spoken to Rocky, The National Outside Sales Manager?    If you can, do it, he is the mover and shaker and if he can get more money for his reps, we have a winner!

   Please feel free to call me anytime!

George

---

**From:** ninon@connectamerica.com [mailto:ninon@connectamerica.com]
**Sent:** Tuesday, June 23, 2009 4:52 PM
**To:** ggf@comcast.net
**Cc:** WeAlarmYou@aol.com
**Subject:** FW: Great Paycheck!

Hi George,

Good to hear from you and glad things are working out so well for you.  First Street is a great program!

With regard to Electric Mobility, thank you for your suggestions – they are good.  We are aware that the program is having a slow start and are working on additional avenues within Electric Mobility to bolster the entire program.  We will also be training their call center to promote directly as well.  Your suggestions regarding sales agent commission is good, we are not aware of what commissions are being paid to sales agents since these are internal decisions,  but its good to know.. and I'll mention it to Linda and see if they would consider raising them to get more traction on the program.  Email campaign is also in the planning stages and we're hoping to have something done pretty soon.

With regard to Internet Alliance – Unfortunately there has not been much traction on that front – it is disappointing - Especially since they had promised to give the offer full visibility in several parts of their site -  So far, I've not seen anything that would compel me to buy.  I'll be talking to them this week so we can work on making changes.

Thanks,

Ninon

---

**From:** WeAlarmYou@aol.com [mailto:WeAlarmYou@aol.com]
**Sent:** Tuesday, June 23, 2009 2:00 PM
**To:** ninon@connectamerica.com
**Subject:** Fwd: Great Paycheck!

---

From: ggf@comcast.net
To: WeAlarmYou@aol.com
Sent: 6/23/2009 1:50:01 P.M. Eastern Daylight Time
Subj: RE: Great Paycheck!

## EXHIBIT LIST

| Exhibit | Description |
|---------|-------------|
| A | Agreement |
| B | Amendment to Agreement |
| C | Emails evidencing Flowers' continued good faith performance of Services under the Agreement and Amendment |
| D | Correspondence from Connect America representatives expressing Connect America's appreciation for Plaintiff's Referrals and Services provided |
| E | Press Release announcing sale of Connect America |
| F | Commission checks sent to Flowers by Connect America |
| G | Correspondence evidencing Flowers' repeated requests for evidence of Connect America's contractual arrangements with First Street or any of the other Referral Customers |
| H | November 10, 2009 termination letter from Connect America to Flowers |
| I | Correspondence from Flowers and his then counsel to Connect America advising of its breach of the Agreement |
| J | Advertising evidencing the marketing of the Devices by First Street |
| K | Advertisements from April, 2012 AARP Bulletin and April 15, 2012 edition of Parade Magazine evidencing First Street's continuing marketing of the Devices |
| L | Philips Lifeline advertisements published in the June, 2012 edition of AARP Bulletin and the June 24, 2012 edition of Parade Magazine |