**Exhibit 13**

# CONFIDENTIAL

November 10, 2009

George Flowers

517 Fordham Road

Woodbury Heights, NJ 08097

Dear George,

It will be a year in December 2009 that we have compensated you for the First Street introduction.

Based on the fact that you have not introduced us to any other strategic partners and are now working for a competitor (VRI), I have decided to terminate our arrangement after one full year. We will continue to pay you at the $10/unit for First Street sales through December 31, 2009. Since your sales trail by 60 days, your last commission check from Connect America will be in February 2010.

This proved to be a good introduction for you as you are on track to make $50,000 due to this relationship.

Very truly yours,

Kenneth S. Gross

President

Cc Dave Modena



**Connect America LLC 000043**

Connect America                                    1/13/2010
2193 West Chester Pike
Broomall, Pa. 19008
Attn: Ken Gross, President

Dear Ken,

I received you letter and I do not agree that you can terminate my commission payments after one year. This clearly was never your intent. There was never any discussion of a time limit in any of our conversations or correspondence. I expect that you will continue to make the monthly payments on all my referral accounts. My referral accounts are First Street, Electric Mobility, and Internet Alliances.

In addition, I would like an accounting of the monthly sales volume (units) of all my accounts from the date of signing their contracts.

Clearly, $10 per unit was the minimum amount you were to pay me under our agreement without time limit or restrictions.   For First Street you were to pay me the difference between $15 per month and what was finally settled with First Street. If there is no spread, then I would earn $10 per unit sold.   This is very well documented and since you have never provided me a copy of the contract with First Street, I do not know the final terms of the agreement.   Therefore, I would appreciate receiving a copy of the executed contracts for First Street, Electric Mobility, and Internet Alliances.

I would appreciate a response by 1/31/2010.

Thanks,

George Flowers
517 Fordham Rd,
Woodbury Hts., NJ 08097

FLOWERS DEF EXHIBIT P 000066

## CONFIDENTIAL

**THIS AGREEMENT** dated this _____ day of _____,
200___

BETWEEN:

### CONNECT AMERICA.COM L.L.C.,
2193 West Chester Pike Broomall, PA 19008
(hereinafter referred to as "CONNECT AMERICA")

- and -

### INTERNET ALLIANCE, INC
3901 Commerce Drive
Raleigh, NC 27610
(hereinafter referred to as "INTERNET ALLIANCE")

### MARKETING ALLIANCE AGREEMENT

A. CONNECT AMERICA operates a medical alarm business and provides medical alarm Equipment and Alarm Monitoring Services (as hereinafter defined) to the public;

B. CONNECT AMERICA and INTERNET ALLIANCE have agreed that it would be beneficial for both corporations to offer Customers of INTERNET ALLIANCE an opportunity to obtain Medical Alarm Equipment and Alarm Monitoring Services from CONNECT AMERICA;

C. CONNECT AMERICA and INTERNET ALLIANCE wish to enter into a Marketing Promotional Agreement setting out the terms and conditions of their agreement.

NOW, THEREFORE, in consideration of the mutual covenants, promises and provisos contained in this Agreement and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

**Connect America LLC 000076**

## CONFIDENTIAL

### ARTICLE 1. - INTERPRETATION

1.1.1. **"Customer" or "Customers"** means any customer of INTERNET ALLIANCE who purchases Alarm Monitoring Services from CONNECT AMERICA as a result of this Agreement;

1.1.2. **"Marks"** means the marks described in paragraph 6.1;

1.1.3. **"Monitoring Fees"** means the fee paid by the Customer to CONNECT AMERICA for the monthly Alarm Monitoring Services as set out in Schedule A attached hereto;

1.1.4. **"Offer"** means the medical alarm equipment and monitoring services package set out in paragraph 2.2.1, 2.2.2, below;

1.1.5. **"Medical Alarm Monitoring Services"** means those services provided by CONNECT AMERICA in monitoring Medical Alarm Equipment for the Customer;

1.1.6. **"Medical Alarm Equipment"** means the equipment to be supplied by CONNECT AMERICA, to each Customer, as a minimum, more specifically as outlined in Schedule A of this Agreement.

1.1.7. **"Term"** means the Term of this Agreement as described in Article 9 herein;

### ARTICLE 2. - PROVISION OF MEDICAL ALARM UNITS

2.1. **OBLIGATIONS OF INTERNET ALLIANCE**

2.1.1 During the Term of this Agreement, INTERNET ALLIANCE will promote the offer on its senior related websites prepared by INTERNET ALLIANCE and CONNECT AMERICA to all its existing/potential customers, advising such customers about the Offer. (See Schedule C for details)

2.1.2 During the Term of this Agreement, INTERNET ALLIANCE shall not enter any form of agreement with any other party, which in any way offers any customer of INTERNET ALLIANCE medical alarm services.

**CONFIDENTIAL**

2.2    **OBLIGATIONS OF CONNECT AMERICA**

2.2.1. CONNECT AMERICA shall provide a basic Medical Alarm Equipment package, **as provided in Schedule A** of this Agreement to Customers provided the Customer has paid CONNECT AMERICA a minimum of the first three months Monitoring Fees.

2.2.2. CONNECT AMERICA may provide additional lockboxes and pendants in addition to the medical alarm unit if requested by the customer. Such additional equipment shall be provided to the Customer at CONNECT AMERICA's then current rates.

2.2.3. On the fifteenth day of each calendar month, CONNECT AMERICA shall provide INTERNET ALLIANCE with a statement setting out the number of Customers who accepted the Offer during the previous calendar month and CONNECT AMERICA will pay INTERNET ALLIANCE monthly recurring revenue per customer who purchases the service for the duration of the customer's monitoring service with CONNECT AMERICA and as long as the customer is in good standing with CONNECT AMERICA. (Details outlined in Schedule B)

**ARTICLE 3. – MEDICAL ALARM MONITORING SERVICES**

3.1.   CONNECT AMERICA agrees to provide Medical Alarm Equipment and Alarm Monitoring Services to the Customer if requested on a month to month basis after the initial three month upfront monthly monitoring payment.

**ARTICLE 4. - REPRESENTATIONS AND WARRANTIES OF CONNECT AMERICA**

4.1.   CONNECT AMERICA hereby represents and warrants to INTERNET ALLIANCE that;

4.1.1. CONNECT AMERICA is a corporation that has been duly incorporated, organized and is a valid and subsisting corporation.

4.1.2. CONNECT AMERICA has the power, legal right and corporate authority to enter into this Agreement and to do all acts and things that are required or contemplated hereunder to be done, observed and performed by it including, without limitation, all licenses to operate a medical alarm installation and monitoring system business;

4.1.3. This Agreement constitutes a legal, valid and binding obligation of CONNECT AMERICA.

3

## CONFIDENTIAL

4.1.4. CONNECT AMERICA is, or will be, in good standing under any and all laws in every jurisdiction in which it, or INTERNET ALLIANCE, carries on business or is registered;

4.1.5. INTERNET ALLIANCE shall under no circumstances be responsible for any cost of any Medical Alarm Equipment provided to any Customer pursuant to the terms of this Agreement.

4.1.6. CONNECT AMERICA agrees to and does hereby indemnify and save harmless INTERNET ALLIANCE from any loss, claims, damages and demands whatsoever arising out of, under, pursuant to, or as a result of any breach of any representation, warranty or agreement of CONNECT AMERICA contained in this Agreement and to include without limiting the generality or scope of the indemnity, indemnification for legal fees on a solicitor and his own client basis.

## ARTICLE 5 – CONFIDENTIALITY AND NON-COMPETE

5.1     CONFIDENTIALITY:
All business information and materials containing information disclosed between INTERNET ALLIANCE and CONNECT AMERICA, its representatives or agents, shall be deemed CONFIDENTIAL and shall be treated by both parties as CONFIDENTIAL information during the period of this agreement and at all times thereafter.

5.2     NON-COMPETE:
INTERNET ALLIANCE upon termination of this agreement, agrees not to share the names of any referrals that became CUSTOMERS of CONNECT AMERICA to anyone for the purpose of converting their account to another company that provides any type of monitored medical alarm service.  They will remain confidential in perpetuity and any effort to convert them to another company will result in punitive damages

## ARTICLE 6. - TRADE MARKS

6.1.    During the term of this Agreement, CONNECT AMERICA shall grant INTERNET ALLIANCE a non-exclusive and non-transferable license without right to sublicense, to use and display the trademark "CONNECT AMERICA" and other such names and trademarks as designated for use by CONNECT AMERICA (collectively defined as the "Marks") to be used in a manner authorized by CONNECT AMERICA with INTERNET ALLIANCE herein function of advising its customers about the Offer.

**CONFIDENTIAL**

6.2.   INTERNET ALLIANCE will only be entitled to use and display the Marks as provided herein, until the earlier of:

      a)   the expiration of this Agreement; or

      b)   the termination of this Agreement.

6.3.   Upon the expiration or termination of this Agreement INTERNET ALLIANCE shall immediately cease to use, directly or indirectly, in any manner whatsoever the Marks or any names or marks similar to the Marks, and shall remove the Marks from and/or deliver up to CONNECT AMERICA authorized representative all materials including signs, invoices, stationery and other advertising materials in its possession, custody and control upon which the Marks appear.

6.4.   INTERNET ALLIANCE acknowledges that CONNECT AMERICA is the exclusive owner of the Marks and all goodwill associated therewith, and that except as provided for in this Agreement, INTERNET ALLIANCE does not and will not acquire any right, title or interest in any of the Marks and will not dispute or contest for any reason whatsoever, directly or indirectly, before and after expiration or termination of this Agreement the validity of CONNECT AMERICA's ownership to the Marks.

## ARTICLE 7. - REPRESENTATIONS AND WARRANTIES OF INTERNET ALLIANCE

7.1.   INTERNET ALLIANCE hereby represents and warrants to CONNECT AMERICA that:

7.1.1.   INTERNET ALLIANCE is a corporation that has been duly incorporated, organized and is valid and subsisting corporation.

7.1.2.   INTERNET ALLIANCE has the power, legal right and corporate authority to enter into this Agreement and to do all acts and things that are required or contemplated hereunder to be done, observed and performed by it;

7.1.3.   All things required to be given or done by INTERNET ALLIANCE pursuant to this Agreement have been validly authorized.

7.2.   INTERNET ALLIANCE agrees to and does hereby indemnify and save harmless CONNECT AMERICA from any loss, claims, damages and demands whatsoever arising out of, under, pursuant to, or as a result of any breach of any representation, warranty or agreement of INTERNET ALLIANCE contained in this Agreement and to include without limiting the generality or scope of the indemnity, indemnification for legal fees on a solicitor and his own client basis.

**CONFIDENTIAL**

## ARTICLE 8 - TERM OF AGREEMENT

8.1 This Agreement may be terminated at any time, by either party by providing in writing, thirty (30) days notice of their intention to terminate this Agreement at the address for notice as provided for in this Agreement

## ARTICLE 9 - GENERAL

9.1 All rights by this Agreement shall not be assigned or transferred by any party without the prior written consent of the other party to this Agreement, which consent shall not be unreasonably withheld.

9.2 All notices, requests, demands or other communication by the terms hereby required or permitted to be given hereunder shall, unless otherwise specifically provided for herein be given in writing and served to each party at its address as follows:

      9.2.1. To:   CONNECT AMERICA at:
                      2193 West Chester Pike
                      Broomall, PA 19008
                      Attention:  Ken Gross, President

      9.2.2. To:   INTERNET ALLIANCE INC. at:
                      3901 Commerce Drive
                      Raleigh, NC 27610
                      Attention:  Jeff Sheffer, President

9.3 This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings and negotiations, whether oral or written, and there are no general or specific warranties, representations or other agreements except as are herein specifically set forth.

9.4 The parties hereto covenant and agree to do such things and execute such further documents, agreements, instruments or as may reasonably be required by another party hereto from time to time in order to carry out the terms of this Agreement in accordance with the true intent.

9.5  This Agreement shall be governed by and construed in accordance with the laws of the State of Pennsylvania.

9.6 This Agreement shall ensure to the benefit of and be binding upon the parties hereto, their respective heirs, executors, administrators, successors and assigns.

9.7 No amendment or variations or revisions of this Agreement shall be binding upon any party unless it is evidenced in writing and executed by the parties.

6

**CONFIDENTIAL**

9.8 If any provision of this Agreement shall be judged void or unenforceable by a competent court, the remaining provisions of this Agreement shall continue in full force and effect.

IN WITNESS WHEREOF the parties have duly executed this Agreement as at the date and year first above written.

CONNECT AMERICA.COM L.L.C

Per: _____

Ken Gross
President

INTERNET ALLIANCE INC.

Per: _____

Jeff Sheffer
President

**CONFIDENTIAL**

**<u>Schedule A - Basic Equipment Package</u>**

**The Offer and Benefits to Internet Alliance Senior customers and caregivers:**

Medical Alarm Base Unit – (plug-and-go)
Battery back up (included in unit)
Power Supply
Telephone Connection Cord
Waterproof Emergency pendant
24/7 monitoring UL Approved with 2 way voice communication
No Charge for the Equipment
No Activation Fee
Free Ground Shipping by FedEx
Monitoring Fee: $29.95 per month.  (First 3 months paid upfront by the customer)
No long term contract

Complimentary INTERNET ALLIANCE/Connect America Dedicated toll free line
provided by Connect America  as follows:

**1-800-800- 1034**

# CONFIDENTIAL

## Schedule B

### INTERNET ALLIANCE  Recurring Revenue Program:

INTERNET ALLIANCE will receive from Connect America the following monthly recurring revenue for each CONNECT AMERICA medical alarm unit sold to INTERNET ALLIANCE customers as a result of this Agreement:

$10.00 monthly recurring revenue per unit activated

# CONFIDENTIAL

### Schedule C

**INTERNET ALLIANCE and CONNECT AMERICA Online Process and
Responsibilities:**

- Connect America and INTERNET ALLIANCE work together on appropriate web related content with a call to action for customers to take advantage of the offer.
- Both companies are responsible to approve web contents.
- INTERNET ALLIANCE will be responsible for promoting the medical alert service on all its senior related websites.

- Customers wishing to take the offer would simply:

    1. Request to be contacted through INTERNET ALLIANCE's online sign-up form

        **https://www.usmedicalsupplies.com/medical-alarm-signup.htm**

Or,

    2. Call the online offer's dedicated **1-800-800- 1034** toll free line to purchase or request additional information on the offer.

- INTERNET ALLIANCE will be responsible for providing an as received automatic copy of the sign up form to CONNECT AMERICA showing the names and phone numbers of those customers who have requested to be contacted through the offer's online sign-up form.

    **https://www.usmedicalsupplies.com/medical-alarm-signup.htm**

**Marketing Channels**

- All INTERNET ALLIANCE's senior related websites:

**Connect America LLC 000085**

## CONFIDENTIAL

**Reporting**

| | |
|---|---|
| 4 Lift Chairs | http://www.4-lift-chairs.com/ |
| 4 Medical Supplies | http://www.4-medical-supplies.com/ |
| A1 Medical Supplies | http://www.a1-medical-supplies.net/ |
| A1 Stair Lifts | http://www.a1-stair-lifts.com/ |
| Adjustable Beds 101 | http://www.adjustable-beds-adjustable-bed.com/ |
| All Electric Scooters | http://www.allelectricscooters.com/ |
| All Lift Chairs | http://www.all-lift-chairs.com/ |
| AmeriGlide | http://www.ameriglide.com/ |
| Electric Scooters 4 Less | http://www.electricscooters4less.com/ |
| Electric Wheelchairs 101 | http://www.electric-wheelchairs-101.com/ |
| GoldenRest | http://www.goldenrest.net/ |
| Jazzy Electric Wheelchairs | http://www.jazzy-electric-wheelchairs.com/ |
| Lift Chair Store | http://www.lift-chair-store.com/ |
| Lift Chairs | http://www.lift-chairs.com/ |
| Lift Chairs 101 | http://www.lc101.net/ |
| Lift Chairs 4 Less | http://www.lift-chairs-4-less.com/ |
| Medical Supplies 4 Less | http://www.medical-supplies-4-less.com/ |
| Mobility Superstore | http://www.mobility-superstore.com/ |
| Stair lifts 4 Less | http://www.stairlifts-4-less.com/ |
| US Medical Supplies | http://www.usmedicalsupplies.com/ |
| Universal Accessibility | http://www.universal-accessibility.com/ |
| Vertical Platform Lifts | http://www.vertical-platform-lifts.com/ |
| Wheelchair Lifts and Ramps | http://www.wheelchair-lifts-ramps.com/ |

All INTERNET ALLIANCE customer activity will be reported by Connect America to INTERNET ALLIANCE on a monthly basis or as often as agreed.

In particular, Connect America will report the names and number of INTERNET ALLIANCE clients who have taken advantage of the Offer.

The 1-800 INTERNET ALLIANCE dedicated line, and customer and online sign-up page would ensure proper tracking of INTERNET ALLIANCE sales and compensation.

11

# CONFIDENTIAL

Connect America

## Cash Disbursements Journal

### For the Period From Jan 1, 2007 to Jan 31, 2012

Filter Criteria includes: 1) Vendor IDs from US MEDICAL SUPPLIES to US MEDICAL SUPPLIES. Report order is by Date. Report is printed in Detail Format.

| Date | Check # | Account ID | Line Description | Debit Amount | Credit Amount |
|------|---------|------------|------------------|--------------|---------------|

This report contains no data.

**Bruce Rodger**

| | |
|---|---|
| **From:** | Art Von Ahnen [artvonahnen@gmail.com] |
| **Sent:** | Friday, March 01, 2013 5:30 PM |
| **To:** | Bruce Rodger |
| **Cc:** | Art - Gmail |
| **Subject:** | FW: Connect America Dealer Domain Names |
| **Attachments:** | Master Domain Names 10-27-08.xls |

Art Von Ahnen
941-932-5381
art@vonahnen.net

**From:** Art Von Ahnen [mailto:art@vonahnen.net]
**Sent:** Tuesday, November 25, 2008 3:02 PM
**Subject:** Connect America Dealer Domain Names

George,

Email me back when you are ready to get started.

Art

Arthur A. Von Ahnen
941-400-0034
art@vonahnen.net

**Connect America.com LLC 000281**

**Bruce Rodger**

| | |
|---|---|
| **From:** | Art Von Ahnen [artvonahnen@gmail.com] |
| **Sent:** | Friday, March 01, 2013 5:30 PM |
| **To:** | Bruce Rodger |
| **Cc:** | Art - Gmail |
| **Subject:** | FW: Connect America Dealer Agreement |
| **Attachments:** | DEALER AGREEMENT 2995.00 5-30-07.doc |

Art Von Ahnen
941-932-5381
art@vonahnen.net

**From:** Art Von Ahnen [mailto:art@vonahnen.net]
**Sent:** Wednesday, November 26, 2008 10:55 PM
**Subject:** Connect America Dealer Agreement

George,

I have attached the dealer agreement for your review.

Thanks,

Art

Arthur A. Von Ahnen
941-400-0034
art@vonahnen.net

**Connect America.com LLC 000282**



Connect America.Com
2193 W. Chester Pike
Broomall, PA 19008
1-800-90-60-USA

## CONNECT AMERICA.COM, LLC

## DEALER AGREEMENT

THIS AGREEMENT dated ____/____ day of 200_____, by and between CONNECT AMERICA.COM, LLC with its Corporate

Office location at 2193 West Chester Pike, Broomall, Pennsylvania 19008 (hereinafter referred to as "COMPANY")

And _____, with its address at_____

_____ (hereinafter referred to as "DEALER").

THE COMPANY is engaged in the business of selling, marketing, installing, monitoring and servicing Medical Alert Systems and selling Dealerships in accordance with the terms and conditions of this Agreement.

THE DEALER is engaged in the business of selling, marketing and installing (optional) Medical Alert Systems in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements contained herein, the parties hereto, do mutually agree as follows:

COMPANY'S RESPONSIBILITIES:

COMPANY will provide DEALER with necessary sales agreements, marketing collateral and kits as listed on "easy start-up" sheet.

COMPANY will provide DEALER with proprietary sales and marketing training manual as listed on "easy start-up" sheet as well as ongoing assistance as necessary

COMPANY will provide Medical Alert equipment to be installed by DEALER (optional) or provide for shipment of equipment to customer directly for self-installation.

COMPANY will provide DEALER with Medical Alert monitoring services, toll free number and answering service.

COMPANY will provide DEALER with custom web page and domain name.

COMPANY will provide DEALER with customer billing and collection service.

COMPANY will provide liability insurance as required to monitor Medical Alert Systems.

COMPANY will issue monthly compensation payment to DEALER for all active/paid up accounts.

DEALER'S RESPONSIBILITIES:

DEALER will aggressively market and sell Medical Alert Systems to the residential and assisted living marketplaces.

DEALER will complete customer order sheet and fax complete order to COMPANY to begin order processing.

DEALER may install (optional) Medical Alert System in order to maintain customer relationship and generate strong referral base -or- unit will be shipped directly to customer.

**Connect America.com LLC 000283**

1

INDEPENDENT CONTRACTOR:

DEALER is an independent contractor and is not an agent, employee, servant, partner, or joint venturer of COMPANY. DEALER is not authorized to make any promise, agreement, representations or contract on behalf of COMPANY. DEALER acknowledges full responsibility for all the debts and obligations of the business operated pursuant to this Dealership, including, but not limited to, all bills, debts, taxes, licenses, permits, governmental required fees and/or financial obligations and various business expenses. COMPANY shall not be liable for any of the debts or obligations of DEALER'S business. Dealer will complete IRS Form W-9 to be forwarded to COMPANY upon execution of this agreement.

DEALERSHIP FEE:

DEALER agrees to pay the initial Dealership fee of $2,995.00 upon execution of this Agreement. Dealership fee includes the all materials and services listed on the "Easy Start-Up Sheet".

Additional Sales and Marketing Materials may be purchased as necessary from time to time. These products and pricing are listed on the "Additional Material Price List" and are not to be construed with the Simple Start-Up.

The COMPANY will supply all necessary sales order forms at no charge to the DEALER.

COMPENSATION:

COMPANY will pay DEALER Recurring Revenue of $10.00 per month per active/paid up Medical Alert System sold by DEALER. Recurring Revenue will increase to $12.50 per month per active/paid up Medical Alert System after 50 cumulative sales by DEALER. Recurring Revenue will increase to $15.00 per month per active/paid up Medical Alert System after 100 cumulative sales by DEALER.

New and renewal accounts will be paid the 30th of the month following payments received from said account.

In the event of a delinquent customer account, and after reasonable effort has been asserted by COMPANY, the DEALER will be notified prior to customer termination to personally attempt to make the collection and bring account current so the he/she may be paid on said account.

DEALER may, at his/her option, charge customer an installation fee (not to exceed $50.00). Installation consists of plugging in the electric cord, phone cord, and sending a test signal to central monitoring station….few minutes…..no tools required. This charge will be collected by the DEALER and retained as 100% income.

DEALER may, at his/her option, charge customer an activation fee (not to exceed $99.00). This charge will be collected by the DEALER and retained as 100% DEALER income. This activation fee may consist of collecting medical data, including prescription medicine, medical history and physician information of the customer.

ORIGINAL TERM:

This agreement will be effective as of the date executed below. The initial term will be for one year, and the agreement will be automatically renewed for additional one-year terms.

DEALER is required to produce a minimum of 12 sales per year to maintain full Dealer Benefits such as Web Site Hosting, Answering Service and Toll Free Telephone Number. If DEALER does not reach minimum requirement of 12 systems in a one-year period, DEALER will be charged a monthly service fee of $99 to cover expenses of COMPANY to continue providing these services.

Either Party, with 30 days prior written notice to the other Party, may terminate this agreement, with or without cause. Upon proper notice of termination, all DEALER'S accounts will continue to generate the same revenue from COMPANY for as long as each customer's account is active and paid-up and DEALER is not in violation of content in this Agreement, or COMPANY will pay DEALER, in one lump sum, the amount equal to one year Dealer Revenue.

TRADEMARKS:

COMPANY'S trademarks, trade names, domain names, toll free numbers, customer contracts and logo's (collectively referred to as "Marks") are crucial to its reputation, good will and business, therefore, will always remain the property of the COMPANY. DEALER shall cooperate fully with COMPANY in protecting and maintaining its Marks. DEALER shall not remove or alter any mark from equipment or materials. DEALER shall only use the Marks in the sale or promotion of COMPANY'S products or services. DEALER shall not use COMPANY'S Marks on "self-created" or advertising materials without prior written consent from the COMPANY.

**Connect America.com LLC 000284**

**ADVERTISING:**

DEALER will adhere to specifications provided by the COMPANY for advertising and promotions, which may include placement of newspaper ads, television ads, radio spots, billboards, direct mail, flyers and promotional pieces. COMPANY will furnish templates or sample ads for these types of advertising that have proven successful in the past and it would be in the best interest of the DEALER to request this type of assistance as necessary.

**CONFIDENTIALITY:**

All business information and materials containing information disclosed to DEALER by COMPANY, its representatives or agents, shall be deemed CONFIDENTIAL and shall be treated by the DEALER as CONFIDENTIAL information during the period of this agreement and at all times thereafter. DEALER shall be liable to COMPANY for damages caused by any breach of this provision or by any unauthorized disclosure of CONFIDENTIAL information and/or materials by DEALER'S officers, employees or agents.

**NON-COMPETE:**

DEALER agrees upon termination of this agreement, notwithstanding the cause of termination, shall not compete with the business of the COMPANY, or it's successors or assigns, and shall not directly or indirectly engage in the business of Medical Alarms or another business competitive to the business of the COMPANY. This non-compete agreement shall extend nationwide and shall be in full force and effect for five years commencing with the date of termination.

**INDEMNIFICATION:**

DEALER is fully responsible for all of his/her verbal and/or written statements made regarding the COMPANY products, services, and business plan which are not expressly contained in the official COMPANY materials. DEALER agrees to indemnify the COMPANY and the COMPANY'S directors, officers, employees and agents, and hold them harmless from any and all liability including judgments, cause of action, execution, debt, litigation, any loss, civil penalties, attachment, demand, refunds, attorney fees, court costs, or other obligation of any kind arising out of the DEALER'S acts, words, conduct, or omission as an independent contractor for the sale of the COMPANY'S products and services. It is further understood that the COMPANY, MANUFACTURER and CENTRAL STATION are not insurers. DEALER understands that a Medical Alert System is a preventative measure and cannot guarantee that no loss will occur. This provision shall survive the termination of this agreement.

**OTHER:**

This agreement is non-transferable by DEALER and shall be governed by the laws of the state of Pennsylvania.

AGREEMENT SIGNED this _____ day of _____, 20_____.


CONNECT AMERICA.COM, LLC                                    DEALER:

By:_____          By:_____

_____          _____
Print Name                                                        Print Name

_____          _____
Title                                                              Title

_____          _____
Date                                                              Date

**Connect America.com LLC 000285**

3

**Bruce Rodger**

| | |
|---|---|
| **From:** | Art Von Ahnen Connect America [artlogicmark@gmail.com] |
| **Sent:** | Friday, March 01, 2013 5:31 PM |
| **To:** | Bruce Rodger |
| **Cc:** | Art - LogicMark |
| **Subject:** | george info |

George Flowers
Good Neighbor Medical Alert ??
Bus: 609-980-1100
Cell: 609-980-1100
GGF@Comcast.net

**Exhibit 14**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - -

GEORGE G. FLOWERS,                    : No. 12-4787
                                      :
                        Plaintiff, :
        v.                            :
                                      :
CONNECT AMERICA.COM, LLC,             :
                                      :
                        Defendant. :

- - - - - - - - - - - - - - - - - -

                    - - -
        WEDNESDAY, JANUARY 30, 2013
                    - - -

              Oral deposition of MARK LEIGHTON,
taken pursuant to notice, held at the LAW OFFICES
OF HENRY IAN PASS, 3 Bala Plaza, Suite 700A,
Bala Cynwyd, Pennsylvania, 19004, commencing at
1:08 p.m. before Shauna L. Detty, Court Reporter -
Notary Public there being present.
                    - - -


              KAPLAN, LEAMAN AND WOLFE
            Registered Professional Reporters
              Constitution Place, Suite 909
                  325 Chestnut Street
                Philadelphia, PA 19106
                  (215) 922-7112

Mark Leighton

28

1   A.      I don't recall any specifically, but it
2   would have been any company that would be focused
3   on or residing in senior market space.
4   Q.      No, I understand the generic answer. I'm
5   now asking about what specific companies did you
6   discuss with Ken Gross.
7   A.      I don't recall specific companies.
8   Q.      How about Dr. Leonard's? Did you discuss
9   Dr. Leonard's in March of 2009?
10  A.      I don't recall.
11  Q.      When you were hired in June of 2009, on
12  what basis were you compensated?
13          MR. RODGER: Is your question a
14  generic salary or commission or salary plus
15  commission, or are you asking for dollars and cents
16  information?
17          MR. PASS: Right now, it's generic
18  and it will get more detailed, as I'm sure you can
19  appreciate.
20          MR. RODGER: All right. Well, if it
21  gets excessively detailed, I would object on the
22  grounds that it's none of your business, A, and
23  relevance of the lawsuit, B. If you're currently
24  asking was it salary or something else in a generic

29

1   term, I don't object to that.
2           MR. PASS: Well, you voiced your
3   objection, but, of course, the witness will have to
4   answer the question.
5           And in terms of relevance, the
6   amount and basis of compensation is incredibly
7   relevant to the lawsuit in terms of the incentive
8   for claiming to have brought in clients that
9   Mr. Flowers may have otherwise introduced.
10          But you will voice your objection at
11  the proper time, but please wait until the question
12  has been asked.
13          MR. RODGER: I don't concede that
14  point.
15          MR. PASS: Nor do you have to.
16          MR. RODGER: But if you ask
17  questions and I find them objectionable, I will
18  tell you; and if I don't, I will sit here quiet as
19  a little mouse and he can answer the questions.
20          MR. PASS: There is two bases for
21  objections in this deposition: One is privilege;
22  the other is the form of the question. With regard
23  to the form of the question, the witness, of
24  course, is compelled to answer.

30

1   BY MR. PASS:
2   Q.      Mr. Leighton, when you were hired by
3   Connect America, were you given a salary?
4   A.      Yes.
5   Q.      And was part of your compensation a bonus
6   for revenue that was generated through your
7   efforts?
8   A.      There was a bonus. I don't recall the
9   exact structure.
10  Q.      Was that bonus articulated in writing?
11  A.      I don't believe so.
12  Q.      But you don't know? Sitting here today,
13  you don't know whether your compensation was
14  memorialized in any written form?
15  A.      What exact form, I don't recall.
16  Q.      Well, then how was your bonus calculated?
17  When you were hired in -- when you started in June
18  of 2009, what was the formula?
19          MR. RODGER: For the moment, assume
20  the question requires an answer in generic terms.
21          THE WITNESS: It was related to
22  business that I generated.
23  BY MR. PASS:
24  Q.      Okay.

31

1           Please tell me what you mean by
2   "business that I generated."
3   A.      So if I created a partnership with a
4   company, that would be business I generated.
5   Q.      Did you create a partnership between
6   Connect America and a company called Amerimark
7   doing business as Dr. Leonard's?
8   A.      Yes.
9   Q.      Please describe in as much detail as
10  possible the origin of your relationship with --
11  I'm going to refer to the company as Dr. Leonard's.
12  Tell me the origin of that relationship.
13  A.      I cold-called the VP of marketing and
14  made several attempts -- his name was Mark Lenox --
15  made several attempts to reach him, eventually
16  reached him and discussed the program, our
17  opportunity with him.
18  Q.      You use the term "cold call." What do
19  you mean by that?
20  A.      He had no idea who I was; I didn't know
21  him, other than researching and finding him, and
22  then I called him.
23  Q.      And when was that?
24  A.      I don't know specifically the date.

10 (Pages 28 to 31)

Mark Leighton

32

1 **Q.** How soon after you started work at
2 Connect America did you cold call Mr. Lenox?
3 **A.** As I said, I don't specifically know the
4 date.
5 **Q.** But I'm asking how soon afterward. Was
6 it a week? Was it a month? Was it six months?
7 **A.** I don't know.
8 **Q.** Did there come a time when you were paid
9 a bonus based upon business that was generated
10 through Dr. Leonard's?
11 **A.** Yes.
12 **Q.** When did that start? When did you first
13 get paid a bonus for business that you claim to
14 have brought in through Dr. Leonard's?
15 **A.** I don't know the specific date. I
16 believe it was around December or January of after
17 the program started. Again, I don't recall exactly
18 what year that was.
19 **Q.** When did you first learn about a company
20 called Dr. Leonard's?
21 **A.** I don't know specifically, but it was
22 researching companies that market to seniors.
23 **Q.** And is it correct to say that that
24 research was conducted after you started work at

33

1 Connect America?
2 **A.** Yes.
3 **Q.** Is it your testimony that you arrived at
4 identifying Dr. Leonard's solely through your
5 independent research after you started work at
6 Connect America?
7 **A.** Yes.
8 **Q.** Did you ever discuss a possible business
9 relationship between Connect America and
10 Dr. Leonard's before -- I'm sorry, with Ken Gross
11 before you identified Dr. Leonard's through your
12 purported independent research?
13 **A.** I would expect no.
14 **Q.** But the question is did you ever.
15 Did you ever have any conversations
16 with Kenneth Gross about a company called
17 Dr. Leonard's?
18 **A.** I don't recall.
19 **Q.** Well, if you had had a conversation with
20 Ken Gross about Dr. Leonard's, is it correct to say
21 that your testimony that you discovered the company
22 independently would be false?
23 **MR. RODGER:** Objection. Don't
24 answer that question. That's not a question. It

34

1 calls for a hypothetical. It is judgmental.
2 **BY MR. PASS:**
3 **Q.** When is the first time you had a
4 conversation with Kenneth Gross about a company
5 called Dr. Leonard's?
6 **A.** I don't recall specifically. I would --
7 if I was to make an educated guess, it would be
8 after I had reached Mark Lenox.
9 **Q.** Is it correct to say that prior to your
10 independent research, you were not familiar with a
11 gentleman named Mark Lenox?
12 **A.** Yes.
13 **Q.** And is it correct to say that you learned
14 about the identity of Mark Lenox through publically
15 available information?
16 **A.** Say that again.
17 **Q.** Is it correct to say that you learned
18 about the identity of Mark Lenox through publically
19 available information?
20 **A.** Yes.
21 **Q.** What resources did you use to conduct
22 your independent research that led to your
23 discovery of Dr. Leonard's?
24 **A.** The internet.

35

1 **Q.** When you started working at Connect
2 America, were you given either a laptop or personal
3 computer?
4 **A.** Yes.
5 **Q.** And is it correct to say that when you
6 conducted this research, it was conducted through
7 hardware furnished by Connect America?
8 **A.** Yes.
9 **Q.** Do you currently use the computer that
10 you used to identify Dr. Leonard's?
11 **A.** No.
12 **Q.** What happened to that computer?
13 **A.** It blew up. It crashed some years ago
14 and I replaced it.
15 **Q.** So is it correct to say it crashed
16 sometime after June of 2009?
17 **A.** Yes.
18 **Q.** But you don't -- you don't know around
19 when that occurred?
20 **A.** I don't know specifically when, but I
21 would venture to say late 2010 is when I got a new
22 computer.
23 **Q.** With regard to the computer that crashed,
24 was the memory backed up?

11 (Pages 32 to 35)

Mark Leighton

40

1    PASS: We are all in agreement that
2  at this stage, discovery is not focusing on the
3  revenue generated or economics of the transactions
4  between Dr. Leonard's and Connect America.
5    MR. RODGER: Okay. I think we've
6  clarified the evidence on that point and we can
7  move on.
8  BY MR. PASS:
9  Q.    Did you ever have any conversations with
10  Ninon Prozonic about Connect America before you
11  first contacted Mr. Lenox?
12    MR. RODGER: About Connect America?
13    THE WITNESS: I don't understand
14  what that means.
15    MR. RODGER: Did you mean to ask if
16  he had conversations with Mr. Prozonic about
17  Connect America? That's what you asked.
18    MR. PASS: Could you please read
19  back the question?
20    - - -
21    (Whereupon, the court reporter read
22  the record back as requested.)
23    - - -
24    MR. RODGER: If that's the question,

41

1  it's fine.
2    MR. PASS: I will withdraw the
3  question.
4  BY MR. PASS:
5  Q.    Mr. Leighton, prior to your contacting
6  Mr. Lenox at Dr. Leonard's, did you ever have any
7  conversations with Ninon Prozonic relating to
8  Dr. Leonard's?
9  A.    Not that I recall.
10  Q.    Prior to your contacting Mr. Lenox at
11  Dr. Leonard's, did you ever have any conversations
12  with any employee of Connect America regarding a
13  possible partnership or business relationship
14  between Dr. Leonard's and Connect America?
15  A.    Not that I recall.
16  Q.    Then is it correct to say that when you
17  called Mr. Lenox, you had not discussed the
18  possible business relationship between
19  Dr. Leonard's and Connect America with anyone else?
20  A.    Yes.
21  Q.    Are you familiar with --
22    MR. PASS: Actually, could you read
23  that question and answer back?
24    - - -

42

1    (Whereupon, the court reporter read
2  the record back as requested.)
3    - - -
4  BY MR. PASS:
5  Q.    To the best that you recall, tell me
6  about the discussion that you had with Mr. Lenox at
7  the time you first contacted him.
8  A.    It was to talk to him about who we were
9  as a company, try to start some sort of dialogue
10  with him, who he is, where he works, and to
11  basically give him an overview of the possibility
12  of our companies working together.
13  Q.    Did Mr. Lenox indicate any previous
14  familiarity with Connect America during that
15  conversation?
16  A.    Not that I recall.
17  Q.    How about during any other conversation,
18  did Mr. Lenox ever advise you that he had been
19  familiar with Connect America before you had
20  contacted him?
21  A.    Not that I recall.
22  Q.    Are you familiar with a gentleman named
23  Walter Podsiedlak?
24  A.    How is that spelled?

43

1  Q.    P-O-D-S-I-E-D-L-A-K.
2  A.    Yes.
3  Q.    And who is Mr. -- who is Walt? Let's
4  refer to him as Walt.
5  A.    He is the sales representative from
6  Linear.
7  Q.    And when did you first either meet or
8  speak with Walt?
9  A.    I don't recall the first time I met him
10  or spoke with him.
11  Q.    Was it before or after you contacted
12  Mr. Lenox?
13  A.    I don't recall.
14  Q.    Under what circumstances did you first
15  either meet or speak with Walt?
16  A.    I don't recall.
17  Q.    When's the last time you spoke with Walt?
18  A.    Today, by e-mail.
19  Q.    By the way, Mr. Leighton, other than with
20  your counsel, did you discuss this case with anyone
21  else?
22  A.    Yes.
23  Q.    With whom?
24  A.    Ken Gross.

13 (Pages 40 to 43)

Mark Leighton

44

1  **Q.**   And when was that?
2  **A.**   This morning.
3  **Q.**   Tell me what you said and tell me what he
4  said.
5  **A.**   I don't recall specifically, but, in
6  general, that I was not going to be in the office
7  because I would be at this deposition.
8  **Q.**   Is that the sum and substance of the
9  conversation?
10  **A.**   Yes.
11  **Q.**   Did you have any conversations with Ken
12  Gross about the claims and issues in this lawsuit?
13  **A.**   Yes.
14  **Q.**   When was that?
15  **A.**   We met with counsel. I don't recall the
16  date. And it was to look at the claim.
17  **MR. RODGER:** All right. Anything
18  **else that occurred at a meeting with counsel is**
19  **privileged. I am going to assert that privilege.**
20  **The fact that the meeting occurred is not**
21  **privileged, but we've gone as far as we're going to**
22  **go down that road.**
23  **BY MR. PASS:**
24  **Q.**   Other than discussions where counsel was

45

1  present, did you have any discussions with Ken
2  Gross or any other Connect America employee about
3  this litigation?
4  **A.**   No.
5  **Q.**   Did you ever discuss this litigation with
6  Walt Podsiedlak?
7  **A.**   No.
8  **Q.**   Did you ever discuss this litigation with
9  nonemployees of Connect America?
10  **A.**   Yes.
11  **Q.**   Other than with counsel, with whom did
12  you discuss the case?
13  **A.**   I didn't discuss the case, but I told my
14  wife I was going to be in a deposition today.
15  **Q.**   Did you review any documents or materials
16  in preparation for this deposition other than with
17  counsel?
18  **A.**   No.
19  **Q.**   Are you familiar with a gentleman named
20  Gary Griesler, G-R-I-E-S-L-E-R?
21  **A.**   Gary?
22  **Q.**   I may be mispronouncing it. Griesler or
23  Griesler.
24  **A.**   There's a Gary Griesler -- I believe

46

1  that's his name -- that runs Amerimark.
2  **Q.**   Did you ever meet Gary Griesler?
3  **A.**   There's two Garys. I met his son. I met
4  Louis, I'm sorry. I did not meet Gary.
5  **Q.**   Who is Louis Griesler?
6  **A.**   Gary's son.
7  **Q.**   And is Louis Griesler an employee of
8  Dr. Leonard's?
9  **A.**   Yes.
10  **Q.**   And in what context did you interact with
11  Louis Griesler?
12  **A.**   I shook his hand.
13  **Q.**   When was that?
14  **A.**   I don't recall specifically.
15  **Q.**   Was it at Dr. Leonard's offices or
16  Connect America's offices?
17  **A.**   Dr. Leonard's offices.
18  **Q.**   When was the first time that you had a
19  meeting at Dr. Leonard's offices?
20  **A.**   It was in Cleveland. It was attended by
21  Ken Gross and I. The program started in, I
22  believe, a July time frame, and I don't recall the
23  exact date of that first meeting, but it was before
24  the start of that program.

47

1  **Q.**   Okay.
2  Who attended that meeting besides
3  yourself, Ken Gross, Louis Griesler?
4  **A.**   Louis wasn't in attendance of the
5  meeting.
6  **Q.**   But that's where you shook his hand?
7  **A.**   I had visited the offices at some point
8  and was introduced to Louis just to shake his hand.
9  **Q.**   Okay.
10  Who else did you meet at
11  Dr. Leonard's that day? Whatever that day was,
12  what other employees did you either meet or meet
13  with at Dr. Leonard's?
14  **A.**   Mark Lenox and Dave Oby.
15  **Q.**   Did you ever meet or speak with a woman
16  named Lucy Swingberg (ph.)?
17  **A.**   No.
18  **Q.**   Do you know who she is?
19  **A.**   No.
20  **Q.**   Did you ever meet or speak with a
21  gentleman named Art Walsack (ph.)?
22  **A.**   No.
23  **Q.**   Do you know who he is?
24  **A.**   No.

14 (Pages 44 to 47)

Mark Leighton

48

1   Q.      Did you ever meet or speak with a
2   gentleman named Tom McIntyre?
3   A.      No.
4   Q.      Do you know who he is?
5   A.      No.
6   Q.      Did you ever speak or meet with a woman
7   named Vilma Hampton?
8   A.      No.
9   Q.      Do you know who she is?
10  A.      No.
11  Q.      And you just testified that a gentleman
12  named David Oby attended that first meeting at
13  Dr. Leonard's --
14  A.      Yes.
15  Q.      -- is that correct?
16  A.      Yes.
17  Q.      Prior to that meeting, had you ever
18  spoken with or met Mr. Oby?
19  A.      Yes.
20  Q.      In what -- well, strike that.
21          When did you first meet with David
22  Oby?
23  A.      I don't recall the date. We spoke on the
24  phone and by e-mail.

49

1   Q.      Is it correct to say that the
2   conversation occurred after you cold-called
3   Mr. Lenox?
4   A.      Yes.
5   Q.      At the time of the meeting, what was
6   David Oby's position at Dr. Leonard's?
7   A.      I don't know the title. I know he worked
8   for Mark Lenox.
9   Q.      Do you know in what capacity?
10  A.      Mark was in charge of marketing. As I
11  understood it, Dave was in charge of insertion
12  marketing.
13  Q.      Please tell me what you mean by
14  "insertion marketing."
15  A.      The annoying things that fall out of a
16  magazine, that's insertion.
17  Q.      Okay.
18          Did you ever meet with
19  representatives of Dr. Leonard's in Edison, New
20  Jersey?
21  A.      No.
22  Q.      Is it correct to say that Dr. Leonard's
23  is headquartered in Edison, New Jersey?
24  A.      Amerimark Holdings owns Dr. Leonard's and

50

1   Healthy Living, which is another brand. As I
2   understand it, the headquarters for those companies
3   and holdings is in Cleveland.
4   Q.      Okay.
5           Are you familiar with any operations
6   of Dr. Leonard's in Edison, New Jersey?
7   A.      Yes.
8   Q.      And what are they?
9   A.      Specifically, I don't know, but as I
10  understand, it has to do with the catalog, some of
11  the catalog work.
12  Q.      When was the last time you spoke with
13  Mark Lenox?
14  A.      It was the last time I visited.
15  Q.      Just spoke with. Spoke with.
16  A.      I know.
17  Q.      It was -- okay.
18  A.      It was when I last visited. That was
19  sometime in October/November of last year.
20  Q.      To your knowledge, is Mr. Lenox still
21  head of marketing at Dr. Leonard's?
22  A.      I believe he is no longer at Amerimark.
23  Q.      Who took his place?
24  A.      I'm not aware of anyone taking his place.

51

1   Q.      To your knowledge, is Mr. Oby still
2   employed at Amerimark or Dr. Leonard's?
3   A.      Yes.
4   Q.      When's the last time you spoke with
5   Mr. Oby?
6   A.      Around the same time I met with Mark.
7   Q.      As you sit here today, is Connect America
8   currently selling medical alarms to or through
9   Dr. Leonard's?
10  A.      Yes.
11  Q.      And who is your point person, as you sit
12  here today, at Dr. Leonard's with regard to that
13  program?
14  A.      Dave Oby.
15  Q.      To your knowledge, what is Mr. Oby's
16  current position at Dr. Leonard's or Amerimark?
17  A.      As I understand it, it's unchanged.
18  Q.      To your knowledge, is Mr. Lenox's
19  position still open since he was the head of
20  marketing and you don't know whether anyone
21  succeeded him?
22  A.      I don't know.
23  Q.      Aside from David Oby or Mark Lenox, with
24  whom at Dr. Leonard's have you corresponded with

15 (Pages 48 to 51)

Mark Leighton

52

1   since the relationship between Connect America and
2   Dr. Leonard's commenced?
3   **A.**     Can you be specific?
4   **Q.**     Yeah.
5          Identify all of the people at
6   Dr. Leonard's with whom you've communicated
7   regarding the business relationship between
8   Dr. Leonard's and Connect America since June of
9   2009.
10  **A.**     It would be Mark Lenox, Dave Oby.
11  There's a marketing woman whose name is Diane.  I
12  believe she potentially is Mark's boss.  I've had a
13  discussion with her before.
14  **Q.**     What's her name?
15  **A.**     I don't know her last name.
16  **Q.**     But her first name is Diane?
17  **A.**     Yeah.  And there was a call center
18  manager, I believe it was Wendy, that I was on the
19  phone with before.
20  **Q.**     Can you think of anyone else?
21  **A.**     No.
22  **Q.**     When's the last time you met with Ninon
23  Prozonic?
24  **A.**     She was just recently here, I believe it

53

1   was last week, the 21st.
2   **Q.**     Did there come a time that you learned
3   that Ms. Prozonic had dental surgery?
4   **A.**     Yes.
5   **Q.**     And when was that?  When did she have the
6   surgery?
7   **A.**     I believe it was Thursday last week.
8   **Q.**     Was that before or after she was at
9   Connect America?
10  **A.**     It was after.
11  **Q.**     How frequently does Ms. Prozonic attend
12  meetings at Connect America in Bromall?
13  **A.**     Probably quarterly.
14  **Q.**     Did anyone from Connect America ever
15  share with you e-mails or other correspondence
16  between George Flowers and Connect America
17  specifically relating to Dr. Leonard's?
18  **A.**     Everything that I've seen is in the court
19  filings.
20         **MR. RODGER:  Go off the record for a**
21  **moment.**
22         - - -
23         **(Whereupon, an off-the-record discussion was**
24  **held.)**

54

1          - - -
2          **MR. PASS:  Let's mark this**
3   **Leighton-1.**
4          - - -
5          **(Whereupon, a 3/18/09 E-mail has**
6   **been marked as Exhibit Leighton-1 for**
7   **identification.)**
8          - - -
9   **BY MR. PASS:**
10  **Q.**     Mr. Leighton, I've provided you with a
11  copy of an e-mail sent by George Flowers to a
12  website, WeAlarmYou@aol.com, that we understand to
13  be Kenneth Gross's e-mail address.  This is a
14  document that was produced by Connect America in
15  discovery and I would request that you take a look
16  at it and let me know when you've completed your
17  review because I'd like to ask you some questions
18  about it.
19  **A.**     (Witness complied.)  Okay.
20  **Q.**     Mr. Leighton, prior to today, had you
21  ever seen the e-mail that I've provided to you?
22  **A.**     Yes.
23  **Q.**     Okay.
24         And when did you first see it?

55

1   **A.**     When the court documents were made
2   available to me, the filing.
3   **Q.**     The filing?
4   **A.**     What would we call the case, whatever you
5   filed?
6          **MR. RODGER:  Document production,**
7   **initial disclosures, probably, or subsequent.**
8   **BY MR. PASS:**
9   **Q.**     Okay.
10         And prior to that, you had not seen
11  this document, correct?
12  **A.**     Correct.
13  **Q.**     Okay.
14         Did there come a time before the
15  filing of the lawsuit that brings you here today
16  that you learned about the identity of a gentleman
17  named George Flowers?
18  **A.**     No.
19  **Q.**     So is it correct to say that the first
20  time you learned about the identity of George
21  Flowers, who's here today, was after Mr. Flowers
22  filed his lawsuit against Connect America?
23  **A.**     Correct.
24  **Q.**     You testified that you had not seen this

16  (Pages 52 to 55)