IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GEORGE G. FLOWERS         :
                                   :           CIVIL ACTION
       v.                       :
                                   :           NO.  12-4787
CONNECT AMERICA.COM, LLC     :

**SURRICK, J.**                                                **SEPTEMBER <u>24</u>, 2014**

## <u>MEMORANDUM</u>

Presently before the Court are Plaintiff George G. Flowers's Motion for Partial Summary Judgment (ECF No. 18) and Defendant Connect America.com LLC's Cross-Motion for Summary Judgment (ECF No. 21).  For the following reasons, Plaintiff's Motion will be granted in part and denied in part, and Defendant's Motion will be granted in part and denied in part.

## I.     BACKGROUND

### A.     Procedural Background

On August 20, 2012, Plaintiff George G. Flowers filed the Complaint for this breach of contract action.  (Compl., ECF No. 1.)  Jurisdiction is based on 28 U.S.C. § 1332(a) because the parties are diverse and the amount in controversy exceeds $75,000.  (*Id.* ¶¶ 2-5.)  On November 2, 2012, this Court bifurcated the liability and damages portion of Plaintiff's claims.  (ECF No. 14.)  On March 5, 2013, Plaintiff's filed the current Motion for Partial Summary Judgment on liability.  (Pl.'s Mot., ECF No. 18.)  Defendant Connect America.com LLC, filed a Cross-Motion for Summary Judgment and accompanying Memorandum of Law on March 8, 2013.  (Def.'s Mot., ECF No. 21; Def.'s Mem., ECF No. 22.)  On April 15, 2013, both Plaintiff and Defendant

filed Responses in Opposition to each other's Motions.  (Pl.'s Resp., ECF No. 26; Def.'s Resp., ECF No. 27.)

      **B.**      **Factual History**

      Defendant is a limited liability company involved in the business of selling and servicing personal emergency response systems ("PERS") and related monitoring services.  (*See* Gross Dep. Ex 1., Def.'s Mem. Ex. 3.)  A PERS is a wearable base transmitter unit which allows a person, with the push of a button, to speak to an operator who can summon medical help to the person's home in the event of a medical emergency.  (*Id.*)  Most subscribers to Defendant's service are older adults who are living independently.  (*Id.*)  The fees paid by subscribers include a one-time payment for the wearable base transmitter and a recurring monthly payment of $29.99 for the monitoring services.  (*See id.*)  Defendant markets its services through direct mail solicitations, internet advertising, local dealers, and "Strategic Alliance Partners."  (*See id.*)  A Strategic Alliance Partner is a large company that offers products to the geriatric customer base targeted by Defendant.  (*See* Gross Dep. I 68, Def.'s Mem. Ex. 1.)  These companies partner with Defendant by including promotional material about Defendant's PERS in their own marketing to geriatric customers.  (*Id.*)  Dealers, on the other hand, are generally individuals who sign a standardized "dealer agreement" and are compensated for sales of PERS to end users resulting from the dealer's direct local marketing and sales efforts.  (Def.'s Mem. 6 n.3; Def.'s Ex. 3.)

      Plaintiff is an individual who, for twenty-five years, worked for Electric Mobility Company ("EM")—the company that manufactures, markets, and sells the "Rascal Scooter," which is sold to the elderly, disabled, and infirm.  (Pl.'s Mot. 2-3; Def.'s Mem. 4.)  After retiring from EM in January 2007, Plaintiff founded another company, Platinum Independence, in

October 2007.[1]  (Flowers Dep. I 48-49, Def.'s Mem. Ex. 6.)  Platinum Independence sought to market various types of products to geriatric customers.  (Pl.'s Mot. 3; Def.'s Mem. 5.)  It was through his work on behalf of Platinum Independence that Plaintiff became acquainted with Defendant's President, Kenneth S. Gross ("Gross").  (Pl.'s Mot. 4; Def.'s Mem. 6.)

Plaintiff and Gross connected in September 2008, when Plaintiff reached out to Defendant via telephone requesting that Platinum Independence be allowed to sell Defendant's PERS.  (Flowers Dep. I 146-49.)  Plaintiff first met with Gross at Defendant's headquarters, where Plaintiff was given a tour of the facility and offered the possibility of becoming a dealer for Defendant.  (Id. at 149.)  A second meeting between Plaintiff and Gross occurred sometime in October 2008.  (Id. at 155.)  At the second meeting, Plaintiff pitched Gross about becoming part of Platinum Independence's marketing system.  (Id.)  Defendant did not become a Platinum Independence "member" and no written dealer agreement between Plaintiff and Defendant was executed at either of those meetings.  (Flowers Dep. I 165-70; Pl.'s Mot. 4; Def.'s Mem. 6-7.)  Plaintiff and Gross met additional times in October 2008.  (Flowers Dep. I 172-73, 177-78; Def.'s Mot. 8.)  Plaintiff claims that at a subsequent meeting, he and Gross entered into a finders fee agreement under which Plaintiff would find Strategic Alliance Partners for Defendant.  (Flowers Decl. ¶¶ 6-7, Pl.'s Mot. Ex. 1.)  Plaintiff specifically claims that Gross said "if you can introduce me to [FirstStreet], I will give you $15 a month in recurring revenue to split between you and [FirstStreet]."  (Flowers Dep. I 178-79.)  Plaintiff allegedly responded, "I'm on it.  I'm on it."  (Id. at 179.)  According to Plaintiff, Gross orally agreed that Defendant would pay Plaintiff:  (1) $15 of the monthly recurring revenue related to each unit sold by a company that Plaintiff introduced to Defendant, minus the amount of monthly recurring revenue paid to the

---

[1] Platinum Independence was formally dissolved on April 4, 2009.  (Flowers Dep. I 86.)

company that makes the sale; or (2) if all $15 of the monthly recurring revenue was committed to the selling company, $10 per unit sold.[2]  (Flowers Decl. ¶¶ 6-7; Compl. ¶ 10.)  Essentially, Plaintiff claims that if Defendant agreed to pay $15 per unit of the monthly recurring revenue to the company making the sale, then Plaintiff would receive $10 per unit.  (*Id.*)  However, if Defendant agreed to pay less than a $15 of monthly recurring revenue to the selling company, for example if $10 went to the selling company, then Plaintiff would receive the difference, in this example $5.  Neither party alleges that the agreement was memorialized in writing at the time it was made.  (*See* Flowers Dep. I 179.)  Plaintiff assumed that any commission payments that he was entitled to under the agreement would continue forever.  (Flowers Dep. I 189.)  Both Gross and Flowers agree that the duration of the payments was never discussed.  (Gross Dep. I 151; *see* Flowers Dep. I 189-90.)  At some point during all of these events, Defendant also sent Plaintiff a blank copy of Defendant's "Dealer Agreement."  (Flowers Decl. ¶ 9; Gross Dep. I 136; Flowers I Dep. 196.)

### 1.   *Defendant Contracts with FirstStreet and Electric Mobility*

After Gross verbally agreed to compensate Plaintiff for an introduction to FirstStreet, Plaintiff made the introduction.  (Gross Dep. I 139.)[3]  Plaintiff was making a pitch on behalf of Platinum Independence to FirstStreet, and at some point during the pitch, Plaintiff facilitated an

---

[2] In its Memorandum, Defendant admits that Gross agreed to compensate Plaintiff for introducing Gross to FirstStreet, if the introduction led to a business relationship between Defendant and FirstStreet.  (Def.'s Mem. 8; Gross Dep. I 150-51.)  Defendant further claims that various compensation formats were discussed, but no specific agreement was reached on the amount or type of compensation that Plaintiff would receive.  (*Id.*)  Defendant does not cite a source that supports this additional factual assertion.

[3] Gross claims the introduction occurred around December 2008.  (Gross Dep. I 138.)  However, an e-mail from Gross to Plaintiff on November 11, 2008 suggests that at that time Plaintiff had already introduced Defendant to FirstStreet.  (Nov. 11 e-mail, Flowers Decl. Ex. 1 at 22.)

introduction between Defendant and FirstStreet by calling Gross and then handing the telephone

to Dave Modina ("Modina"), Vice President of Marketing for FirstStreet.  (*Id.* at 128.)  At that

time, Modina and Gross agreed to set up a meeting.  (*Id.* at 141-43.)  The meeting occurred

sometime in January or February 2009, at which time Modina and Gross discussed the terms of a

deal between Defendant and FirstStreet.  (*See id.* 144-46.)

     Plaintiff also introduced Defendant to his former employer, EM.  (Flowers Decl. ¶ 8;

Nov. 11 e-mail; *see* Def.'s Mem. 9.)  On November 11, 2008, Gross e-mailed Plaintiff stating

> We had a good meeting this afternoon with [EM] . . . They seem interested in doing something with us starting after JAN 1 . . . at this point we are closing the door to any new alliances. . . .
>
> I will honor my commitment to you on EM and First Street should they come to fruition since you did introduce us to both companies, but will not enter into any new agreements past them.
>
> You will earn $10 per unit sold by EM, paid monthly, and the difference between $15 per month and what we finally settle on with FS.  If there is no spread on the monthly with FS then you will earn the same $10 per unit sold.

(Nov. 11 e-mail; *see* Flowers Decl. ¶ 8 & Ex. 1 at 22.)[4]  On November 21, Plaintiff responded, "I

appreciate your offer to honor our agreement with EM[] and [FirstStreet]."  (Pl.'s Resp. Ex. 17.)

That same day, Gross replied via e-mail explaining that he had just met with FirstStreet that

week and was in the process of reviewing an agreement with them.  He further stated,

> I am willing to enter into an agreement with you at $10 per unit.  This would be an introduction fee only.  I do not need help maintaining these relationships once the introduction is made.  The larger more sophisticated partners want the full $15 per month.  There is no more room to share in recurring.

---

[4] In his deposition, Gross admitted that he made a commitment to Plaintiff prior to November 11, and stated that when he made the commitment, he told Plaintiff what was in "Paragraph 4" of the November 11 e-mail. (Gross Dep. 150-51.)  Paragraph four stated "You will earn $10 per unit sold by EM, paid monthly, and the difference between $15 per month and what we finally settle on with FS.  If there is no spread on the monthly with FS then you will earn the same $10 per unit sold."  (Nov. 11 e-mail.)

Let me know if you want to proceed. . . .

(Gross Nov. 21 e-mail, Pl.'s Resp. Ex. 17.)[5]  A few days after Gross's e-mail to Plaintiff, on November 24, 2008, Defendant executed a contract with FirstStreet that was effective December 1, 2008 through May 31, 2009.  (FirstStreet Contract 105-120, Flowers Decl. Ex. 6.)  Under the terms of the contract, FirstStreet would receive $160 for each unit that it sold, regardless of customer cancellations or returns.  (*Id.* at 106.)  In addition, FirstStreet would receive $10 per month for each unit that it sold as long as the customer continued to use and pay the monthly monitoring fee for twelve months following the sale.  (*Id.*)  The contract was amended in January 2009 so that FirstStreet would receive $350 for each unit that it sold and $10 per month for each unit that it sold when the customer continued to use the unit for 36 months after the sale.  (*Id.* at 110.)  In March 2010, Defendant's contract with FirstStreet was amended again.  This time FirstStreet would receive $380 for each unit that it sold minus a percentage for initial cancellations.  (FirstStreet Contract 118.)  Defendant and FirstStreet's business relationship terminated on April 30, 2012.  (Gross Dep. I 68.)  Plaintiff claims that he did not see the contract or addendums between Defendant and FirstStreet until after this litigation commenced.  (Flowers Dep. I 197.)

In early 2009, EM became one of Defendant's Strategic Alliance Partners, entering into a contract for three years.  (Flowers Dep. II 141, Def.'s Mem Ex. 7; Pl.'s Ex. 6 at 92.)  Defendant agreed to pay EM $15 of the monthly recurring revenue.  (Flowers Decl. ¶ 8 & Pl.'s Ex. 6 at 89,

---

[5] Plaintiff claims that there was "disagreement" between him and Gross regarding what Gross had agreed to pay Plaintiff for introducing Defendant to FirstStreet.  Plaintiff specifically claims "I thought he agreed to pay me the $15 a month per monthly recurring revenue, and he changed the agreement very soon after [FirstStreet] agreed to sell [Defendant's PERSs], which upset me dramatically . . . ."  (Flowers Dep. I 196-97.)

95.)  Defendant and EM's business relationship terminated on December 15, 2010.  (Pl.'s Ex. 6
at 101.)

On February 5, 2009, Plaintiff wrote to Gross expressing his happiness that FirstStreet
and EM had started promoting and selling Defendant's product.  (Feb. 5 Ltr., Def.'s Mem. Ex.
12.)  He noted that he understood that FirstStreet had sold several hundred units since December
2008, and he included this information to facilitate payments that Defendant owed him for sales
that had already occurred.  (*Id.*)  Plaintiff also expressed his interest in "promoting [Defendant]
to [his] other contacts with some other type of agreement with [Defendant] or becoming a special
dealer" as previously discussed.  (*Id.*)  On February 24, 2009, Plaintiff e-mailed Gross a version
of Defendant's standard "Dealer Agreement" that had been modified by Plaintiff.  (Def.'s Mem.
Ex. 9.)  The marked-up Dealer Agreement was never executed.  (Flowers Decl. ¶ 10; Gross Dep.
I 111-12.)

On March 5, 2009, Gross forwarded Plaintiff an e-mail with information on the success
of FirstStreet's sales of Defendant's product.  (March 5 e-mail, Def.'s Mem. Ex. 5.)  Gross
specifically stated that if Plaintiff "brought in 5 more like this one . . . [he] would never have to
work again!!"  (*Id.*)  On March 18, 2009, Plaintiff sent Gross an e-mail indicating that he had
acted as a representative of Defendant at a trade show, which Gross had allegedly approved, and
in doing so had found some opportunities.  (March 18 e-mail, Flowers Decl. Ex. 1 at 27.)
Plaintiff specifically stated that "Dr. Leonards [sic] is in my sights also!!"  (*Id.*)  Gross testified
that around this time—from March 5th to March 23rd—"things came up" that made Gross no
longer want to do business with Plaintiff.  (Gross Dep. II 99.)  On March 23, 2009, Gross sent an
e-mail to Plaintiff stating:

I thought about our last conversation over the weekend and have come to the conclusion if you are not happy with the $10 per medical alert unit sold by partners introduced by you, we should go in different directions.

I believe my offer was extremely fair based upon the same compensation package as two other industry professionals who work for us, so I am not going to deviate from my policy.

I wish you good luck as you pursue a recurring revenue deal.  We will continue to pay you on this scale . . . for sales generated by Electric Mobility and First Street.

There is no reason to meet further or discuss a dealer program at this time.

(March 23 e-mail, Flowers Decl. Ex. 1 at 24.)[6]  Plaintiff responded that he understood Gross's position and would still like to pursue opportunities with accounts he already had scheduled and look for other opportunities for Defendant under the $10 agreement.  (*Id.*)

2.    *Defendant Contracts with Internet Alliance*

After Plaintiff responded to Gross, he continued to reach out to businesses on Defendant's behalf.  On March 27, Plaintiff sent an e-mail to Ninon Prozonic, Defendant's Vice President of Strategic Alliances, indicating that he had spoken to his contact at Internet Alliance about the possibility of Internet Alliance selling Defendant's product, and the company was interested.  (Flowers Decl. Ex. 1 at 31; Leighton Dep. 74, Def.'s Mem. Ex. 14.)  Throughout the rest of March 2009 and into April 2009, Plaintiff sent additional e-mails to individuals at Internet Alliance to facilitate a deal between Defendant and Internet Alliance.  (Flowers Decl. Ex 1 at 32-39.)  On April 17, 2009, a contract was executed under which Internet Alliance agreed to sell Defendant's product.  (*Id.* at 40.)

Also in April 2009, Plaintiff signed an "independent sales representative" agreement with another medical alarm company, VRI.  (Flowers Dep. II 53.)  On June 6, 2009, Gross sent

---

[6] Plaintiff claims that in his e-mail, Gross changed the terms of their previous finders fee agreement from Plaintiff sharing in monthly recurring revenue to now receiving a flat $10 per unit sold from any new referrals.  (Flowers Decl. ¶ 13.)

Plaintiff an e-mail with the subject line "Great Paycheck!"  In the e-mail, Gross stated that the FirstStreet relationship was "GREAT!" and that EM and Internet Alliance was "ZERO!" (Flowers Decl. Ex. 1 at 41.)  Gross also inquired into how "things [were] working out for [Plaintiff] at VRI."  (*Id.*)  Internet Alliance never actually sold any of Defendant's product and EM sold fewer than 20 units.  (Gross Dep. II 15; Gross Dep. I 27-28.)

> 3. *Defendant Contracts with Dr. Leonard's*

During the time that Plaintiff was reaching out to Internet Alliance about selling Defendant's product, he was also reaching out to Dr. Leonard's.  On March 20, 2009, Plaintiff e-mailed Vilma Hampton ("Hampton"), an employee of Dr. Leonard's who Plaintiff claims was responsible for purchasing medical alarms.[7]  (Flowers Decl. ¶ 12 & Ex. 1 at 29.)  The e-mail was a follow-up to a conversation Plaintiff had with Hampton regarding Dr. Leonard's earning revenue selling Defendant's product.  (Flowers Decl. ¶ 12 & Ex. 1 at 29.)  Plaintiff sent additional e-mails to Hampton promoting Defendant's product on March 27, April 6, April 14, and April 22.  (Pl.'s Mot. Ex. 12; Flowers Decl. ¶¶ 15-18.)  Plaintiff informed Gross that he had been reaching out to Dr. Leonard's.  (Flowers Decl. ¶ 26.)  While Hampton did not respond to Plaintiff's e-mails, on April 27, 2009, she did forward one of Plaintiff's e-mails to another Dr. Leonard's employee, Joe Mango ("Mango").  (Pl.'s Mot. Ex. 12.)  Hampton directed Mango to review the e-mail, indicated that Plaintiff had called several times, and asked if the opportunity that Plaintiff wrote about would be something that Dr. Leonard's would consider.  (Pl.'s Mot. Ex. 12.)  On May 11, 2009, Hampton again forwarded the e-mails she received from Plaintiff to Mango asking for his comments.  (*Id.*)  Despite his efforts, Plaintiff admits he did not introduce anyone at Dr. Leonard's to any of Defendant's employees.  (Flowers Dep. II 191.)

---

[7] There is a dispute over Hampton's role at Dr. Leonard's.  Defendant claims that she was a "buyer-in-training" with no decision-making authority.  (Def.'s Mem. 14.)

Also in May 2009, Defendant's new employee, Mark Leighton ("Leighton"), Defendant's Vice President of Sales, began reaching out to Dr. Leonard's.  (Flowers Decl. ¶ 20; Pl.'s Mot. Ex. 14.)  Leighton personally identified Dr. Leonard's as a business opportunity through his independent research.  (Leighton Dep. 33.)[8]  Leighton did not recall discussing possible business opportunities with Dr. Leonard's with Gross prior to May 2009.  (Leighton Dep. 28.)  Leighton began reaching out to Dr. Leonard's by cold-calling Dr. Leonard's Vice President of Marketing, Mark Lenox ("Lenox").  (*Id.* at 31.)  A number of Leighton's calls went unanswered until Leighton finally spoke with Lenox on May 15, 2009.  (Leighton Dep. 82-83, Pl.'s Mot. Ex. 13.)  On May 16, Leighton sent Lenox an e-mail attaching information about selling Defendant's product and revenue potential.  (Pl.'s Mot. Ex. 15.)  Leighton continued to communicate and meet with individuals at Dr. Leonard's through the summer of 2009.  (*See id.*)  Ultimately, on September 12, 2009, Dr. Leonard's executed a contract with Defendant for Dr. Leonard's to sell Defendant's product as a Strategic Alliance Partner.  (Flowers Decl. ¶ 27.)  Leighton never communicated with Hampton or Mango.  (Leighton Dep. 52.)

> **4.**     *Defendant Terminates its Relationship with Plaintiff*

On November 10, 2009, Gross sent a letter to Plaintiff stating the following:

> It will be a year in December that we have compensated you for the FirstStreet introduction.

> Based on the fact that you have not introduced us to any other strategic partners and are now working for a competitor (VRI), I have decided to terminate our arrangement after one full year.  We will continue to pay you at $10/unit for FirstStreet sales though December 31, 2009.  Since your sales trail by 60 days, your last commission check from Connect America will be in February 2010.

---

[8] Specifically, Leighton claims he learned about Dr. Leonard's from internet research that he conducted on a computer furnished to him by Defendant.  Leighton claims that the computer crashed years ago.  (Leighton Dep. 35.)

> This proved to be a good introduction for you as you are on track to make $50,000 due to this relationship.

(Flowers Decl. Ex. 1 at 64.)  Plaintiff responded in a letter dated January 13, 2010 stating

> I do not agree that you can terminate my commission payments after one year. This clearly was never your intent.  There was never any discussion of a time limit in any of our conversations or correspondence.  I expect you will continue to make the monthly payments on all my referral accounts.  My referral accounts are First Street, Electric Mobility, and Internet Alliance. . . .
>
> Clearly, $10 per unit was the minimum amount you were to pay me under our agreement without time limit or restrictions.  For First Street you were to pay me the difference between $15 per month and what was finally settled with First Street.  If there is no spread, then I would earn $10 per unit sold. . . .

(*Id.* at 66.)  Defendant did not respond to Plaintiff's letter.  (*Id.* at 67.)  A few months later, on March 21, 2010, Gross sent an e-mail to Modena with the subject line "George Flowers."  (Pl.'s Mot. Ex. 10.)  In the e-mail, Gross explained that he was receiving threating letters from Plaintiff demanding that Defendant continue to pay Plaintiff $10 per unit sold by FirstStreet.  (*Id.*)  Gross stated "[Plaintiff] received $50K in 12 months for doing nothing.  There is no written agreement in place only my good word.  As we both agreed, we chose to give you the extra money in our new deal, and we are not paying [Plaintiff] anymore]."  (*Id.*)  Gross asked Modena to tell Plaintiff to "back off and concentrate on other things."  (*Id.*)

Throughout Plaintiff and Defendant's relationship, Plaintiff received six checks from Defendant.  The first check, dated March 10, 2009, was for $1,610.00.  (Flowers Decl. Ex. 1 at 58.)  The check stated that $370.00 was for "DEC SALES" and $1,240.00 was for "JAN SALES."  (*Id.*)  The second check for $2,680.00, dated April 11, 2009, was for "FEB SALES." (*Id.* at 57.)  Plaintiff's third check, dated July 15, 2009, for $4,230.00 was described as "Commission Sales – Dealer (1099)."  (*Id.* at 56)  On August 17, 2009, Plaintiff received another check for $6,100.00 for "Commission Sales – Dealer (1099)."  (*Id.* at 55.)  The fifth check, dated

11

September 24, 2009, was for $4,600.00.  (*Id.* at 54.)  Finally, Plaintiff received his final check on January 15, 2010 for $4,240.00.  (*Id.* at 53.)  No information was included with the checks about how the payments were calculated.

## II.   LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); s*ee also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record. . . ."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The nonmoving party may not avert summary judgment by relying on speculation or by rehashing the allegations in the pleadings.  *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.

Moreover, courts must not resolve factual disputes or make credibility determinations. *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

When cross-motions for summary judgment are filed, each party claims that it alone is entitled to summary judgment. "[T]he making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). Rather, each movant must still show that no genuine issue of material fact exists, and if both parties fail to carry their respective burdens, the court must deny the motions. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1023 (3d Cir. 2008).

## III.   DISCUSSION[9]

### A.   Alleged Breach of the Original Contract

Both parties have moved for summary judgment on the breach of contract claim. In Pennsylvania, "a plaintiff seeking to proceed with a breach of contract action must establish (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (internal quotation omitted). An enforceable contract exists where "both parties have manifested an intention to be bound by [the contract's] terms[,]. . . the terms are sufficiently definite to be specifically enforced[,]" and there is consideration on both sides. *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298-99 (3d Cir. 1986). When "ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d

---

[9] It is undisputed that Pennsylvania law applies. (*See* Pl.'s Mot. 18-19; Def.'s Mem. 18-19.)

253, 263 (3d Cir. 2010) (internal quotation omitted).  "[W]hen the record contains conflicting

evidence regarding intent, the question of whether the parties formed a completed contract is one

for the trier of fact."  *Id.* at 263 (citing *Channel Home*, 795 F.2d at 300 n.9).

      The parties do not dispute that they entered into a contract.  However, the terms of the

contract are in dispute.[10]  Both parties agree that Plaintiff promised Defendant that he would

introduce Defendant to prospective strategic alliance partners, and that Defendant, in return,

promised to compensate Plaintiff if an introduction led to a Strategic Alliance Partnership.

However, the parties disagree on how Plaintiff was to be compensated.  Defendant contends that

it agreed to pay Plaintiff $10 for each PERS unit sold by a strategic alliance partner that Plaintiff

introduced to Defendant.  (Def.'s Mem. 19.)  Plaintiff, on the other hand, claims that Defendant

promised to pay him the greater of $10 for each PERS unit sold—as Defendant claims—or $15

of monthly recurring revenue related to each unit sold, less the amount of monthly recurring

revenue paid to the strategic alliance partner ("monthly recurring revenue spread").  (Pl.'s Mot.

5.)  Neither party claims that the contract was memorialized in writing at the time that it was

made.  Therefore, we look to the actions of the parties as "significant and substantial evidence of

their intention."  *Fenestra, Inc. v. John McShain, Inc.*, 248 A.2d 835, 836 (Pa. 1969).

      Generally, "in the case of a disputed oral contract, what was said and done by the parties,

as well as what was intended by what was said and done by the parties, are questions of fact to

be resolved by the trier of fact."  *Johnston the Florist, Inc. v. TEDCO Const. Corp.*, 657 A.2d

511, 516 (Pa. Super. Ct. 1995).  Thus, we will be unable to grant summary judgment on the

---

[10] Neither party addresses the clear dispute over the terms of the contract in their
Motions.  In fact, Plaintiff's Motion does not clearly set out what it contends were the terms of
the contract, and Defendant does not explain how it came to the conclusion that the "record
makes clear that the terms of the agreement" were what it claims.  (*See* Pl.'s Mot. 17-32; Def.'s
Mem. 19.)

breach of contract claim for either party if there are material issues of fact concerning the terms

of the contract between Plaintiff and Defendant.  Here, there is no disputed issue of material fact

regarding the compensation that Plaintiff was entitled to under the oral contract.  Plaintiff

submitted evidence to support that Defendant agreed to pay him the greater of $10 for each

PERS sold or the monthly recurring revenue spread.  Specifically, Plaintiff testified that Gross

told him that he would pay him the monthly recurring revenue spread, and Defendant did not

submit conflicting testimony.  In addition, Plaintiff produced the November 11 e-mail from

Gross to Plaintiff, which was sent after Plaintiff had already introduced Defendant to EM and

FirstStreet.  In the e-mail, Gross wrote that he would "honor [his] commitment to [Plaintiff],"

and Plaintiff would earn "the difference between $15 per month and what we finally settle on

with [FirstStreet].  If there is no spread on the monthly with FS then you will earn the same $10

per unit sold."  (Nov. 11 e-mail.)  Gross admitted to communicating those terms to Plaintiff prior

to November 11, 2009.  There is no evidence in the record, beyond unsupported assertions by

Defendant, that Plaintiff was to be compensated only at a flat rate of $10 per PERS unit sold.[11]

Therefore, there is no disputed issue of material fact concerning Plaintiff's commission.  The

---

[11] The existence of the November 21, 2009 e-mail from Gross to Plaintiff in which Gross wrote to Plaintiff regarding the FirstStreet deal and stated "I am willing to enter into an agreement with you at $10 per unit" does not support Defendant's argument.  That e-mail occurred after the contract was made and performed by Plaintiff, as Plaintiff had already introduced Defendant to FirstStreet and EM.  This e-mail appears to be an offer to modify the contract, but it was not supported by additional consideration because introductions had already occurred.  Therefore, the subsequent written modification is unenforceable and the original terms of the contract control.  *J.W.S. Delavau, Inc. v. E. Am. Transport & Warehousing, Inc*., 810 A.2d 672, 681 (Pa. Super. Ct. 2002) ("[O]nce a contract has been formed, its terms may be modified only if both parties agree to the modification and the modification is founded upon valid consideration."); *see also Feldman v. Phila. Trust Co.*, No. 1925, 2008 WL 4281966 (Pa. C.P. Ct. Aug. 22, 2008) (finding subsequent written contract did not invalidate or alter terms of previous oral contract when party had already fully performed).

record establishes that Defendant promised to compensate Plaintiff for introductions that lead to sales of PERS at the greater of $10 per unit or the monthly recurring revenue spread.

Similarly, there is no disputed issue of material fact regarding the duration of the contract between Plaintiff and Defendant.  Although Plaintiff assumed his commission payments would last "forever," both parties have acknowledged that the contract did not include—and the parties did not discuss—terms regarding the length of time that Plaintiff was entitled to compensation. Defendant contends that because the contract was silent as to the duration of Plaintiff's payments, there was no meeting of the minds, so it was obligated to pay Plaintiff only for a reasonable time.  Defendant claims one year of commission payments is a reasonable time. Conversely, Plaintiff argues that under Pennsylvania law, he is entitled to receive commission payments so long as Defendant is still receiving a benefit from his introduction.

Defendant is correct that if an essential term is left out of a contract, the law will not invalidate the contract but will substitute a reasonable term.  *Greene v. Oliver Realty, Inc.*, 526 A.2d 1192, 1194 (Pa. Super. Ct. 1987).  However, a court will not substitute a contractual term when the parties' intentions are ambiguous.  *Id.*  Here, the parties' intentions are not ambiguous: Defendant intended to compensate Plaintiff for successful introductions to Strategic Alliance Partners, and the parties left out an essential term regarding the period of time during which Plaintiff would be entitled to compensation.  However, a "reasonable amount of time" will not be substituted here because in Pennsylvania, when a contract for the payment of commissions omits details about the duration for which a party is entitled to commission, courts have not substituted in a "reasonable time."[12]  Rather, "[w]here a contract [for commission] is silent or ambiguous,

---

[12] If Pennsylvania law provided for the substitution of a "reasonable amount of time" the issue would not be appropriate for summary judgment, as it would be a question of fact that must be properly decided by a jury.

16

Pennsylvania law generally will not divest an employee's right to an earned commission." *Little v. USSC Grp., Inc.*, 404 F. Supp. 2d 849, 854 (E.D. Pa. 2005).

More specifically, a party's right to an earned commission is not forfeited upon the termination of the contract that entitled the party to the commission, unless the contract provides otherwise or further work is required by the party to secure the commission. *See id*, at 854 (citing *Chaflin v. Mfr.' Club of Phila.*, 158 A. 575, 576 (Pa. Super. Ct. 1932)); *Linn v. Emp'r Reinsurance Corp.*, 153 A.2d 483, 485-86 (Pa. 1959); *see also Levan v. Royal Paper Prods., Inc.*, 185 A.2d 801, 803 (Pa. Super. Ct. 1962) (finding the plaintiff would have been entitled to commissions after the termination of the contract "if the mere bringing together of [the] defendant and respective customers was [] the test of performance"); *Feldman*, 2008 WL 4281966 ("An employee may continue to receive a commission as long as the employer continues to receive a benefit from the business procured by the employee."). In *Linn*, the plaintiffs and defendant entered an oral contract in which the plaintiffs agreed to aid in securing the business of an insurance company, and in exchange, the defendant agreed to pay the plaintiffs five percent on all reinsurance premiums received from the business that the plaintiffs helped secure. 153 A.2d at 484. After entering the contract, the plaintiffs helped secure the business and were paid commissions for 27 years on the business that they had helped secure. *Id.* Eventually, the plaintiff and defendant terminated their contract. *Id.* at 485. The Pennsylvania Supreme Court ruled that even though the contract had been terminated, the defendant still had to pay the plaintiffs' commissions for the business they had secured. *Id.* at 485-86. The court reasoned that plaintiffs had done all that they had promised to do under a contract by helping secure reinsurance business for the defendant. *Id.* The defendant was also

required do what it had promised to do—pay a five percent commission—so long as the defendant was still benefitting from the agreement.  *Id.* at 486.  The *Linn* case is on point.

Plaintiff promised to introduce Defendant to prospective Strategic Alliance Partners, and Defendant promised to compensate Plaintiff for such introductions if they led to sales of Defendant's product.  Once Plaintiff introduced Defendant to FirstStreet and EM, he had performed under the contract.  Therefore, if those introductions led to sales of Defendant's product, Defendant was obligated to perform under the contract by paying the promised compensation as long as it continues to benefit from Plaintiff's introduction.  The subsequent termination of the contract has no effect on Defendant's obligations to Plaintiff for introductions that he provided to FirstStreet and EM.  Defendant "received full performance from [P]laintiff[] and cannot now be permitted to accept the benefits of its agreement while at the same time repudiate the obligations it assumed." *Linn*, 153 A.2d at 486.  FirstStreet continued to be a Strategic Alliance Partner and sell Defendant's product until the business relationship terminated on April 30, 2012.  Defendant stopped compensating Plaintiff under the contract on January 15, 2010.[13]  Consequently, Defendant breached the contract by not performing as it had promised.

Defendant argues that we should follow the case of *J.V. Distributing, Inc. v. Waber, Inc.*, No. 94-3053, 1995 WL 505951 (E.D. Pa. Aug. 22, 1995).  In *Waber*, after a bench trail, the court determined that an oral contract for payment of commissions had been made on all essential terms, except the length of time the commission was to be paid.  *Id.* at *9.  The court determined that it should imply a term of a reasonable length because while one party intended for the commission payment to last indefinitely, there was evidence that the other party did not.  *Id.* at

---

[13] We do not consider whether the commissions paid to Plaintiff were accurate in accordance with the contract since we have no information on how Defendant calculated the payments.

*7, 9-10. *Waber* does not discuss the established Pennsylvania law cited above but relies on a Pennsylvania Superior Court case, *Greene*, 526 A.2d at 1194, that did not involve the payment of commissions. *Id.* We decline to adopt the *Waber* rationale here.

### B.      Alleged Breach of the Modified Contract

Plaintiff and Defendant agree that the contract between them was modified after Plaintiff introduced Defendant to FirstStreet and EM.  The message of the March 23 e-mail reflects that Gross had offered to compensate Plaintiff $10 per PERS sold by a Strategic Alliance Partner that Plaintiff introduced to Defendant.  When Plaintiff replied to the e-mail, he accepted Defendant's offer.  Thus, any introductions provided by Plaintiff after the modification of the contract terms was governed by the new terms.

Plaintiff alleges that Defendant breached the modified contract by not compensating Plaintiff for the introductions that he provided to Internet Alliance and to Dr. Leonard's. Defendant argues that no such breach occurred because Internet Alliance did not sell any of Defendant's product and because Plaintiff did not introduce Defendant to Dr. Leonard's.  We agree with Defendant.

There is no dispute that Plaintiff introduced Defendant and Internet Alliance.  Thus, under the modified contract, Plaintiff would be entitled to compensation for any PERSs that Internet Alliance sold.  However, Defendant has offered evidence that Internet Alliance never actually sold any of Defendant's product, and Plaintiff has not offered any facts to the contrary. (Gross Dep. II 15; Gross Dep. I 27-28.)  Consequently, there is no disputed issue of material fact and we must accept Defendant's assertion that Internet Alliance never sold its product and that Plaintiff is not entitled to compensation for the introduction.  Because Plaintiff had no right to

compensation under the terms of the modified contract, Defendant could not have breached such contract by not paying Plaintiff.

Defendant also could not have breached the modified agreement with Plaintiff by refusing to compensate Plaintiff for PERS sales made by Dr. Leonard's because Plaintiff did not introduce Defendant to Dr. Leonard's. Defendant contends that it was not introduced to Dr. Leonard's by Plaintiff. To support this contention, Defendant pointed to facts that show that Leighton started personally reaching out to Lenox of Dr. Leonard's in May 2009 via phone and e-mail. The record indicates that once Leighton was actually able to reach Lenox, Leighton began negotiating a deal with Dr. Leonard's that was ultimately consummated in September 2009. In addition, Defendant submits deposition testimony of Plaintiff in which he was asked "Who at Dr. Leonard's did you introduce to whom at Connect America?" and Plaintiff responded "No one." (Flowers Dep. I 191.)

In an attempt to create a material factual dispute that would preclude summary judgment in Defendant's favor, Plaintiff points to evidence to show that Plaintiff introduced Defendant to Dr. Leonard's. Specifically, Plaintiff points to its own factual assertions that establish that prior to May 2009, Plaintiff had reached out to a different employee of Dr. Leonard's several times by phone and e-mail about Dr. Leonard's selling Defendant's product, and he had told Gross he was making such efforts. Two of Plaintiff's e-mails were forwarded on to Mango, another employee of Dr. Leonard's, but none of Plaintiffs e-mails or phone calls were returned. Plaintiff also points out that the information that he sent to Hampton of Dr. Leonard's was similar to the information Leighton later sent to Lenox of Dr. Leonard's. We view these facts and the inferences to be drawn therefrom in the light most favorable to Plaintiff. Nevertheless, we find there is no disputed issue of material fact.

For Plaintiff to be entitled to compensation, he must have introduced Dr. Leonard's and Defendant.  While the oral contract did not define what constitutes an "introduction," we agree with Plaintiff that Pennsylvania law on finder's fee agreements is illustrative.  (Pl.'s Br. 26.) "[A] finder[] is an independent actor whose role is that of a middleman who introduces the parties, supplies information to one or both about the other and is required to do little else . . . ." *Kinnel v. Mid-Atl. Mausoleums, Inc.*, 850 F.2d 958, 962 (3d Cir. 1988) (citing *Amerofina, Inc. v. U.S. Indus., Inc.*, 335 A.2d 448, 451 (Pa. Super. Ct. 1975)).  The extent of the services required for a finder to be entitled to a fee is that:  (1) the finder introduces his employer to a third party with whom the employer consummates a business relationship; and (2) the transaction directly results from the introduction.  *See Amerofina*, 335 A.2d at 452.  There must be "a causal connection between the activities of the finder and the resultant" business relationship.  *Id.* at 453.

Here, no causal connection can be inferred.  Plaintiff has established that he was the first person on behalf of Defendant to reach out to Dr. Leonard's regarding a possible business relationship.  The record indicates that Plaintiff's message reached two individuals at Dr. Leonard's.  However, no fact has been supplied that would allow a reasonable fact finder to infer that Plaintiff's limited communication with one of Dr. Leonard's employees had any causal connection to the ultimate deal between Dr. Leonard's and Defendant.  Even though Plaintiff sent much of the same information to Dr. Leonard's that Leighton later sent, Plaintiff and Leighton communicated with different individuals.  There is nothing to indicate that Hampton or Mango, who Plaintiff had communicated with, had any interaction with Lenox or the other Dr. Leonard's employees, who ultimately negotiated and entered the deal between Defendant and Dr. Leonard's.  Contrary to Plaintiff's assertion, the facts do not support an inference that Dr.

Leonard's entered an agreement with Defendant only because of Plaintiff's prior communications with one employee of Dr. Leonard's. Such speculation by Plaintiff is insufficient to survive summary judgment, especially when Plaintiff admitted in his deposition that he did not actually introduce anyone at Dr. Leonard's to Defendant. Without any facts that can support even an inference of a causal connection between Plaintiff's communications with Dr. Leonard's and the ultimate contract between Defendant and Dr. Leonard's, no reasonable fact finder could find that Plaintiff introduced the two parties. Accordingly, Plaintiff is not entitled to compensation for an introduction, and Defendant is entitled to summary judgment on the breach of contract claim as it relates to Dr. Leonard's.

## IV.    REMAINING COUNTS

We have found that a valid oral contract, which is supported by consideration, existed between the parties. Therefore, Plaintiff's alternative claim for promissory estoppel fails because the doctrine applies to cases where consideration is lacking. *Cardamone v. Univ. of Pittsburgh*, 384 A.2d 1228, 1233 (Pa. Super. Ct. 1978). Plaintiff's alternative claims for unjust enrichment also fail because the doctrines apply to situations where no express contract exists. *Mitchell v. Moore*, 729 A.2d 1200, 1202 (Pa. Super. Ct. 1999) ("[W]e may not make a finding of unjust enrichment . . . where a written or express contract between parties exists."). The same reasoning applies to Plaintiff's claim for quantum meruit. *Id.* at 1202 n.2 ("[A] claim of *quantum meruit* raises the issue of whether a party has been unjustly enriched, and in order to prove such a claim a party must successfully prove the elements of unjust enrichment . . . ."). Therefore, summary judgment will be granted in favor of Defendant as to Plaintiff's claims for promissory estoppel, unjust enrichment, and quantum meruit.

With regard to Plaintiff's alternative claim for declaratory judgment, Defendant has not met its burden of establishing that there is no disputed issue of material fact entitling it to

judgment as a matter of law.  Accordingly, summary judgment will not be granted on that claim at this juncture.

## V.      CONCLUSION

For the foregoing reasons, Plaintiff's Motion will be granted in part and denied in part, and Defendant's Motion will be granted in part and denied in part.  An appropriate Order follows.

BY THE COURT:

_____

**R. BARCLAY SURRICK, J.**